JOSEPH T. MCNALLY
Acting United States Attorney
LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division
PATRICK CASTAÑEDA (Cal. Bar No. 319431)
JASON C. PANG (Cal. Bar No. 296043)
SURIA M. BAHADUE (Cal. Bar No. 344369)
Assistant United States Attorneys
    1400/1300/1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0637/2652/5487
    Facsimile: (213) 894-0141
    E-mail:    Patrick.Castaneda@usdoj.gov
               Jason.Pang@usdoj.gov
               Suria.Bahadue@usdoj.gov


Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>                v.<br><br>MIRELA TODOROVA,<br><br>                Defendant. | No. 2:21-CR-00244-AB<br><br>TRIAL MEMORANDUM<br><br>Trial Date:   February 18, 2025<br>Trial Time:   8:30 a.m.<br>Location:     Courtroom of the<br>              Hon. André Birotte<br>              Jr. |

        Plaintiff United States of America, by and through its counsel

of record, the Acting United States Attorney for the Central District

of California and Assistant United States Attorneys Patrick

Castañeda, Jason C. Pang, and Suria M. Bahadue, hereby files its

Trial Memorandum.

//

1    This Trial Memorandum is based upon the attached memorandum of

2  points and authorities, the files and records in this case, and such

3  further evidence and argument as the Court may permit.

4  Dated: January 31, 2025          Respectfully submitted,

5                                   JOSEPH T. MCNALLY
                                    Acting United States Attorney
6
                                    LINDSEY GREER DOTSON
7                                   Assistant United States Attorney
                                    Chief, Criminal Division
8

9                                   _____/s/_____
                                    PATRICK CASTAÑEDA
10                                  JASON C. PANG
                                    SURIA M. BAHADUE
11                                  Assistant United States Attorneys

12                                  Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Table of Contents

TRIAL MEMORANDUM................................................................1

I.   STATUS OF THE CASE........................................................1

     A.   Procedural Background................................................1

     B.   Pending Stipulations.................................................2

II.  ELEMENTS OF THE OFFENSE...................................................2

     A.   Conspiracy...........................................................2

     B.   Distribution of Fentanyl.............................................3

     C.   Possession with Intent to Distribute Controlled
          Substances...........................................................4

     D.   Making False Statements to a Government Agency...........5

III. THE GOVERNMENT'S CASE.....................................................5

     A.   Statement of Facts...................................................5

          1.   Defendant Led a Tech-Savvy Drug-Delivery Business....5

          2.   Defendant Bought "Oxy Blues" and Put Them On Her
               Menu............................................................7

          3.   Defendant's Fentanyl-Laced "Oxy Blues" Caused
               Three Near Fatal Overdoses.........................9

          4.   Defendant Continued Operations and Was Caught
               with Multiple Drugs in Her Apartment...............11

          5.   Defendant Made False Statements to the Government...12

          6.   Defendant, via her former cellmate, Sent the
               Government Her Confessions.........................13

     B.   Witnesses in the Government's Case-in-Chief.............13

IV.  LEGAL AND EVIDENTIARY ISSUES.............................................14

     A.   Pending Motions.....................................................14

     B.   Relevant Conspiracy Law............................................15

     C.   Co-Conspirator's Statements........................................17

     D.   Other Relevant Hearsay Exceptions....................21

          1.   Past Recollection Recorded.........................21

iii

    2.   Present Sense Impression............................21

    3.   Defendant's Hearsay Statements......................21

E.  Case Agents..........................................22

F.  Digital Device Evidence..............................22

    1.   Authentication and Identification...................23

    2.   Transcripts for English language recordings........25

G.  Business Records.....................................26

H.  Summary Charts and Lay Testimony Regarding Digital Evidence............................................26

I.  Expert Testimony and Related Evidence....................27

J.  Truth Testimony Provision of Plea/Immunity Agreements....27

K.  Defendant's Statements...............................28

L.  Cross-Examination of Defendant...........................28

M.  Use of Exhibits During Opening Statement................29

N.  Affirmative Defenses, Reciprocal Discovery, and Jury Nullification......................................29

O.  Character and Impeachment Evidence......................30

V.  CONCLUSION.................................................31

# Table of Authorities

CASES                                                                    PAGE(S)

Blumenthal v. United States,
   332 U.S. 539 (1947) ................................................ 16
Bourjaily v. United States,
   483 U.S. 171 (1987) ................................................ 17
Burrage v. United States,
   571 U.S. 204 (2014) ............................................. 2, 3
Crawford v. Washington,
   541 U.S. 36 (2004) ................................................ 17
Garlington v. O'Leary,
   879 F.2d 277 (7th Cir. 1989) ...................................... 20
Michelson v. United States,
   335 U.S. 469 (1948) ........................................... 30, 31
Smith v. United States,
   133 S. Ct. 714 (2013) ......................................... 16, 17
Taylor v. Illinois,
   484 U.S. 400 (1988) ............................................... 30
United States v. Abushi,
   682 F.2d 1289 (9th Cir. 1982) ..................................... 16
United States v. Ammar,
   714 F.2d 238 (3d Cir. 1983) ....................................... 19
United States v. Anekwu,
   695 F.3d 967 (9th Cir. 2012) ...................................... 27
United States v. Arambula-Ruiz,
   987 F.2d 599 (9th Cir. 1993) ...................................... 19
United States v. Arias-Villanueva,
   998 F.2d 1491 (9th Cir. 1993) ..................................... 19
United States v. Barnes,
   604 F.2d 121 (2d Cir. 1979) ....................................... 21
United States v. Black,
   767 F.2d 1334 (9th Cir. 1985) ..................................... 23
United States v. Boulware,
   470 F.3d 931 (9th Cir. 2006) ...................................... 27
United States v. Chen,
   754 F.2d 817 (9th Cir. 1985) ...................................... 26
United States v. Chu Kong Yin,
   935 F.2d 990 ...................................................... 23
United States v. Cloud,
   872 F.2d 846 (9th Cir. 1989) ...................................... 15
United States v. Cooper,
   990 F.3d 576 (8th Cir. 2021) ....................................... 3
United States v. Crespo de Llano,
   838 F.2d 1006 (9th Cir. 1987) ..................................... 18

**Table of Authorities (continued)**

CASES                                                                    PAGE(S)

United States v. Echeverry,
  759 F.2d 1451 (9th Cir. 1985) ............................... 19, 20
United States v. Fernandez,
  839 F.2d 639 (9th Cir. 1988) ............................... 21, 28
United States v. Fleischman,
  684 F.2d 1329 (9th Cir. 1982) ................................... 27
United States v. Francis,
  916 F.2d 464 (8th Cir. 1990) ................................... 17
United States v. Freeman,
  498 F.3d 893 (9th Cir. 2007) ................................... 25
United States v. Gagliardi,
  506 F.3d 140 (2d Cir. 2007) .................................... 24
United States v. Garza,
  980 F.2d 546 (9th Cir. 1992) ................................... 15
United States v. Gil,
  58 F.3d 1414 (9th Cir. 1995) ................................... 18
United States v. Hill,
  42 F.3d 914 (5th Cir. 1995) .................................... 16
United States v. Houston,
  406 F.3d 1121 (9th Cir. 2005) ................................. 2, 3
United States v. Hubbard,
  96 F.3d 1223 (9th Cir. 1996) ................................... 16
United States v. Hultgren,
  713 F.2d 79 (5th Cir. 1983) .................................... 15
United States v. Jimenez Recio,
  537 U.S. 270 (2003) ............................................ 17
United States v. Krasovich,
  819 F.2d 253 (9th Cir. 1987) ................................... 16
United States v. Layton,
  720 F.2d 548 (9th Cir. 1983) ................................... 20
United States v. Lechuga,
  888 F.2d 1472 (5th Cir. 1989) .................................. 20
United States v. Loya,
  807 F.2d 1483 (9th Cir. 1987) .................................. 18
United States v. McCollom,
  664 F.2d 56 (5th Cir. 1981) .................................... 31
United States v. Miller,
  664 F.2d 94 (5th Cir. 1981) .................................... 20
United States v. Miranda-Uriarte,
  649 F.2d 1345 (9th Cir. 1981) .................................. 28
United States v. Monroe,
  943 F.2d 1007 (9th Cir. 1991) ............................... 27, 28
United States v. Morel-Pineda,
  829 F. App'x 187 (9th Cir. 2020) .............................. 23

**Table of Authorities (continued)**

CASES                                                                PAGE(S)

United States v. Nixon,
  418 U.S. 683 (1974) ........................................... 19
United States v. Ortega,
  203 F.3d 675 (9th Cir. 2000) ................................. 22
United States v. Powell,
  955 F.2d 1206 (9th Cir. 1992) ................................ 30
United States v. Santiago,
  837 F.2d 1545 (11th Cir. 1988) ............................... 20
United States v. Schmit,
  881 F.2d 608 (9th Cir. 1989) ................................. 19
United States v. Siddiqui,
  235 F.3d 1318 (11th Cir. 2000) ............................... 24
United States v. Smith,
  918 F.2d 1501 (11th Cir. 1990) ............................... 24
United States v. Spawr Optical Research, Inc.,
  685 F.2d 1076 (9th Cir. 1982) ................................ 18
United States v. Thomas,
  586 F.2d 123 (9th Cir. 1978) ................................. 16
United States v. Tille,
  729 F.2d 615 (9th Cir. 1984) ............................. 19, 20
United States v. Waters,
  627 F.3d 345 (9th Cir. 2010) ................................. 21
United States v. Williams,
  989 F.2d 1061 (9th Cir. 1993) ................................ 19
United States v. Wood,
  943 F.2d 1048 (9th Cir. 1991) ................................ 26
United States v. Yarbrough,
  852 F.2d 1522 (9th Cir. 1988) ........................... 19, 20
United States v. Zavala-Serra,
  853 F.2d 1512 (9th Cir. 1988) ........................... 18, 19
Zal v. Steppe,
  968 F.2d 924 (9th Cir. 1992) ................................. 30

Statutes

18 U.S.C. § 1001 ..................................... 5, 6, 8, 12
18 U.S.C. § 1001(a)(2) ......................................... 1
21 U.S.C. § 802(25)(A-C) ....................................... 3
21 U.S.C. §§ 841(a)(1) .................................... 1, 3, 4
21 U.S.C. §§ 846(a)(1) ...................................... 1, 2

Rules

Fed. R. Crim. P. 16(b)(1)(A) ................................. 29
Fed. R. Crim. P. 16(d)(2)(C) ................................. 30

**Table of Authorities (continued)**

CASES                                                                    PAGE(S)

Fed. R. Evid. 104(a)..................................................18
Fed. R. Evid. 405(a)..................................................31
Fed. R. Evid. 611(a)..................................................27
Fed. R. Evid. 701.....................................................25
Fed. R. Evid. 702.....................................................27
Fed. R. Evid. 801(c)...............................................21, 28
Fed. R. Evid. 801(d)(2)(A).........................................21, 28
Fed. R. Evid. 801(d)(2)(E)............................................17
Fed. R. Evid. 803(5)..................................................21
Fed. R. Evid. 803(6)(D)...............................................26
Fed. R. Evid. 901(b)..................................................24
Fed. R. Evid. 902(11).................................................26
Fed. R. Evid. 1002....................................................24

1

## TRIAL MEMORANDUM

2

## I.   STATUS OF THE CASE

3

### A.   Procedural Background

4      Defendant Mirela Todorova ("defendant") is charged in a nine-
5 count second superseding indictment with conspiracy to distribute and
6 possess with intent to distribute controlled substances resulting in
7 serious bodily injury, in violation of 21 U.S.C. §§ 846(a)(1),
8 (b)(1)(B)(ii) and (b)(1)(C) (Count One); distribution of fentanyl, in
9 violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Count Two);
10 distribution of fentanyl resulting in serious bodily injury, in
11 violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Count Three);
12 distribution of fentanyl resulting in serious bodily injury, in
13 violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Count Four);
14 distribution of fentanyl resulting in serious bodily injury, in
15 violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Count Five);
16 possession with intent to distribute methamphetamine, in violation of
17 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (Count Six); possession with
18 intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1),
19 (b)(1)(B)(ii) (Count Seven); possession with intent to distribute
20 MDMA, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Count 8);
21 and making false statements, in violation of 18 U.S.C. § 1001(a)(2)
22 (Count Nine).

23      Defendant has pleaded not guilty to all charges and will proceed
24 to trial on February 18, 2025 at 8:30 a.m.  The final status
25 conference is scheduled for February 7, 2025 at 1:30 p.m.
26 Defendant's three co-defendants in this case have pleaded guilty.

27

28

1        **B.    Pending Stipulations**

2        To streamline its case and avoid testimony on noncontroversial

3    topics, the government has proposed potential stipulations to defense

4    counsel regarding foundational issues concerning extractions of

5    digital devices, controlled substance testing of narcotics found in

6    victim R.M.'s home and defendant's apartment, toxicology results of

7    victim H.A., and surveillance footage obtained during the course of

8    this investigation.  The government estimates that these stipulations

9    would cut off its case-in-chief by approximately 10 witnesses.

10   Defense counsel informed the government that defendant will not agree

11   to any stipulations.

12   **II.  ELEMENTS OF THE OFFENSE**

13       **A.    Conspiracy**

14       The elements of conspiracy to distribute and possess with intent

15   to distribute controlled substances are: (1) there was an agreement

16   between two or more person to distribute and/or possess with intent

17   to distribute controlled substances; and (2) the defendant joined in

18   the agreement knowing of its purpose and intending to help accomplish

19   that purpose.  21 U.S.C. § 846(a)(1), (b)(1)(B)(ii), (b)(1)(C); Ninth

20   Circuit Model Criminal Jury Inst. No. 12.4 and 12.5 (2022 ed.).

21       To be subject to the twenty-year mandatory minimum sentencing

22   enhancement charged in Count One, the government must also prove that

23   serious bodily injury resulted from the use of such controlled

24   substances.  See Burrage v. United States, 571 U.S. 204, 214, 218-19

25   (2014); United States v. Houston, 406 F.3d 1121, 1124-5 (9th Cir.

26   2005).  "Serious bodily injury" is defined in Title 21 as bodily

27   injury which involves a substantial risk of death; (B) protracted and

28   obvious disfigurement; or (C) protracted loss or impairment of the

2

function of a bodily member, organ, or mental faculty.  21 U.S.C.
§ 802(25)(A-C).  Serious bodily injury includes overdoses.  United
States v. Cooper, 990 F.3d 576, 582 (8th Cir. 2021) (collecting
cases).

To be subject to the five-year mandatory minimum sentencing
enhancement charged in Count One, the government must also prove that
the conspiracy involved at least 500 grams of a mixture and substance
containing a detectable amount of cocaine, a Schedule II narcotic
drug controlled substance, in violation of Title 21, United States
Code, Sections 841(a)(1), (b)(1)(B)(ii).

### B.    Distribution of Fentanyl

The elements of distribution of fentanyl as charged in Counts
Two through Five are:  (1) the defendant knowingly distributed a
controlled substance; and (2) the defendant knew it was fentanyl or
some other federally controlled substance.  See 21 U.S.C.
§§ 841(a)(1), (b)(1)(C); Ninth Circuit Model Criminal Jury Inst. No.
12.4 (2022 ed.).  To be subject to the twenty-year mandatory minimum
in Counts Three through Five, the government must also prove that
serious bodily injury resulted from the use of such controlled
substance.  See Burrage v. United States, 571 U.S. 204, 214, 218-19
(2014); United States v. Houston, 406 F.3d 1121, 1124-5 (9th Cir.
2005).  "Serious bodily injury" is defined in Title 21 as bodily
injury which involves a substantial risk of death; (B) protracted and
obvious disfigurement; or (C) protracted loss or impairment of the
function of a bodily member, organ, or mental faculty.  21 U.S.C.
§ 802(25)(A-C).  Serious bodily injury includes overdoses.  United
States v. Cooper, 990 F.3d 576, 582 (8th Cir. 2021) (collecting
cases).  "Distributing" means delivering or transferring possession

1    of a controlled substance to another person, with or without any

2    financial interest in that transaction. Ninth Circuit Model Criminal

3    Jury Inst. No. 12.4 (2022 ed.)

4        **C.    Possession with Intent to Distribute Controlled Substances**

5        The elements of possession with intent to distribute controlled

6    substances as charged in Counts Six through Eight are: (1) defendant

7    knowingly possessed controlled substances; and (2) defendant

8    possessed such controlled substances with the intent to distribute it

9    to another person.  See 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii)

10   (b)(1)(C); Ninth Circuit Model Criminal Jury Inst. No. 12.1 (2022

11   ed.).

12       A person has possession of something if the person knows of its

13   presence and has physical control of it, or knows of its presence and

14   has the power and intention to control it.  More than one person can

15   be in possession of something if each knows of its presence and has

16   the power and intention to control it.  See Ninth Cir. Model Crim.

17   Jury Inst. No. 6.15 (2022 ed.).

18       To be subject to the ten-year mandatory minimum sentencing

19   enhancement charged in Count Six, the government must also prove that

20   defendant knowingly and intentionally possessed with intent to

21   distribute at least 500 grams of a mixture and substance containing a

22   detectable amount of methamphetamine, a Schedule II narcotic drug

23   controlled substance, in violation of Title 21, United States Code,

24   Sections 841(a)(1), (b)(1)(A)(vii).

25       To be subject to the five-year mandatory minimum sentencing

26   enhancement charged in Count Seven, the government must also prove

27   that defendant knowingly and intentionally possessed with intent to

28   distribute at least 500 grams of a mixture and substance containing a

4

detectable amount of cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B)(ii).

### D.   Making False Statements to a Government Agency

The elements of making false statements are (1) the defendant made a false statement; (2) the statement was made in a matter within the jurisdiction of the DEA; (3) the defendant acted willfully; that is, the defendant acted deliberately and with knowledge both that the statement was untrue and that her conduct was unlawful; and (4) the statement was material to the activities or decisions of the DEA; that is, it had a natural tendency to influence, or was capable of influencing, the agency's decisions or activities.  The jury must unanimously agree as to which statement or statements were false and material.  See Ninth Circuit Model Jury Instructions, No. 24.10 (2022 ed.) [False Statement to Government Agency (18 U.S.C. § 1001)].

## III. THE GOVERNMENT'S CASE

### A.   Statement of Facts

The government will prove beyond a reasonable doubt that, beginning on a date unknown, continuing through on or about March 24, 2021, defendant engaged in a drug trafficking conspiracy that resulted in multiple overdoses and the seizure of various controlled substances from her Hollywood stash-house apartment.  In December 2021, defendant then met with the DEA pursuant to a proffer agreement and made several false statements regarding her drug trafficking knowledge and activities.  At trial, the government intends to prove the following:

1.   Defendant Led a Tech-Savvy Drug-Delivery Business

Beginning no later than June 2020 and continuing through to

March 2021, defendant operated a drug-trafficking conspiracy using a network of drivers to deliver a broad menu of drugs to customers. (See SSI at 3 (outlining manner and means).  To carry out this scheme, defendant personally, or with the help of one of her main driver, co-defendant Mucktarr Kather Sei, obtained drugs and made, mixed, and packaged the drugs for distribution.  (SSI at 3; id., O.A. 3, 12, 16, 54, 76, 82, 88.)  Defendant and her drivers then delivered the delivered drugs to customers with all drug profits flowing to defendant, who paid her employees by the hour or per delivery shift. (E.g., O.A. 3-7, 10, 18.)  In the fall of 2020, the business expanded, and defendant hired more drivers, including co-defendants Christopher Y. Moreno Nunez and Ashley Johnson, to assist co-defendant Sei with advertising defendant's drug menu, fulfilling customer orders, and collecting payment.  (E.g., O.A. 21, 23, 24, 27, 30-31, 33, 36, 46, 55, 60-61, 63, 69, 72, 79-80, 83-84, 86, 89-90, 92.)  Co-defendants Sei, Moreno Nunez, and Johnson have pleaded guilty in this case.

To communicate with customers and coordinate deliveries, defendant used her personal cellphone number ending in 9519 and gave her co-defendants "work phone[s]," including one with a cellphone number ending in 7924, that they used when working for her.  (SSI at 3; O.A. 11, 30, 36, 42, 69, 71, 81, 92, 108.)  Defendant's customers contacted her personal 9519 number, but she linked that number and the work phones, including the 7924 number, to the same "fake iCloud" account (the "iCloud Account"), which allowed customers to have one point of contact (9519) to place drug orders while her co-defendants could see the orders on the work phones and coordinate deliveries amongst themselves behind the scenes.  (See, e.g., SSI at 3; O.A. 9,

26, 48, 71.)  All defendants would communicate with each other in parallel on their respective personal cellphone numbers as needed. (E.g., O.A. 9, 26, 30, 36, 39.)

Soon after hiring co-defendant Sei, defendant started traveling out of town, giving co-defendant Sei the keys to her Hollywood stash-house-apartment where the drugs were kept, and leaving him to run operations while continuing to direct him as needed from abroad. (O.A. 4-5, 15, 29, 40, 47, 62, 105.)  In her words to co-defendant Sei, "I don't trust anyone else in my apartment . . . ."  (O.A. 103.) In co-defendant Sei's own words, when defendant traveled out of town, he would "hold down the fort."  Multiple times throughout the conspiracy, defendant traveled to Mexico where she kept "Princess," her pet jaguar, while she continued to communicate with customers and co-defendants.  (O.A. 8-9; 37-61.)  While abroad, defendant continued to oversee and manage the conspiracy, including by providing co-defendant Sei with customers' orders and delivery addresses or by providing customers with co-defendant Sei's contact information for deliveries.  (O.A. 44, 49, 52.)

2.    Defendant Bought "Oxy Blues" and Put Them On Her Menu

Defendant obtained purported oxycodone pills or "oxy blues" and put them on her drug menu.  Specifically, on September 14, 2020, defendant bought approximately 100 oxy blues from an unknown male source in a parking lot.  After advertising these pills on her menu, defendant assured a customer on September 24, 2020, that the pills were "real and safe."  (O.A. 19.)

Defendant's assurances were as fake as the parking lot pills she was selling.  In fact, she knew that selling the pills she marketed as oxycodone was dangerous.  For example, on October 2, 2020, Javier

Lopez -- defendant's ex-boyfriend -- warned her: "**No oxy** no glass No H . . . Don't be stupid[.] **You will kill someone.**" (emphasis added) And just a few days later, a customer told defendant, "Yo mimi the oxys are dirty," and asked whether they were pressed or contained fentanyl, and defendant replied that the (parking lot) pills were real prescription pills without fentanyl. (O.A. 22.) A few days after that, co-defendant Sei texted defendant, "Check Zac Melrose. Saying the blues are fake," and defendant replied, "I did thanks." (O.A. 25.)

Despite customer concerns, defendant kept oxy blues on her menu and bought even more. On October 18, 2020, she texted a source of supply, stating "I need M30s tomorrow," referring to oxycodone pills. Meanwhile, another criminal associate texted defendant, "Mimi call me I just got a bad ass plug for fentinal [sic]," and after calling her multiple times, defendant replied, "Ok coming down." The next day, defendant asked a source of supply via text message, "Did you pick up the blues?" Answering affirmatively, text messages show they later met and CashApp records show defendant ultimately paid the source and saved the source's number ending in 3616, as "Eric **Blues** Alex Friend." (emphasis added).

Defendant continued to instruct co-defendant Sei to deliver oxy "blues" to customers going forward. (O.A. 34-35.) On November 9, 2020, in text messages, co-defendant Sei asked defendant if she had "more blues," noting there were "Only 2left." (O.A. 35.) Defendant responded, "Tomorrow[.] I'll see you tomorrow afternoon," and co-defendant Sei replied, "Sounds good." (Id.) Consistent with defendant's texts, tolls from November 10, 2020 reveal she communicated several times with the 3616 number, and oxy blues

1    remained on the drug menu.  Indeed, while in Mexico, on November 25,

2    2020, defendant texted co-defendant Sei and instructed him to pay

3    "Eric" (the 3616 number) $5,000 for 1,000 more "blues," which co-

4    defendant Sei confirmed through texts.  (O.A. 57-59.)

### 3.    Defendant's Fentanyl-Laced "Oxy Blues" Caused Three Near Fatal Overdoses

7         According to Customs and Border Patrol ("CBP") records,

8    defendant traveled to Mexico between November 11 and 27, 2020.

9    Before she left, she gave co-defendant Sei keys to her Hollywood

10   stash-house-apartment, including the drugs and work phones connected

11   to the iCloud Account, to keep operations going.  On November 15,

12   2020, victim R.M. texted defendant's personal 9519 number, asking for

13   one gram of cocaine and two oxy blues, which co-defendant Sei

14   delivered later that night after seeing the order on the work phone

15   and coordinating with R.M. through the same.  (O.A. 38; Count Two.)

16        While still in Mexico, defendant texted co-defendant Sei in the

17   early morning hours of November 26, 2020 (Thanksgiving Day),

18   "Coordinate with Chris [Moreno Nunez] and start as early as

19   possible."  Later that day, victim B.L.H. contacted defendant's 9519

20   number seeking drugs, including "oxys," which co-defendant Moreno

21   Nunez saw through the work phone and delivered that same day at about

22   5:26 p.m.  (O.A. 60.)  Shortly after ingesting the oxys, victim B.L.H

23   suffered an overdose, requiring significant medical intervention and

24   Narcan to save her life.  (O.A. 60; Count Three.)  On November 27,

25   2020, defendant returned from Mexico, obtained her key back from co-

26   defendant Sei, and business continued as usual.  (O.A. 62.)

27        On December 11, 2020, defendant instructed co-defendant Sei via

28   text messages to his personal phone number (not connected to the

iCloud account), to coordinate with another driver for deliveries
that night, which co-defendant Sei did throughout the night into the
early morning hours of December 12, 2020. (O.A. 62-66.) Before
midnight, victim S.L. contacted defendant's 9519 number and ordered
four "oxy" pills and 1 gram of ketamine. After midnight, while the
other driver was making deliveries elsewhere co-defendant Sei, using
the work phone, delivered the drugs to victim S.L., who shortly
thereafter suffered an overdose, requiring significant medical
intervention and Narcan to save his life. (O.A. 67; Count Four.)
Hours later, victim S.L. texted defendant's 9519 number, "Hey you
gave me fentanyl last night[.] Don't sell that oxy which is
fentanyl," and the reply, which came hours later, was "Thanks for
letting me know."

    Despite victim S.L.'s overdose, defendant continued her
operations. (O.A. 68-86.) On December 21, 2020, before defendant
again left for Mexico, a customer texted her, "Hey mimi are you by
chance able to get the **little blue fentanyl pills** that look like the
perc's but you can smoke," and the response was, "Yes[.] 30 each plus
delivery fee." (emphasis added) On December 23, 2020, the day
defendant left for Mexico, she reminded co-defendant Sei, "While I'm
out of town I prefer a minimum amount of **employees**, like one or two,
not five people handling the cash. **So we can keep people
accountable.**" (O.A. 72 (emphasis added).) And further text messages
show that defendant instructed co-defendant Sei to keep the drivers
stocked up and on schedule going forward. On January 8, 2020, after
victim H.A. placed an order for drugs to defendant's personal 9519
number, co-defendant Johnson, using the work phone, delivered fifteen
"oxys" to victim H.A. (O.A. 79.) The next morning, victim H.A.

10

suffered a near fatal overdose, requiring her to be hospitalized for

almost a week.  Nevertheless, oxycodone pills stayed on the menu

through at least February 5, 2021.  (O.A. 85, 91, 93.)

        4.   Defendant Continued Operations and Was Caught with
           Multiple Drugs in Her Apartment

On or about February 11, 2021, after one of defendant's drivers

was apprehended, co-defendant Sei asked co-defendant Johnson for the

driver's full name and date of birth so a "Lawyer can come see him as

soon as possible."  (O.A 95.)  On February 13, 2021, in text

messages, defendant informed co-defendant Sei that she had paid the

driver $10,000 for the attorney, adding **We have erased all data on

our phones.**"  (O.A. 96. (emphasis added).)  defendant travelled back

to Mexico the next day and continued to direct her drivers and drug

business from abroad.  Co-defendant Sei continued working for

defendant but attempted to narrow his role to "tak[ing] care of

everything in the house, supplies etc.," even though he would drive

when defendant paid him extra money.  (O.A. 98-101.)

On March 4, 2021, when defendant returned from Mexico, she told

co-defendant Sei to have "a bag overstocked and ready to go," so she

could deliver to her drug customers that night.  (O.A. 102.)  Over

the next few weeks, defendant hired and trained additional drivers

while co-defendant Sei drove less and continued to assist with non-

driving duties.  (O.A. 106-112.)

Defendant's drug-delivery business came to end in late March

2021.  Specifically, on March 24, 2021, after surveilling defendant

for multiple days, federal agents executed federal search warrants on

defendant's person, home, and car.  (O.A. 113-114.)  From her

apartment, agents seized numerous drug-trafficking materials and

1  drugs, including lab-confirmed methamphetamine, cocaine, and MDMA, as
2  a well as a single purported oxy pill that actually contained
3  fentanyl.  (O.A. 113; Counts Six through Eight.)  They also seized
4  various digital devices, including a phone they would later identify
5  as the 7924 work phone.  (Id.)  From her car, which law enforcement
6  pulled over and detained defendant from, agents seized her 9519
7  personal phone on which they saw the messages with R.M. about drug
8  sales, numerous messages with many other drug customers spanning
9  multiple years, and about nineteen contacts identified as "Driver,"
10 including co-defendant Sei's 1328 personal phone number saved under
11 "Kather Driver." (O.A. 114.)

12            5.   Defendant Made False Statements to the Government
13       On May 18, 2021, while the R.M. investigation continued and
14 before investigators had identified the other charged overdoses, the
15 grand jury returned an indictment against defendant, charging her
16 with possession with intent to distribute MDMA and a 5-year mandatory
17 minimum quantity of cocaine seized from her apartment.  (Dkt. 17.)
18       On December 8, 2021, defendant and her then lawyer met with the
19 government for a proffer, which was conducted pursuant to a proffer
20 agreement that was signed by all parties on the day of the proffer.
21 Despite being represented and advised by counsel, defendant made
22 numerous false statements during this proffer, thus breaching the
23 agreement's clear requirement of "complete truthfulness and candor."
24 In sum, defendant claimed, among other things, she thought the drugs
25 seized from her apartment were vitamins, she never instructed anyone
26 how to package or make drugs, and she only met co-defendant Sei
27 twice.  (See, e.g., id. ¶¶ 17-19, 21-22, 26, 28, 35.)  Defendant's
28 multiple lies are contradicted by extensive digital evidence.

Moreover, when defendant met with the government for a second proffer
on May 18, 2022,  she apologized admitted to not telling the truth
during her first proffer.  As detailed in the government's motion in
limine no. 3, defendant continued to lie, omit, and tell half-truths
in her second, third, and fourth proffers as well.

> 6.    Defendant, via her former cellmate, Sent the
>        Government Her Confessions

On April 7, 9, 19, and 24, 2023, defendant, via her former
cellmate, sent the government unsolicited confessions (the "Todorova
Manifesto").  Subsequently, in her fourth proffer on October 23,
2023, defendant admitted writing and sending the Todorova Manifesto
to her former cellmate, "Jenn West," also known as H.K.L., who sent
them to the government.  In that very same proffer, defendant
admitted that she did not throw away the single blue oxy pill seized
from her apartment because it was the only evidence of the people
that had died and she wanted to keep it to remember them.

**B.    Witnesses in the Government's Case-in-Chief**

The government estimates that it will call up to 25 witnesses in
its case-in-chief, as identified below.  The government expects that
it can cut approximately 10 witnesses, if defendant would enter trial
stipulations.  While the length of defendant's cross-examinations are
difficult to predict, the government expects that its case-in-chief
can be completed in six to eight days.  Should defendant offer
witnesses or present evidence in her defense, the government may
choose to call additional witnesses in rebuttal.  In particular, to
streamline its case and reduce the amount of witnesses and issues,
the government plans to present only the distribution to R.M. as part

1  of Counts 1 and 2 but not evidence regarding R.M.'s fatal overdose

2  unless defendant opens the door.

3      1.  Victim H.A.

4      2.  C.C.

5      3.  I.D.

6      4.  Special Agent David Dansart

7      5.  L.H.

8      6.  Victim B.L.H.

9      7.  Special Agent Caleb Hodgson

10     8.  A.J.

11     9.  Paramedic Bryan Kasravi

12     10.  Victim S.L.

13     11.  Dr. Spencer Levine

14     12.  Linda Lowery

15     13.  Coroner Investigator Kristina McGuire

16     14.  C.M.N.

17     15.  Paramedic Roger Polk

18     16.  M.K.S.

19     17.  Paramedic Peter Scott

20     18.  Joseph Soeka

21     19.  Special Agent Robert Thomas

22     20.  Quest Diagnostics Lab Technician

23     21.  DEA Chemists Fracia Martinez, Susan Zeigler, Vien Zhivago,

24         Annecia Martin, and Anjail Ameen

25 **IV.  LEGAL AND EVIDENTIARY ISSUES**

26     **A.  Pending Motions**

27     There are nine pending government motions _in limine_:  (1) to

28 limit evidence of victim's sexual history, (2) to admit 911 calls,

14

(3) to admit defendant's Proffer Statements, (4) to exclude defendant's statements, (5) to admit business records, (6) to exclude nullification and improper reference, testimony, and argument (7) to exclude buyer-seller defense, (8) to exclude entrapment defense, and (9) to exclude defendant's experts.  In addition, concurrently with the filing of this trial memorandum, the government filed a motion to strike surplusage from the second superseding indictment and to file a trial indictment.

There are four pending defense motions: (1) in limine to exclude inextricably intertwined and Rule 404(b) evidence, (2) for attorney conducted voir dire, (3) in limine to exclude references to "street" meth, and (4) for disclosure of grand jury transcripts.

The motions have been fully briefed and are scheduled to be heard at the Court's pretrial conference scheduled for February 7, 2025.

### B.    Relevant Conspiracy Law

"The agreement need not be explicit; it may be inferred from the defendant's acts pursuant to a fraudulent scheme or from other circumstantial evidence."  United States v. Cloud, 872 F.2d 846, 852 (9th Cir. 1989).  The government need not prove direct contact between co-conspirators or the existence of a formal agreement; instead, an agreement constituting a conspiracy may be inferred from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose.  See United States v. Garza, 980 F.2d 546, 552-53 (9th Cir. 1992).  Moreover, "[w]ithin reasonable limits, the precise date of the [conspiracy] offense is not required."  United States v. Hultgren, 713 F.2d 79, 89 (5th Cir. 1983).

15

It is not necessary for the government to show that the defendant knew "the exact scope of the conspiracy, the identity and role of each of the co-conspirators, or the details of the operations or any particular plan." United States v. Thomas, 586 F.2d 123, 132 (9th Cir. 1978). However, the government must prove that the defendant was aware of "the essential nature of the plan." Blumenthal v. United States, 332 U.S. 539, 557 (1947); United States v. Krasovich, 819 F.2d 253, 255-56 (9th Cir. 1987).

The key element of proof as to any specific co-conspirator is the showing that she knew, or had reason to know, of the participation of others in the illegal plan, and that she knew, or had reason to know, that the benefits to be derived from the operation were probably dependent upon the success of the entire venture. United States v. Abushi, 682 F.2d 1289, 1293 (9th Cir. 1982). Once a conspiracy is proven, evidence establishing beyond a reasonable doubt the defendant's connection to that conspiracy -- even if the connection is slight -- is sufficient to convict her of knowingly participating in the conspiracy. United States v. Hubbard, 96 F.3d 1223, 1227 (9th Cir. 1996).

Once a person becomes a member of a conspiracy, that person remains a member until that person withdraws from it. (9th Cir. Model Jury Instruction No. 8.24.) "[E]stablishing individual withdrawal [is] a burden that rest[s] firmly on the defendant regardless of when the purported withdrawal took place." Smith v. United States, 133 S. Ct. 714, 719 (2013). A conspirator can continue to be held accountable for acts of conspirators after she has been arrested unless she has withdrawn. United States v. Hill, 42 F.3d 914, 917 (5th Cir. 1995). Additionally, there is no

16

"automatic termination" rule simply because the government has defeated the conspiracy's objective.  See, e.g., United States v. Jimenez Recio, 537 U.S. 270, 275 (2003).  Finally, because the crime of conspiracy is complete upon entering into an unlawful agreement, despite the absence of an overt act, the government does not have the burden to disprove a defendant's withdrawal from the conspiracy. United States v. Francis, 916 F.2d 464, 466 (8th Cir. 1990). "Passive nonparticipation in the continuing scheme is not enough to sever the meeting of the minds that constitutes the conspiracy." Smith, 133 S. Ct. at 719

### C.   Co-Conspirator's Statements

Declarations by one co-conspirator during the course of and in furtherance of the conspiracy may be used against another conspirator because such declarations are not hearsay.  See Fed. R. Evid. 801(d)(2)(E).  Further, statements made in furtherance of a conspiracy were expressly held by the Supreme Court in Crawford v. Washington, 541 U.S. 36, 56 (2004) to be "not testimonial" such that their admission does not violate the Confrontation Clause.  As such, the admission of co-conspirator statements pursuant to Fed. R. Evid. 801(d)(2)(E) requires only a foundation that: (1) the declaration was made during the life of the conspiracy; (2) it was made in furtherance of the conspiracy; and (3) there is, including the co-conspirator's declaration itself, sufficient proof of the existence of the conspiracy and of the defendant's connection to it.  See Bourjaily v. United States, 483 U.S. 171, 173, 181 (1987).

The government must prove by a preponderance of the evidence that a statement is a co-conspirator declaration in order for the statement to be admissible under Rule 801(d)(2)(E).  Bourjaily, 483

17

1  U.S. at 176; United States v. Crespo de Llano, 838 F.2d 1006, 1017

2  (9th Cir. 1987).  Whether the government has met its burden is to be

3  determined by the trial judge, and not the jury.  United States v.

4  Zavala-Serra, 853 F.2d 1512, 1514 (9th Cir. 1988).  The Court may

5  rely on inadmissible evidence, such as a co-conspirator's plea

6  agreement, in determining whether the 801(d)(2)(E) exception applies.

7  Cf. United States v. Gil, 58 F.3d 1414, 1420 (9th Cir. 1995) (the

8  preliminary determination of whether FRE 801(d)(2)(E) applies is to

9  be made "by the court, not the jury, pursuant to Fed. R. Evid.

10  104(a)); Fed. R. Evid. 104(a) ("the court must decide any preliminary

11  question about whether . . . evidence is admissible.  In so deciding,

12  the court is not bound by evidence rules, except those on

13  privilege").

14      The trial court has discretion to determine whether the

15  government may introduce co-conspirator declarations before

16  establishing the conspiracy and the defendant's connection to it.

17  United States v. Loya, 807 F.2d 1483, 1490 (9th Cir. 1987).  It also

18  has the discretion to vary the order of proof in admitting co-

19  conspirator statements.  Id.  The court may allow the government to

20  introduce co-conspirator declarations before laying the required

21  foundation under the condition that the declarations will be stricken

22  if the government fails ultimately to establish by independent

23  evidence that the defendant was connected to the conspiracy.  Id.;

24  United States v. Spawr Optical Research, Inc., 685 F.2d 1076, 1083

25  (9th Cir. 1982).

26      To be admissible under Federal Rule of Evidence 801(d)(2)(E) as

27  a statement made by a co-conspirator in furtherance of the

28  conspiracy, a statement must "further the common objectives of the

18

conspiracy," or "set in motion transactions that [are] an integral part of the [conspiracy]." United States v. Arambula-Ruiz, 987 F.2d 599, 607-08 (9th Cir. 1993); United States v. Yarbrough, 852 F.2d 1522, 1535 (9th Cir. 1988). Such statements are admissible whether or not they actually result in any benefit to the conspiracy. United States v. Williams, 989 F.2d 1061, 1068 (9th Cir. 1993); United States v. Schmit, 881 F.2d 608, 612 (9th Cir. 1989). Thus, co-conspirator declarations need not be made to a member of the conspiracy to be admissible under Rule 810(d)(2)(E) and can be made to government informants and undercover agents. Zavala-Serra, 853 F.2d at 1516 (statements to informants and undercover agents); United States v. Tille, 729 F.2d 615, 620 (9th Cir. 1984) (statements to informants); United States v. Echeverry, 759 F.2d 1451, 1457 (9th Cir. 1985) (statements to undercover agent). Declarations of an unindicted co-conspirator made in furtherance of the conspiracy may be used against a charged conspirator. See United States v. Nixon, 418 U.S. 683, 701 (1974); Williams, 989 F.2d at 1067.

Courts have interpreted the "in furtherance of" requirement broadly and have considered, among others, the following co-conspirator declarations as being made "in furtherance of the conspiracy":

1.   statements made to induce enlistment in the conspiracy, see United States v. Arias-Villanueva, 998 F.2d 1491, 1502 (9th Cir. 1993);

2.   statements made to keep a conspirator abreast of a co-conspirator's activity, to induce continued participation in a conspiracy, or to allay the fears of a co-conspirator, see id.; see also United States v. Ammar, 714 F.2d 238, 252 (3d Cir. 1983)

("[s]tatements between conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy further the ends of the conspiracy . . . .");

3.    statements made to prompt action in furtherance of the conspiracy by either of the participants to the conversation, see United States v. Layton, 720 F.2d 548, 556 (9th Cir. 1983);

4.    statements related to the concealment of the criminal enterprise, see Tille, 729 F.2d at 620; Garlington v. O'Leary, 879 F.2d 277, 283 (7th Cir. 1989);

5.    statements seeking to control damage to an ongoing conspiracy, see Garlington, 879 F.2d at 283;

6.    statements made to reassure members of the conspiracy's continued existence, see Yarbrough, 852 F.2d at 1535;

7.    statements by a person involved in the conspiracy to induce a buyer's purchase of contraband by assuring the buyer of the person's ability to consummate the transaction, see Echeverry, 759 F.2d at 1457;

8.    statement identifying another co-conspirator as source for the contraband to be sold to purchaser, see United States v. Lechuga, 888 F.2d 1472, 1480 (5th Cir. 1989);

9.    "bragging," boasts and other conversation designed to obtain the confidence, or allay the suspicions, of another conspirator (or apparent conspirator who actually was an undercover agent), see United States v. Santiago, 837 F.2d 1545, 1549 (11th Cir. 1988); Lechuga, 888 F.2d at 1480; United States v. Miller, 664 F.2d 94, 98 (5th Cir. 1981); and

20

1    10.   statements that refer to another conspirator as the boss,

2    the overseer, or sir, see <u>United States v. Barnes</u>, 604 F.2d 121, 157

3    (2d Cir. 1979).

4    Here, the government will introduce a significant volume of

5    defendant's text messages with co-defendants and co-conspirators

6    (such as sources of supply) and co-defendants' text messages among

7    each other, all of which fall within this exception.

8    **D.   Other Relevant Hearsay Exceptions**

9        1.   <u>Past Recollection Recorded</u>

10   Under Federal Rule of Evidence 803(5), a record may be read into

11   evidence if it (1) is on a matter the witness once knew about but now

12   cannot recall well enough to testify truthfully and accurately;

13   (2) was made or adopted by the witness when the matter was fresh in

14   the witness's memory; and (3) accurately reflects the witness's

15   knowledge.  Fed. R. Evid. 803(5).

16       2.   <u>Present Sense Impression</u>

17   Under Federal Rule of Evidence 803(1), a statement "describing

18   or explaining an event or condition, made while or immediately after

19   the declarant perceived it," is admissible.

20       3.   <u>Defendant's Hearsay Statements</u>

21   Defendant's statements are admissible only if offered against

22   her; otherwise, they fall within the scope of the rule against

23   hearsay.  Fed. R. Evid. 801(d)(2)(A); <u>United States v. Fernandez</u>, 839

24   F.2d 639, 640 (9th Cir. 1988).  The hearsay rule prohibits a

25   defendant from obtaining the benefit of testifying without subjecting

26   himself to cross-examination by placing his self-serving prior

27   statements before the jury through other witnesses.  Fed. R. Evid.

28   801(c); <u>Fernandez</u>, 839 F.2d at 640; <u>United States v. Waters</u>, 627 F.3d

21

1  345, 385 (9th Cir. 2010) (holding that defendant's exculpatory

2  statement proclaiming innocence "is clearly hearsay, and was

3  therefore properly excluded under Rule 801(a)"); United States v.

4  Ortega, 203 F.3d 675, 682 (9th Cir. 2000) (holding that district

5  court did not commit error by prohibiting defendant from cross-

6  examining government witness concerning false exculpatory statements

7  made during the same interview in which defendant made inculpatory

8  statements).

9       **E.   Case Agents**

10      DEA Special Agents Caleb D. Hodgson and David Dansart are the

11  primary case investigators.  Agent Hodgson will testify as the case

12  agent, and Agent Dansart will testify primarily as the "finder"

13  during execution of the search warrants on defendant's person, car,

14  and apartment.  The government respectfully requests that SA Hodgson

15  be permitted to remain in the courtroom throughout trial and that he

16  sit at counsel table.

17      **F.   Digital Device Evidence**

18      The government expects to admit photographs, videos, and text

19  message conversations seized from defendant's digital devices and

20  iCloud.  The content seized from defendant's digital devices show

21  significant evidence of her drug trafficking business, including

22  communications with her co-conspirators, suppliers, and the victims

23  in this case.  Much of this evidence is direct evidence of the

24  charges and is inextricably intertwined with those charges.  Other

25  digital evidence, also including photographs, videos, and text

26  messages, with defendant's other criminal associates is essential to

27  refutes defendant's anticipated defense that she did not know what

28

1  she was doing or that other people were responsible for her drug

2  business.

3           1.    Authentication and Identification

4        The evidence recovered from these digital devices will be

5  identified and authenticated by (1) declarations of the persons

6  responsible for extracting data from such devices pursuant to Rule

7  902(11) and 902(14), (2) by testifying witnesses, or (3) by case

8  agent Caleb Hodgson who will testify that the data are from an

9  extraction of digital devices.

10       Federal Rule of Evidence 901(a) provides that "[t]he requirement

11 of authentication or identification as a condition precedent to

12 admissibility is satisfied by evidence sufficient to support a

13 finding that the matter in question is what its proponent claims."

14 Under Rule 901(a), evidence should be admitted, despite any

15 challenge, once the government makes a prima facie showing of

16 authenticity or identification so "that a reasonable juror could find

17 in favor or authenticity or identification . . . [because] the

18 probative force of the evidence offered is, ultimately, an issue for

19 the jury." United States v. Chu Kong Yin, 935 F.2d 990, 996 (9th

20 Cir. 1991) (citations and internal quotation marks omitted); see also

21 United States v. Black, 767 F.2d 1334, 1342 (9th Cir. 1985); see also

22 United States v. Morel-Pineda, 829 F. App'x 187, 191 (9th Cir. 2020)

23 (citing Black and rejecting defendant's contention that the district

24 court erred in admitting text messages between defendant and third

25 parties when the number in the messages was the one the third-party

26 used to communicate with defendant, and a phone with that number was

27 found upon searching defendant's apartment.)

28       Like other evidence, electronic data, including data seized from

                                    23

digital devices, can be authenticated in a variety of ways, including by an investigator with knowledge of the investigation or by someone with firsthand knowledge of the content or circumstances captured in the data.  See United States v. Smith, 918 F.2d 1501, 1510 (11th Cir. 1990) ("[t]he government may authenticate a document solely through the use of circumstantial evidence, including the document's own distinctive characteristics and the circumstances surrounding its discovery"); United States v. Siddiqui, 235 F.3d 1318, 1322-23 (11th Cir. 2000) (emails sufficiently authenticated by content and context by examining what was said in the messages as well as nicknames used within the messages).  For example, a witness can authenticate text messages that he personally exchanged with the defendant.  See Fed. R. Evid. 901(b) (a party may authenticate evidence through "[t]estimony [of a witness with knowledge] that a matter is what it is claimed to be").  Similarly, a witness can authenticate a photograph or video that depicts the witness or something with which he is familiar, regardless of his knowledge of the particular circumstances under which the photograph or video was taken.  32 McCormick On Evid. § 215 (7th ed.) ("The witness who lays the authentication foundation need not be the photographer, nor need the witness know anything of the time, conditions, or mechanisms of the taking of the picture."); see also Fed. R. Evid. 1002 advisory committee's note.  "The bar for authentication of evidence is not particularly high."  See generally United States v. Gagliardi, 506 F.3d 140, 151 (2d Cir. 2007) (citation omitted).

     Here, as stated above, the government expects to present some digital device evidence directly through witnesses who will authenticate the evidence as a text conversation they had with

1   defendant, or a photograph or video depicting the witness in

2   defendant's apartment.  To the extent there are lingering questions

3   regarding authenticity, the evidence can be conditionally admitted,

4   subject to a case investigator or Cellebrite technician (or

5   stipulation) establishing that the data was seized from defendant's

6   digital devices.

7       For digital device evidence not discussed by lay witnesses, the

8   government may seek to elicit lay testimony from SA Hodgson regarding

9   the meaning of certain extracted messages, based on his knowledge of

10  the investigation.  Lay opinion testimony is admissible if it is (1)

11  "rationally based on the perception of the witness," (2) "helpful to

12  a clear understanding of the witness's testimony or the determination

13  of a fact in issue[,]" and (3) "not based on scientific, technical,

14  or other specialized knowledge within the scope of Rule 702." Fed. R.

15  Evid. 701. See also United States v. Freeman, 498 F.3d 893, 904-05

16  (9th Cir. 2007) (upholding, as proper lay testimony, detective's

17  testimony interpreting ambiguous statements where his "understanding

18  of ambiguous phrases was based on his direct perception of several

19  hours of intercepted conversations. . . and other facts he learned

20  during the investigation" and his testimony "proved helpful to the

21  jury in determining what [defendants] were communicating during the

22  recorded telephone calls").

23       2.   Transcripts for English language recordings

24       For 911 recordings, the recording will be synced with a

25  transcript.  The recordings and corresponding transcripts have been

26  sent to defense counsel, and no changes or objections have been

27

28

proposed.  The statements captured by the recordings are all in English.[1]

### G.  Business Records

At trial, the government anticipates offering several sets of business records into evidence, including 911 calls regarding the victims' overdoses, phone records, financial records, and flight records.  Such records of "regularly conducted activity" fall within an exception to the rule against hearsay and are admissible either through "the testimony of the custodian or another qualified witness" or "by a certification that complies with Rule 902(11)."  Fed. R. Evid. 803(6)(D).  In this case, the government has chosen the latter option with respect to certain records, and has provided copies of those records in discovery to defense counsel along with certifications by appropriately qualified custodians of records, thereby affording opposing counsel "a fair opportunity to challenge them."  Fed. R. Evid. 902(11).  To date, defendant has raised objections only to records from Apple, Ring, and T-Mobile, which are the subject of the government's motion in limine number 5.

### H.  Summary Charts and Lay Testimony Regarding Digital Evidence

The government plans to introduce summary charts regarding (1) the digital devices searched and seized in this case; and (2) and the flow of defendant's drug proceeds.  These charts will aid the jury is understanding this important but voluminous evidence.

The Ninth Circuit has long endorsed the use of summary charts as a "testimonial aid" for the jury.  United States v. Wood, 943 F.2d

---

[1] For recorded conversations in the English language, the recording itself is the evidence, and a transcript of the recording may be provided as an aid in following the conversation. United States v. Chen, 754 F.2d 817, 824 (9th Cir. 1985).

1048, 1053-54 (9th Cir. 1991).  It has also acknowledged that there is no "bright-line rule against admission of summary charts as evidence."  United States v. Anekwu, 695 F.3d 967, 981-82 (9th Cir. 2012).  Rather, it is within a "district court's discretion" under Federal Rule of Evidence 611(a) to determine whether such exhibits can be admitted.  Id. at 982 (citing United States v. Boulware, 470 F.3d 931, 936 (9th Cir. 2006)).

## I.   Expert Testimony and Related Evidence

A qualified expert witness may provide opinion testimony on the issue in question if specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue. See Fed. R. Evid. 702.  To be admissible, expert testimony must satisfy only two basic requirements: (1) the testimony must be helpful to the trier of fact; and (2) the witness must be qualified to deliver the testimony based on his knowledge, skill, experience, training, or education.  Id.  An expert may provide opinion testimony even if it embraces an ultimate issue to be decided by the trier of fact.  See United States v. Fleischman, 684 F.2d 1329, 1335 (9th Cir. 1982).  The government has noticed 10 experts to testify in its case-in-chief, and defendant has not opposed those experts.

## J.   Truth Testimony Provision of Plea/Immunity Agreements

The government may not vouch for the credibility of its witnesses by presenting the jury with personal assurances of the witness's veracity.  However, a reference to the "truthful testimony" provisions of a witness's plea and/or immunity agreement with the government does not constitute vouching if it is made in response to an attack on the witness's credibility because of his plea bargain or grant of immunity.  United States v. Monroe, 943 F.2d 1007, 1013 (9th

Cir. 1991).  To introduce such a "truthful testimony" provision of an

agreement, the government need not wait until re-direct examination,

after the witness's credibility has been attacked on cross-

examination. Instead, where in opening statement the defendant

attacks the witness's credibility because of the witness's particular

agreement, the government may introduce the "truthful testimony"

provisions in direct examination of the witness. Id. at 1014 (because

government introduced "truthful testimony" aspects of a cooperator's

plea agreement only after defendant had attacked cooperator's

credibility in opening statement, government did not vouch for

cooperator).

### K.    Defendant's Statements

As noted above, defendant's statements are admissible only if

offered against her -- otherwise, they fall within the scope of the

rule against hearsay.  Fed. R. Evid. 801(d)(2)(A); United States v.

Fernandez, 839 F.2d 639, 640 (9th Cir. 1988).  The hearsay rule

prohibits a defendant from obtaining the benefit of testifying

without subjecting herself to cross-examination by placing her self-

serving prior statements before the jury through other witnesses.

Fed. R. Evid. 801(c); Fernandez, 839 F.2d at 640.

### L.    Cross-Examination of Defendant

A defendant who testifies at trial may be cross-examined as to

all matters reasonably related to the issues he or she puts in

dispute during direct examination.  "A defendant has no right to

avoid cross-examination on matters which call into question his claim

of innocence." United States v. Miranda-Uriarte, 649 F.2d 1345,

1353-54 (9th Cir. 1981).  The government is not required to provide

1   notice of matters about which it may seek to cross-examine defense

2   witnesses, including defendant, should they testify.

3       **M.   Use of Exhibits During Opening Statement**

4       Exhibits may be used by the government in the opening statement,

5   and so long as the opening statement "avoids references to matters

6   that cannot be proved or would be inadmissible, there can be no

7   error, much less prejudicial error."  United States v. De Peri, 778

8   F.2d 963, 979 (3d Cir. 1985); see also United States v. Rubino, 431

9   F.2d 284, 290 (6th Cir. 1970).

10      The government intends to identify the exhibits, if any, that it

11  will use in its opening statement to the defense prior to trial.

12      **N.   Affirmative Defenses, Reciprocal Discovery, and Jury**
        **Nullification**

13

14      The government requested notice of affirmative defenses

15  (including an entrapment, mental condition or duress, and/or alibi

16  defense) and reciprocal discovery by letter numerous times throughout

17  the pendency of this case.  Aside from defendant's request to raise

18  an entrapment and diminished capacity defense, defendant has neither

19  provided the government with notice of any other affirmative defenses

20  nor reciprocal discovery.

21      Rule 16 of the Federal Rules of Criminal Procedure creates

22  certain reciprocal discovery obligations on the part of defendants to

23  produce three categories of materials that they intend to introduce

24  as evidence at trial: (1) documents and tangible objects; (2) reports

25  of any examinations or tests; and (3) expert witness disclosure.

26  Rule 16 imposes on defendants a continuing duty to disclose these

27  categories of materials.  Fed. R. Crim. P. 16(b)(1)(A), (b)(1)(C),

28  and (c).  In those circumstances where a party fails to produce

discovery as required by Rule 16, the rule empowers the district court to "prohibit that party from introducing the undisclosed evidence," or it may "enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2)(C) and (D). To the extent defendant may attempt to introduce or use any evidence at trial that he has not produced to the government, such documents should be excluded. See Taylor v. Illinois, 484 U.S. 400, 415 (1988) (defendant's failure to comply with, or object to, government's discovery request before trial justified exclusion of unproduced evidence).

The government also reserves the right to object to any evidence and/or argument relating to any possible jury nullification defense, including concerning punishment or that this is a case that should be tried in state court. A defendant has no right to present evidence relevant only to such a defense. United States v. Powell, 955 F.2d 1206, 1213 (9th Cir. 1992); Zal v. Steppe, 968 F.2d 924, 930 (9th Cir. 1992) (Trott, J., concurring) ("[N]either a defendant nor his attorney has a right to present to a jury evidence that is irrelevant to a legal defense to, or an element of, the crime charged.").

### O.    Character and Impeachment Evidence

The Supreme Court has recognized that character evidence -- particularly cumulative character evidence -- has weak probative value and great potential to confuse the issues and prejudice the jury. See Michelson v. United States, 335 U.S. 469, 480, 486 (1948). The Court has thus given trial courts wide discretion to limit the presentation of character evidence. Id.

In addition, the form of the proffered evidence must be proper. Federal Rule of Evidence 405(a) sets forth the sole methods for which

character evidence may be introduced.  It specifically states that, where evidence of a character trait is admissible, proof may be made in two ways: (1) by testimony as to reputation and (2) by testimony as to opinion.  Thus, a defendant may not introduce specific instances of his or her good conduct through the testimony of others.  See Michelson, 335 U.S. at 477.  On cross-examination of a defendant's character witness, however, the government may inquire into specific instances of a defendant's past conduct relevant to the character trait at issue.  See Fed. R. Evid. 405(a).  In particular, a defendant's character witnesses may be cross-examined about their knowledge of the defendant's past crimes, wrongful acts, and arrests.  See Michelson, 335 U.S. at 481.  The only prerequisite is that there must be a good faith basis that the incidents inquired about are relevant to the character trait at issue.  See United States v. McCollom, 664 F.2d 56, 58 (5th Cir. 1981).

**V.   CONCLUSION**

The government respectfully requests permission to file supplemental trial memoranda if necessary.