1          **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3        **HONORABLE ANDRÉ BIROTTE, JR., U.S. DISTRICT JUDGE**

4

5   **UNITED STATES OF AMERICA,**              )
                                               )
6                        **Plaintiff,**        )
                                               )
7      **v.**                                  )   **Case No. CR 21-244 AB**
                                               )
8   **MIRELA TODOROVA,**                       )          **Volume 1**
                                               )      **(Pages 1 - 226)**
9                        **Defendant.**        )
    _____       )

10

11        **REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS**
                      **TRIAL DAY ONE**
12            **TUESDAY, FEBRUARY 18, 2025**
                       **9:34 AM**
13            **LOS ANGELES, CALIFORNIA**

14

15

16

17

18

19

20

21

22
_____

23     **MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR**
              FEDERAL OFFICIAL COURT REPORTER
24              350 WEST 1ST STREET, ROOM 4455
              LOS ANGELES, CALIFORNIA  90012
25                   (213) 894-2305

**UNITED STATES DISTRICT COURT**

1                        **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4       BILAL A. ESSAYLI
        United States Attorney
5       BY:  PATRICK CASTAÑEDA
        BY:  JASON C. PANG
6       BY:  SURIA M. BAHADUE
             Assistant United States Attorneys
7       312 North Spring Street
        Los Angeles, California  90012
8

9
    **FOR THE DEFENDANT:**
10
        CHARLES C. BROWN
11      Attorney at Law
        1 South Fair Oaks Avenue, Suite 204
12      Pasadena, California  91105

13

14  **ALSO PRESENT:**

15      CALEB HODGSON, DEA Special Agent
        ARMANDO ZENTENO
16      MARY VERAL
        MIA STONE
17      RICK GENTILLALLI

18

19

20

21

22

23

24

25

                   **UNITED STATES DISTRICT COURT**

TUESDAY, FEBRUARY 18, 2025; 9:34 AM

LOS ANGELES, CALIFORNIA

-oOo-

THE COURTROOM DEPUTY:  Calling Item 1, CR 21-00244,

United States of America versus Mirela Todorova.

Counsel, please state your appearances for the

record.

MR. CASTAÑEDA:  Good morning, Your Honor.

Patrick Castañeda, Suria Bahadue, and Jason Pang for the

United States.  And with us at counsel table is DEA Special

Agent Caleb Hodgson.

THE COURT:  Good morning.

MR. BROWN:  Good morning, Your Honor.  Charles Brown

on behalf of Ms. Todorova who is present.  Also present are

Armando Zenteno, Mary Veral, Rick Gentillalli, and Mia Stone,

Your Honor.

THE COURT:  Good morning to you all as well.

So we're here for trial today.  There's a couple of

housekeeping matters that we need to go over before we begin

the trial.  I've given you all -- I think you should have at

least proposed voir dire questions.

Have you received those?

MR. PANG:  Yes, Your Honor.

MR. BROWN:  Yes, Your Honor.

THE COURT:  All right.  Any strenuous objections to

```
 1    any of the voir dire questions?
 2              MR. PANG:  No, Your Honor.  We submit.
 3              MR. BROWN:  No, Your Honor.
 4              THE COURT:  Okay.  Great.
 5              MR. BROWN:  Thank you, Your Honor.
 6              THE COURT:  So -- sorry.  Just bear with me a second
 7    here.
 8                   (Pause in the proceedings.)
 9              THE COURT:  All right.  I'm just having some
10    technical difficulties with the PowerPoint.
11              But in the meantime -- all right.  So at least
12    the -- the housekeeping matters that I have is that I think we
13    need to discuss or finalize testimony with regard to H.A.'s
14    sexual history.  Okay?
15              I had a chance over the weekend to kind of look at
16    the cases, think about this issue.  You know, I think as the
17    defense points out, this is -- this is novel.  There's not a
18    lot of case law on this.  I do think, though, that -- at the
19    end of the day, H.A.'s testimony -- sexual testimony is not
20    relevant as it relates to the elements of the charged offense.
21              Having said that, I wanted to get some clarification
22    from the defense perspective.  The Government had indicated
23    that if you wanted to elicit from H.A. her work as a sex
24    worker, that at least the Government's view is that it would
25    open the door to Ms. Todorova organizing sex work, et cetera.
```

09:35AM (line 5)
09:39AM (line 10)
09:39AM (line 15)
09:39AM (line 20)
09:40AM (line 25)

**UNITED STATES DISTRICT COURT**

1    Is it still -- you still want to try to elicit some

2    of that testimony?

3    THE DEFENDANT:  Your Honor, I'm sorry, but, like, I

4    don't want you spreading lies.  So I don't appreciate you

09:40AM 5    saying that.  That's -- that's prejudicial to me, Your Honor.

6    Please take that statement back.  That -- I don't

7    know what you're talking about.  There's absolutely zero, zero

8    evidence of anything that -- what you just said.  So I'm just

9    not -- I'm not okay with you talking about me soliciting,

09:40AM 10    facilitating anything with the word "sex work" in a sentence in

11    my name.  Please leave my name out.  This is not the trial.

12    Thank you.

13    MR. BROWN:  Your Honor, I apologize.

14    THE COURT:  Are you done?

09:40AM 15    THE DEFENDANT:  I've just -- like, I'm not --

16    THE COURT:  Are you done?

17    THE DEFENDANT:  I'm not okay with this, the way --

18    THE COURT:  So here's what we're going to do.

19    THE DEFENDANT:  Please make it right, Your Honor.

09:41AM 20    THE COURT:  Ms. Todorova.  Ms. Todorova.

21    THE DEFENDANT:  It was okay during the motion

22    hearing, but now we have an audience.

23    THE COURT:  Right.  Exactly.  Now we have an

24    audience, Ms. Todorova.  And this is what we're going to do.

09:41AM 25    Okay?  Because you want to play games like this and disrupt

**UNITED STATES DISTRICT COURT**

1    things in the trial, here's what we're going to do.  I didn't

2    want to get there.  Okay?

3              THE DEFENDANT:  I'm not going to stand here

4    anymore --

09:41AM    5              THE COURT:  Look, we have already set it up so that

6    you can watch the trial from the fourth floor.  You have

7    repeatedly interrupted proceedings throughout this case.

8    That's fine.  You want to have these outbursts, we're not doing

9    that in front of the jury.  Do you understand that?

09:41AM   10              THE DEFENDANT:  I understand.

11              THE COURT:  So I want to make sure that you are

12    clear.  If you do this in front of this jury at any time, you

13    will be removed.  You will go downstairs.  You will watch the

14    trial via video.  You will not be able to talk.  You will watch

09:41AM   15    the trial via video.  Do you understand that?

16              THE DEFENDANT:  Yes, I understand.

17              THE COURT:  Okay.  So do I have a commitment from

18    you that you're not going to do these outbursts in front of

19    this jury?

09:42AM   20              THE DEFENDANT:  As I understand right now --

21              THE COURT:  Do I have a commitment from you that you

22    will not conduct these outbursts in front of the jury, yes or

23    no?

24              THE DEFENDANT:  Yes.  Of course.

09:42AM   25              THE COURT:  Okay.

```
 1              THE DEFENDANT:  If it's a fair trial, of course.
 2              THE COURT:  You're going to get a fair trial,
 3    Ms. Todorova.  And I resent the fact that you keep trying to
 4    insult me, suggesting I'm not.  I've bent over backwards to
 5    give you almost everything you wanted, including giving you
 6    lawyers when you wanted to represent yourself.  So stop this
 7    nonsense.
 8              THE DEFENDANT:  Okay.  Thank you, Your Honor.
 9              This is -- they just made up some fantasy, I --
10    unbelievable.
11              MR. BROWN:  Thank you very much, Your Honor.  And I
12    apologize.
13              THE COURT:  No, you don't have to apologize.  You do
14    not have to apologize at all.
15              THE DEFENDANT:  It's one thing, the judge lies --
16    that's not right.
17              MR. BROWN:  Shh.
18              THE COURT:  So I guess the question I have for both
19    of you is that do you -- from the defense perspective, do you
20    intend to elicit this testimony about her work?
21              MR. BROWN:  Your Honor, the only reason I suggested
22    that issue was because it explained why she wanted to commit
23    suicide, Your Honor.
24              THE COURT:  So if the suicide is not coming in, are
25    you -- do you intend to elicit that work?
```

The times 09:42AM, 09:42AM, 09:42AM, 09:43AM, 09:43AM appear in the left margin at lines 5, 10, 15, 20, and 25.

|     |     |
| --- | --- |
|  | 1 |
|  | 2 |
|  | 3 |
|  | 4 |
| 09:43AM | 5 |
|  | 6 |
|  | 7 |
|  | 8 |
|  | 9 |
| 09:43AM | 10 |

           MR. BROWN:  I think perhaps it may go to her
credibility, Your Honor, yes.
           THE COURT:  So I want to hear from the Government.
Why does it not go to her credibility, just her occupation?
Because if, in fact, that is true, she's committed -- she has
committed a crime; right?  If the -- if, in fact, she is a sex
worker, under our laws, she's committed a crime.
           Why is that not relevant to her credibility, and why
do you believe that that opens the door to other -- other
stuff?
           MS. BAHADUE:  We don't think it's relevant to her
credibility, Your Honor.  But even if -- even if the --
           THE COURT:  Why not?
           MS. BAHADUE:  Because, Your Honor, it's essentially
a sideshow.  And the Court --
           THE COURT:  But --
           MS. BAHADUE:  She's already ordering drugs; right,
Your Honor?
           THE COURT:  But she's admitting that the work that
she does is inherent -- is criminal activity.
           MS. BAHADUE:  Also, Your Honor, sex works has
nothing -- has no elements of dishonesty, truthfulness.  Those
aspects are en attendant to those types of acts that would come
in under 608, which is, I think, where we are, specific
instances of conduct.

And typically, there's got to be some showing that the actual act is going to involve some dishonesty or untruthfulness.  Aside from relevance, it is prejudicial.  It is to serve one purpose and that is to malign the victim.

09:44AM    If we do go there, though, we do have text messages on at least one occasion where --

THE COURT:  And I know the text messages -- I don't want to have another outburst from Ms. Todorova.  Why is that relevant?  I mean, if you're saying on the one hand -- I mean, 09:45AM you're saying it's not relevant.  But if it is, we get to go the whole -- we get to open the whole can of worms?

MS. BAHADUE:  It's the full picture of this particular person, and it's the full picture of the defendant.  And it's not a whole can of worms.  I think we're talking about 09:45AM one specific occasion where the defendant did essentially facilitate a particular occasion with two of her drug suppliers.

THE COURT:  But why is that not more prejudicial than probative?  I mean, it's one thing -- look, witness 09:45AM credibility is going to be an issue here, I suspect.  Okay?  And what this person does for a living may or may not be relevant, particularly if it is something that is -- if she's engaged in criminal activity.  But what I'm trying to understand is why is it that -- what you're trying to elicit, 09:45AM even if it is -- I mean, particularly since it's a one-time

incident, why that is relevant.

MS. BAHADUE:  It's probative because it shows the defendant's ability to control her drug business, her ability to control drug suppliers.

THE COURT:  But you have testimony --

MS. BAHADUE:  We do.

THE COURT:  -- from others --

MS. BAHADUE:  But part of this is going to show sort of an imbalance between the defendant and her suppliers.  And if she can use some of her customers as a way to get favors with her suppliers, it's showing exactly the balance of power and it's showing that defendant is in control of those relationships.

So it is probative of the defendant's intent to be this boss, her intent to distribute drugs, her intent to control her suppliers through means of favors for sex with some of her, essentially, friends or clients.  So it is probative, Your Honor, of the defendant and the way she approached her business.

And we're going to probably hear a lot from the defense -- obviously, we haven't gotten there yet -- about who they think was in control of Ms. Todorova and how Ms. Todorova was the one who was essentially preyed upon, when it's our position that these texts actually show the opposite.  She was the one preying upon other people.  And so we want to make sure

1    the jury's not misled.

2        THE COURT:  I got it.

3        Mr. Brown, what's your response to the first point

4    about this work?  Does it -- does it -- is it probative of

09:47AM    5    truthfulness or veracity?  And the crime arguably does not have

6    any elements to suggest that.  And so does that make it less

7    relevant, I suppose?

8        MR. BROWN:  Your Honor, my understanding of the

9    evidence is that Ms. Adler had been selling her body for sex

09:47AM    10    since she was a minor.  And arguably -- she looked older than

11    she was, and it appears that she was lying about her age.  And

12    I think that --

13        THE COURT:  When you say "it appears," how -- I

14    mean, do we have evidence of that or -- or is that just an

09:47AM    15    assumption on your part?

16        MR. BROWN:  An assumption on my part, Your Honor.

17        THE COURT:  Is it fair to say -- I mean, so other

18    than that, are there any other indicia of lack of veracity or

19    truthfulness?

09:47AM    20        MR. BROWN:  Your Honor, I don't wish to malign

21    people who engage in that type of activity.  But it would

22    appear to me -- and I think a common sense understanding of

23    people who engage in that activity -- are probably engaged in

24    acts of dishonesty, in addition to the act -- the sex act

09:48AM    25    itself, Your Honor.

THE COURT:  All right.  Well, I guess -- look, I'm
not willing to go that far because I don't think we can say
based on a common understanding.  I just don't know if that's
enough.  And so I'm not going to allow any testimony about her
09:48AM  sex work to come in, and I'm not going to allow any testimony
about her efforts to commit suicide to come in as well.

So that will be the Court's ruling.

MR. BROWN:  Your Honor, can I address the suicide
issue for the record?

09:48AM  THE COURT:  Yes.

MR. BROWN:  As it relates to the Supreme Court's
holding in *Burrage* as I set forth in my memo, Your Honor, I
think the question of causation is a very nuanced and complex
issue in this case, Your Honor.

09:48AM  And I think a person's intentional decision to take
nine or ten pills, as I indicated in my memo, is an intervening
cause and it should be something that the jury should be
considering for the record.

And I also just want to respond to the Government's
09:49AM  argument about Ms. Todorova, which I think is a completely
specious argument, Your Honor.  And I want to note an ongoing
objection prophylactically, Your Honor, to this type of spin,
which I think is incredibly unfair to Ms. Todorova.

There's no evidence that she was engaged in any
09:49AM  pimping activity or anything like that, Your Honor.

```
 1              THE COURT:  But that's not going to come in.

 2              MR. BROWN:  I just want to be clear that it's a

 3    misrepresentation -- a mis- -- it's a specious

 4    mischaracterization of the universe of facts that we know about

 5    the relationship between Hope Adler and Ms. Todorova.  And I

 6    think I -- I think it's -- to even suggest it --

 7              THE COURT:  But it's not going to come in.

 8              MR. BROWN:  Understood, Your Honor.

 9              THE COURT:  And, look, to your point -- earlier

10    point about the -- the motion and your response, well written.

11    Look, this is an area -- there's not a lot of law on this.  I

12    mean -- but the use of the drug was an independent cause of the

13    injury, at least as I see it.  And there are cases, at least,

14    out there that suggests that the -- the person's intent may not

15    be relevant.

16              Again, look, the Ninth Circuit may say I'm wrong.  I

17    mean, you have an interesting interpretation of the Burrage --

18    Burrage, B-u-r-r-a-g-e, case.  I'm not sure I'd go full bore

19    with you, but I was the one who raised it.  I had some concerns

20    about it that caused the Government to file its briefing.

21              So based on that, I don't think -- I'm not going to

22    allow the evidence of any suicide attempts to come in.

23              MR. BROWN:  Understood, Your Honor.  Thank you very

24    much, Your Honor.

25              THE COURT:  All right.  And then -- all right.  Then
```

|  | |
|---|---|
| 1 | we are also talking about Motion in Limine Number 9, about |
| 2 | Dr. Pietruszka's expert testimony.  I thought I asked that the |
| 3 | parties submit notice of opinions by February 12, both of |
| 4 | Dr. Pietruszka and expert witness Michelle Bush.  What's |
| 5 | happened? |
| 6 | MS. BAHADUE:  We have received those expert |
| 7 | appearances. |
| 8 | THE COURT:  You have or have not? |
| 9 | MS. BAHADUE:  We have.  We have.  We are -- |
| 10 | Dr. Pietruszka is still incomplete in a sense that we're |
| 11 | waiting on case numbers of the prior testimony, and the defense |
| 12 | is working on that to get that to us as soon as possible. |
| 13 | We would like to have that by the end of the day |
| 14 | because that obviously affects our ability to cross-examine him |
| 15 | based on his prior statements. |
| 16 | THE COURT:  When is Dr. Pietruszka scheduled to |
| 17 | testify?  I'm assuming not until next week; right? |
| 18 | MS. BAHADUE:  Right. |
| 19 | MR. BROWN:  Correct, Your Honor. |
| 20 | THE COURT:  What's the soonest that you can get that |
| 21 | information to the Government? |
| 22 | MR. BROWN:  I think, given the fact that I'll be in |
| 23 | court most of the day, it might be tough for me.  But I will -- |
| 24 | I can follow up on the break with Dr. Pietruszka's staff.  My |
| 25 | understanding is that, you know, there's -- they are assembling |

The times 09:51AM appear at lines 5, 10, 15, 20, and 25.

**UNITED STATES DISTRICT COURT**

1    that information now, Your Honor, but -- as of last week when I

2    communicated with them about it.

3             THE COURT:  Okay.  If you could, try to reach out

4    during the lunch break or see if someone -- and let's see if we

09:52AM  5    can get an answer hopefully by tomorrow, the close of business.

6             MR. BROWN:  Yes, Your Honor.  Thank you, Your Honor,

7    for the Court's consideration.

8             THE COURT:  Anything else, Ms. --

9             MS. BAHADUE:  No.  And we, otherwise, are not going

09:52AM  10   to move to exclude the experts at this time.

11            THE COURT:  At this time, right.  You reserve the

12   right to do so.  So we'll cross that bridge when we get to it.

13            Okay.  I gave you all the voir dire questions.  I

14   just want, just so -- Mr. Brown, if you need to set a record,

09:52AM  15   you asked some questions about domestic violence and I excluded

16   them.  Am I missing something here?

17            MR. BROWN:  Your Honor, I think there will be

18   evidence that Ms. Todorova was a victim of domestic violence.

19            THE COURT:  And -- and what's the -- what's the

09:52AM  20   relevance of that?

21            MR. BROWN:  It relates to her relationship with the

22   people that we think were involved in this.

23            THE COURT:  Okay.  I guess --

24            MR. BROWN:  And her alleged role in the offense.

09:53AM  25            THE COURT:  Okay.  I'm just letting you know, it's

1   tough for me to see the relevance of that.  I'm going to keep

2   an open mind until -- as I hear the evidence.  But it seems to

3   me that's not relevant in this case.  But --

4          Mr. Pang.

09:53AM  5          MR. PANG:  Your Honor, I would suggest that before

6   the defense raises it, before cross-examination, certainly not

7   in opening statement and perhaps in their case in chief, we

8   would ask that the parties do a sidebar with the Court so that

9   they can -- the defense can proffer as to what the evidence

09:53AM 10  would be.

11         Of course, in addition to 401 and 403, the

12  Government would also object to lack of notice for a potential

13  duress defense.  That was required under the rules before

14  trial.  They never provided us with one.

09:53AM 15         So to the extent that they're saying that she was

16  coerced into this conduct, which, again, I think is unmoored by

17  the facts, it's certainly just, under the operation of the

18  Federal Rules of Criminal Procedure, improper at this time.  We

19  haven't had an opportunity to prepare for it.

09:54AM 20         THE COURT:  Mr. Brown, do you intend to make such

21  arguments in opening statement or at least during the

22  cross-examination of the Government's witnesses?

23         MR. BROWN:  Your Honor, I, first of all, am not

24  arguing duress.  But, yes, I did intend to argue that my client

09:54AM 25  was a victim of domestic violence with respect to the person

|   |   |
|---|---|
| | 1 | that the Government should have been investigating in this |
| | 2 | case, which is Javier Lopez. |
| | 3 | THE COURT:  But I guess I'm struggling to see -- |
| | 4 | you're saying that your client was a victim of domestic |
| 09:54AM | 5 | violence and, therefore, what?  Because, I mean -- I mean, the |
| | 6 | theory -- to me, if I'm hearing this, you're saying victim of |
| | 7 | domestic violence.  And because of that, that's why she did |
| | 8 | what she did? |
| | 9 | MR. BROWN:  I think it explains, in part, why we're |
| 09:54AM | 10 | here, Your Honor.  And I'm not saying it as a legal excuse, but |
| | 11 | it's a part of her narrative that I think the jury is entitled |
| | 12 | to hear. |
| | 13 | THE COURT:  But what's the -- again, help me |
| | 14 | understand.  Let's play this out.  She's the victim of domestic |
| 09:55AM | 15 | violence.  But is that -- and I don't mean to minimize it, |
| | 16 | but -- okay.  She's a victim of domestic violence.  What does |
| | 17 | that have to do with what she's alleged to have committed -- |
| | 18 | what she's alleged to have done in this case? |
| | 19 | MR. BROWN:  It's part of her story, Your Honor.  I |
| 09:55AM | 20 | think one of the central mysteries of this case is how in the |
| | 21 | world a person like my client with a 4.5 GPA and a perfect |
| | 22 | score on her SAT and a degree in molecular biology would ever |
| | 23 | be immersed in a world like this.  And I think it explains that |
| | 24 | central question of how she would even be involved in this |
| 09:55AM | 25 | world, Your Honor. |

**UNITED STATES DISTRICT COURT**

1    THE COURT:  But aren't you, in essence, saying in

2  that -- in your response, aren't you using that as an

3  explanation for her conduct?  And, if so, does that go towards

4  a duress -- I don't know, an imperfect or -- imperfect or -- or

09:56AM    5  imperfect duress defense?

6    MR. BROWN:  I don't think so, Your Honor.  I

7  think -- I think duress would negate all intent.  And I don't

8  think that that's my argument, Your Honor.  But I think --

9    THE COURT:  But I guess, what is it -- again, I'm

09:56AM    10  just trying to understand.  I don't mean to have you tip your

11  cards, so to speak.  But if you're going to get up there and

12  say my client was a victim of domestic violence, isn't it the

13  natural sort of assumption, okay, then that's why she did what

14  she did?

09:56AM    15    MR. BROWN:  I think to some degree, it explains the

16  dynamic of her relationship with Javier Lopez who, from our

17  standpoint, is a central figure in this case.

18    THE COURT:  Mr. Pang.

19    MR. PANG:  Your Honor, if I can kind of cut through

09:56AM    20  the noise.  This is clearly -- I think the Government has to

21  re-raise its nullification motion and seek for a Court order

22  excluding nullification.

23    This isn't going to duress, as the defense has

24  explicitly acknowledged.  And they're claiming that they want

09:57AM    25  to introduce alleged evidence for which the Government

believes, aside from perhaps defendant's own testimony, there

will be none.  Quite the opposite; that the reason why the

defense wants to raise this in their opening statement is

because they want to elicit sympathy for the defendant.  I

09:57AM   think that's what the Court's getting at.

The fact that Mr. Brown wants to stand in front of

this jury and talk about her 4.5 GPA and that she's a good

girl, she went to school and she did all this great stuff and

she was abused by her mean, mean boyfriend for which there's no

09:57AM   evidence, this is all nullification evidence, Your Honor.  It's

all improper under 401 and 403.  I think we need to re-raise

our motion, Your Honor.

MR. BROWN:  Your Honor, I strongly disagree with

what counsel is saying.  I think it's a part of the narrative,

09:57AM   it's a part of the story of our case that we're entitled to

tell.  And the Government doesn't want --

THE COURT:  But, Mr. Brown, look, you're saying it's

a part of your story but going to what?  I mean, if not -- if

it's not duress, then isn't it just to show that she is a

09:58AM   sympathetic figure because she's been abused by somebody?

MR. BROWN:  No, Your Honor.  It's to rebut the

Government's narrative that Ms. Todorova is the notorious head

of some drug trafficking organization, which they've been

saying erroneously for years.

09:58AM   THE COURT:  Hold on.  Whether she's the head or not,

if the Government is alleging that she distributed drugs that

caused serious bodily injury, does it matter whether or not she

was in an abusive relationship?

MR. BROWN:  Yes, Your Honor, it does matter.

THE COURT:  Why?

MR. BROWN:  Because it shows that her role is not

that of a leader or organizer, which is what they're trying to

portray.  And I get to rebut -- I get to rebut that inference

that -- that picture that they're trying to paint of my client,

which is false, I should be able to rebut the inference that

they're trying to tell by fully exploring her relationship with

Javier Lopez.

THE COURT:  But it's one thing to explore the

relationship with Javier Lopez.  It's another to say that he

was abusive to her.  I mean, if the theory is that he's the one

that was doing this and she just followed his direction, I

don't know if that's really a defense.  But maybe it rebuts

that she was the leader.

But it -- but your injecting the abuse element

without -- without drawing a connection to anything leaves it

only -- it leaves speculation and it's only for sympathy

purposes, isn't it?  I mean --

MR. BROWN:  I think -- I think -- I think -- I think

a person who's accused of a crime like this should be able to

tell the -- her full story to the jury, Your Honor.  I think

**UNITED STATES DISTRICT COURT**

1    they should understand that, especially when the Government has

2    taken every fact out of context, put in all kinds of spin on

3    it, and -- and presenting this sanitized narrative.

4         They've gotten rid of one key witness, but they're

10:00AM  5    trying to walk the line with him.  I think at every turn,

6    Your Honor, the Government doesn't want me to tell my client's

7    story.  And I think as a matter of fairness, I should be able

8    to tell her story.

9         And I'm not -- I'm not trying to nullify the jury.

10:00AM  10   I'm trying to tell my client's story at trial.  And I should be

11   able to do that if there's evidence to support it.  It's

12   relevant to her state of mind.  It's relevant to her state of

13   mind with respect to this offense.  It's clearly relevant.  And

14   it's not jury nullification.

10:00AM  15        THE COURT:  Relevant to her state of mind?  I guess

16   I'm struggling with that.  How?  I mean, her state of mind is

17   what?  That she was abused and that's why she did it.  Isn't

18   that duress?  You're trying to -- you're trying to squeeze in

19   duress but not call it duress.

10:00AM  20        MR. BROWN:  Your Honor, I think -- I think the

21   duress situation would be if somebody was held at gunpoint and

22   did something against their will.

23        THE COURT:  Aren't you suggesting basically the same

24   thing?  She was abused and that's why she did this.  She

10:01AM  25   wouldn't have done it if she wasn't abused.

**UNITED STATES DISTRICT COURT**

1        MR. BROWN:  I'm not saying -- I won't be saying

2   that, Your Honor.

3        THE COURT:  So what are you going to say?  I'm

4   sorry, I just have to probe because it's hard for me to see

10:01AM   5   anything other than she was abused and that's why she did what

6   she did.

7        Look, I'm not -- let's -- this is a different

8   analysis if we were talking about a sentencing enhancement or

9   considerations in sentencing, but we're not.  We haven't gotten

10:01AM  10   there.  We may not ever get there.  But you're asking the Court

11   to say, I want to tell the jury in opening statement that she

12   was abused.

13        It's hard for me to see that that evokes anything

14   other than sympathy or effort to try to -- effort to try to --

10:01AM  15   to suggest to the jurors that there was some other reason why

16   she did this than just doing it.

17        MR. BROWN:  Your Honor, but by the same token, if

18   the Government gets up in opening statement and points a finger

19   at her and says that she's the notorious head of a drug

10:02AM  20   trafficking organization --

21        THE COURT:  Let me stop you there.

22        Is the Government going to get up and say that

23   Ms. Todorova is the notorious head or the leader of a drug

24   trafficking organization?

10:02AM  25        MS. BAHADUE:  Yes.  We're going to say that she ran

**UNITED STATES DISTRICT COURT**

1    a drug delivery business.

2        THE COURT:  Okay.  But your view is that her abuse

3    negates that?

4        MR. BROWN:  Your Honor, I think the framing of the

10:02AM  5    issue in that way, I think, is going to create animus towards

6    my client in the eyes of the jury.  It's going to prejudice her

7    in the eyes of the jury.  It's going to paint a -- it's going

8    to elicit all kinds of images and ideas that people have about

9    drug trafficking organizations and people who are,

10:02AM  10   quote/unquote, "in charge" of drug trafficking organizations,

11   which is fine.  They can say what they want to say, but we

12   should be able to say in response that there's another side to

13   the story.

14       THE COURT:  But the part I'm struggling with -- and

10:03AM  15   I'll cut -- the other side to it is only sympathy and/or

16   duress, both which are not proper.  I mean, I just -- I just

17   don't see it as anything other than one of -- one or both of

18   those things.

19       Now, look, I guess here's what it comes down to.

10:03AM  20   You can't say it in opening statement.  If we get to the point

21   where Ms. Todorova is going to testify, I'll revisit it at that

22   time.  But you can't say it in opening statement because the

23   only purpose of it is to -- at least from the Court's

24   perspective -- and I'm not saying you're doing anything

10:03AM  25   untoward.  It's just -- it would only be there to evoke either

1    sympathy or an imperfect defense.  And I don't think the rules

2    allow for that.

3            So that will be the Court's ruling with respect to

4    that.

10:03AM    5            MR. BROWN:  Thank you, Your Honor.

6            Then, may I address another -- there is another

7    issue that I wanted to address with the Court --

8            THE COURT:  Okay.

9            MR. BROWN:  -- when the Court --

10:03AM    10            THE COURT:  Go ahead.

11            MR. BROWN:  Your Honor, I think the other issue is

12    with respect to how the Government is intending on presenting

13    evidence with respect to the -- R.M.

14            When the Court initially ruled on the Government's

10:04AM    15    decision to modify the Indictment, my understanding was that

16    there would be no testimony regarding R.M.

17            But it seems -- it appears to me from my

18    conversations with the Government is that they are intending to

19    present evidence of what drugs were retrieved from R.M.'s home.

10:04AM    20    And I feel like that's -- that's kind of a fine line that the

21    Court -- that the Government's trying to walk.  And I think

22    it's going to create a lot of issues for us because it's

23    creating -- I think the pregnant implication -- I think the

24    jurors are going to be wondering, Well, where is R.M. and why

10:04AM    25    isn't he here to testify?

1    They're going to call the coroner's assistant who

2    was there who retrieved the drugs.  They say they're not going

3    to ask her her role.  But every witness that they're going to

4    bring in to talk about what was found in R.M.'s home creates

10:05AM    5    the -- it's going to raise the question as to where is R.M.

6    And I -- and I don't think the jury should be

7    allowed to speculate as to where R.M. is or what happened to

8    him.  But by them trying to walk this thin line where we can't

9    ask about it but they get to ask about it I think creates a lot

10:05AM    10    of imbalance and it makes it very, very difficult to defend on

11    that issue, Your Honor.  And I just want to bring that to the

12    Court's attention.  I think it's -- I think it's a danger area.

13    THE COURT:  All right.  So, Mr. Pang, let me ask

14    you.  So what does the Government intend -- what's the offer of

10:05AM    15    proof with respect to R.M.?

16    MR. PANG:  Your Honor, the offer of proof as to R.M.

17    as it pertains to charged Count 2 -- that has been trimmed by

18    the Court -- is that a client ordered drugs that were delivered

19    to his house, then --

10:05AM    20    THE COURT:  A client.  Who is the client?

21    MR. PANG:  R.M., but we won't specify, like, any

22    background about him, that he died, just that he was a client

23    of the defendant, that -- we have the text messages.  I don't

24    think there's going to be any dispute that those are admissible

10:06AM    25    as it pertains to foundation or authenticity.

**UNITED STATES DISTRICT COURT**

1          Then we're going to establish that a county

2    employee -- here, the coroner investigator, but we're not going

3    to elicit the fact that she works for the coroner's office,

4    just that she works for the county -- went to the house,

10:06AM   5    collected the drugs, and brought them back.  That's it.

6          Then obviously we're going to introduce evidence

7    that the drugs were tested because that's relevant to Count 2,

8    which charges the distribution of fentanyl, and that the pills

9    seized from -- the pills and drugs seized from the house of the

10:06AM  10    client, R.M., tested positive for fentanyl.  That gets us to

11    the relevance of the distribution element charged in Count 2.

12          I actually don't think this is a thin line at all.

13    The Government is going to introduce a lot of text messages

14    involving a lot of witnesses that won't be testifying --

10:06AM  15          THE COURT:  Stop for a second, please.

16          I just want to make sure.  So you're going to call a

17    coroner's employee, but they're not going to say they're from

18    the coroner's office.  They're going to say they're a county

19    employee that arrived at the scene, picked up some items, and

10:07AM  20    those items were drugs?

21          MR. PANG:  Correct.

22          THE COURT:  Okay.  Let me ask the defense --

23          MR. PANG:  Sorry, Your Honor, one more thing.  And

24    obviously we're going to have our cooperator testify that --

10:07AM  25    watching the security footage from R.M.'s home, that he was the

| | |
|---|---|
| 1 | one who delivered the drugs to R.M. |
| 2 | THE COURT:  Okay. |
| 3 | MR. PANG:  That's it. |
| 4 | MR. BROWN:  On one or two occasions, Your Honor, |
| 10:07AM 5 | number one, it would be my question of Government counsel and, |
| 6 | two, I think that this really lays out our concern.  If the |
| 7 | Government is presenting other witnesses who overdosed but |
| 8 | survived and they testify, I think the jury is going to be |
| 9 | speculating and wondering -- |
| 10:07AM 10 | THE COURT:  But the problem, though, is that Count 2 |
| 11 | is just a simple distribution count.  At least as the |
| 12 | Government has pared its case down, they're not alleging the |
| 13 | serious bodily injury.  They're alleging distribution. |
| 14 | Am I incorrect? |
| 10:08AM 15 | MR. PANG:  That is correct, Your Honor. |
| 16 | THE COURT:  So if it is only distribution, that -- I |
| 17 | think that would negate any speculation because the charge is |
| 18 | just -- the allegation is that Ms. Todorova distributed drugs |
| 19 | to R.M.  R.M.'s not here to testify.  They can speculate as to |
| 10:08AM 20 | the reasons why, even though the instructions may tell them not |
| 21 | to but -- or I'm not sure about that, actually. |
| 22 | But they can -- I guess they can think about it. |
| 23 | But as it relates to Count 2, it is solely a distribution |
| 24 | count.  So I don't know -- I mean, my hope is that the |
| 10:08AM 25 | Government would have prepared their witnesses enough and no |

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:08AM | 5 |

1    one's going to walk in with some L.A. County coroner uniform or

2    things of that nature.

3            So I'm not sure what I'm seeing is the concern from

4    your -- if it is -- if it comes in as the Government proffers.

5            MR. BROWN:  I guess, one, I think it, again, creates

6    the pregnant expectation or the wonderment as to where this

7    particular witness is.  And then, two, if the Government is

8    going to have Kather Sei talk about these deliveries, are they

9    going forward with this theory of the second delivery that

10   there's been so much litigation about?  Are they trying to say

11   that there were two deliveries?

12           THE COURT:  I don't know -- I mean, I don't know.

13   We'll find out.  But I don't know if it matters as it relates

14   to the count because the allegation is simply distribution.

15           So whether he delivered it once, twice, three times,

16   I'm not sure I see --

17           MR. BROWN:  I understand.

18           THE COURT:  -- the relevance.

19           MR. BROWN:  I understand.

20           THE COURT:  So I'm trusting the Government that they

21   are going to streamline and make sure that there's no potential

22   prejudice as it relates to what happened with R.M.  And

23   obviously, you'll have your ears open.  And if there is, you'll

24   let me know.  But as proffered, I don't think that there's

25   anything -- there's -- I don't see any anything objectionable

**UNITED STATES DISTRICT COURT**

1    to the way it's been proffered.

2              MR. BROWN:  Thank you very much, Your Honor.

3              THE COURT:  All right.  Let's see.  We're going to

4    bring up 80 jurors in a moment, but I just want to make sure we

10:10AM  5    go through this again.

6              Ms. Todorova, I just want to make sure you're

7    listening to me now.  Okay?  We've had a number of hearings,

8    including today, where you feel the need to just say what you

9    want to say.  I recognize you're on trial.  You're stressed,

10:10AM  10   et cetera, but I need you to listen carefully.

11             I cannot have this happen in front of a jury.  If it

12   does, you will be removed from the courtroom.  The trial will

13   proceed with you listening via video, which I don't think you

14   want to do.  I do not want to do this, but I cannot have

10:10AM  15   outbursts.

16             You have a whole team of lawyers that have been

17   working diligently on your behalf.  You need to rely on them.

18   You can communicate with them, ask them questions, but you

19   cannot have outbursts in this courtroom.

10:10AM  20             So I'm just going to ask you a series of questions.

21   You've got to follow the rules of this court.  You've got to

22   sit silently, do not interrupt the proceedings.  Do you

23   understand that?

24             THE DEFENDANT:  Um, I understand.  And, Your Honor,

10:11AM  25   it was just because I felt like my own --

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| 10:11AM | 4 |

1       THE COURT:  Do you understand that?

2       THE DEFENDANT:  -- against me, my judge to be

3  impartial.

4       THE COURT:  Do you understand that, yes or no?

10:11AM  5       THE DEFENDANT:  They can say whatever they want to

6  say, but my judge --

7       THE COURT:  Do you understand that, yes or no?

8       THE DEFENDANT:  I understand.  And I won't say

9  anything during the trial unless I'm a witness on the stand.

10:11AM  10       THE COURT:  If you wish to sit at the table with

11  them, you've got to cooperate with them, which means no

12  outbursts during the trial.  Do you understand that?

13       THE DEFENDANT:  Yes.

14       THE COURT:  When a witness is testifying, okay,

10:11AM  15  you're not going to make any outbursts when a witness is

16  testifying, if you disagree with their testimony.  Do you

17  understand that?

18       THE DEFENDANT:  Yes, I understand.

19       THE COURT:  You're prepared to follow these rules;

10:11AM  20  right?

21       THE DEFENDANT:  I'm sure most of the witnesses --

22       THE COURT:  Are you prepared to follow the rules?

23       THE DEFENDANT:  Yes.  I -- I have -- I'm an

24  idealistic person.

10:11AM  25       THE COURT:  I understand.  Ms. Todorova, I don't

         1    want to hear about your idealist personality.  I have to get

         2    this trial going, and I can't have outbursts.

         3              You do not want to be in a situation where you're

         4    watching this trial via video.  You're not going to be happy

10:12AM  5    about it, and I'm not going to be happy about it.  But you're

         6    leaving me no choice.  You keep doing this.

         7              So I'm asking you -- that's why I've asked you these

         8    questions.  If you act up, I have no choice and you're going to

         9    watch the trial from downstairs.  Okay?

10:12AM 10              THE DEFENDANT:  Okay.

        11              THE COURT:  All right.

        12              THE DEFENDANT:  Thank you.

        13              THE COURT:  Okay.  So if there's nothing further,

        14    let's take a brief recess because we need to bring up all 80 of

10:12AM 15    the jurors.

        16              For the folks in the audience, there may be a little

        17    bit of a logistical issue because we need to put them all in

        18    a -- in spaces where they can sit and get access to

        19    microphones, but we'll deal with that when they come up.  So I

10:12AM 20    just want to let you know in advance.

        21              All right.  So we'll take a brief recess while we

        22    bring the jurors up.  And when they come back, we'll start our

        23    jury selection.  Thank you.

        24              THE COURTROOM DEPUTY:  All rise.  This court is in

10:13AM 25    recess.

```
 1                    (Break taken.)

 2                    (In the presence of the prospective jurors:)

 3               THE COURT:  Good morning, ladies and gentlemen.  I

 4        apologize for the delay.  I want to welcome you to Courtroom 7B

11:20AM  5        here in the U.S. District Court for the Central District of

 6        California.  I want to thank you all for the time and attention

 7        that you will be giving to this case.

 8                    We're here today to select a jury in a case

 9        United States versus Mirela Todorova.

11:20AM 10                    And by a quick show of hands, I just want to know,

11        has anyone here heard of this case just by name alone?  If so,

12        please raise your hand.

13                    Okay.  Next question I ask is:  How many of you out

14        there have a smartphone, cell phone, or personal digital

11:21AM 15        assistant?  Raise your hands, please.

16                    Okay.  I just was doing that to make sure you're

17        listening.

18                    Okay.  All right.  But I would ask, in all

19        seriousness, if you wouldn't mind -- if you wouldn't mind

11:21AM 20        making sure the phones are on airplane mode or silent just

21        because we don't want to have any unnecessary interruptions,

22        and we want to make sure that we have your undivided attention

23        during the course of this important process known as voir dire.

24                    And I want to give you a brief historical

11:21AM 25        perspective.  I mean, this goes back to our Bill of --
```

Declaration of Independence where it says that the history of the present King of Great Britain is a history of repeated injuries and usurpations for depriving us in many cases of the benefit of a trial by jury.

This is further ratified in our Constitution and in our Bill of Rights, as you will -- as you can see here.  We, the People of the United States, establish that a trial of all crimes shall be by jury.  And the Sixth Amendment prescribes that in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury.

Thomas Jefferson said it best when he said, "I consider a trial by jury as the only anchor yet imagined by which a Government can be held to the principles of its Constitution."  So I can't impress upon you the importance of this process.

You know, my family came over to this country from a small island in the West Indies known as Haiti, a country ruled by a dictator.  The justice system was muted in the streets.  Criminally, you could be whisked away by the -- I won't say the French word but basically the Haitian police.  And they would whisk you away and you may never be seen again.  Some of the disputes handled in the streets.

We don't have that here.  I'm not sitting here to tell you that our system of justice is perfect, but I would submit to you that I think that it is the best system in the

world.  So it is very important to have good people like you come down to court and be able to sit and hear important matters like this.

So this is an estimate.  I want to emphasize on the word "estimate" of trial.  We hope to select and get a jury today.  And we hope that the estimated last day of trial will be March 6 where the matter would be submitted to you all for jury deliberations.

It's an estimate, not a promise.  It may be shorter, it may be a little longer, but we think that this is the general range by which the trial will last.  And we're going to do everything that we can to keep us on track.

Generally our court days will be from 9:00 to 12:00.  We'll take one hour to an hour-and-a-half break for lunch, come back, resume until about 4:30, quarter to 5:00 each day.

As you can see here on the calendar, it shows that there are no trials on Fridays.  That's because I handle all my other matters on Fridays.  The one important caveat to that is this:  If you were to begin your deliberations, let's say, on a Thursday, you can come in on Friday to deliberate because you'd be in the jury room deliberating and I could still handle my calendar.  And so that would be the only exception to which you wouldn't be coming to court on Fridays.

So voir dire.  The French word literally means to see the words.  And I'm going to ask you all some individual

questions first and then ask questions of the group.

           Honesty is very important.  We want to make sure both sides have an opportunity to know who the people are as potential jurors.  These questions are not designed to embarrass.  But I will tell you some of the questions that we'll be asking today may be of a somewhat personal nature.

           And if that -- and because of that, if you need to speak to me outside the presence of the other members of the jury, please let me know.  I'll ask you to walk around and come over here to what's called our sidebar.  I'll hit this magic button.  And then we'll be able to have a semi-private conversation at the sidebar.

           Again, we're not trying to pry.  But it's important that we want to pick a fair and impartial jury for both sides in this case.

           Now, I suspect that when you got your jury summons, you were jumping up for joy, ecstatic at the possibility of coming to court and you immediately searched the Internet to look to see what restaurants you could go to, where to park, and things of that nature and perhaps, perhaps you may have come across one or more of these articles.

           Obviously I'm somewhat kidding, I hope.  Look, I get it.  You're extremely busy people.  You have your lives, your work, et cetera.  It takes time to come downtown.  Some of you are traveling from far distances.  It is a sacrifice.  I

1   understand that.  But it is vitally important that we have good

2   people like you help decide important matters like this.

3            For what it's worth, I just served jury duty about

4   six months ago.  So I was called just like you across the

11:26AM   5   street at the civil courthouse, sat in a room.  I think the

6   digs here are a little better.  I was on a concrete floor most

7   of the day, waiting to get called, outside a jury room.  The

8   case settled.  I didn't get called.

9            But in the past, before I was a judge, I actually

11:26AM   10   did serve on a jury.  And I thought it was an exceptional

11   experience.  I am so -- I was so glad that I did.  It really

12   gave me -- it enhanced my healthy respect for our American

13   judicial system.

14            So, again, I know how busy it is and how challenging

11:26AM   15   it is to come down here.  I recognize that.  But by virtue of

16   you being called today, you can join this illustrious group of

17   other famous individuals who have also been called during the

18   course of their respective careers to serve on jury duty.

19            I believe you already met our courtroom clerk,

11:27AM   20   Mr. Tamayo.  He keeps the minutes of the trial.  He'll mark and

21   keep all the exhibits.  He'll place all the witnesses under

22   oath.  He'll swear you in.  He'll apologize for any delays.

23   But he basically is going to be sort of the conductor, keeping

24   things in order.  And he'll be your line of communication

11:27AM   25   generally to me if issues come up during the course of this

trial.

The person to my left has arguably the most challenging job in this trial, and that's our court reporter to my left.  She has the unenviable task of jotting down every word that is being said throughout these proceedings.  In fact, I have what's called a real-time display that lays out everything that's being said during the course of the trial.

So it is -- I share that with you, not only to acknowledge the great work that she does, but to remind you all that she can't take down nods or shakings of the head.  So when you're answering the questions, do your best to remember to answer verbally -- yes, no -- so that she can take down your answers and we have an accurate record of the case.

So this -- because of the volume of folks here, we've already seated a number of you here.  We're going to ask questions this trial of all of the jurors.  So I'm going to ask you all to pay attention and listen carefully to the questions.

Don't check out.  It is more than likely one or more of you out in the galley are going to get called and put into the jury box.  So think about how you might answer those questions as we move along.  We're trying to do this in an effort to be a little more efficient, as we want to try as best as we can, not to waste your time.

Given the hour, it's likely we'll take a break during the jury selection process.  Just want to let you know

```
     1    that -- in a moment, I'm going to have the lawyers introduce

     2    themselves.  You may see them in the hallways or downstairs,

     3    but they're not going to speak to you.  They will walk past you

     4    as if they don't know you.  They're not doing it because

11:29AM  5    they're being rude.  They're doing it because the evidence by

     6    which you have to decide this case should only come in this

     7    courtroom, not in the hallways, not in the elevators, not in

     8    the parking lot or walking to the parking lot.  So they are

     9    under strict orders not to talk to you.  So don't be surprised

11:29AM 10    if they, like I said, literally look past you or through you as

    11    if they don't even know you.

    12            At this time, I want to have Government counsel

    13    introduce themselves.

    14            MR. CASTAÑEDA:  Good morning, everyone.  I'm

11:29AM 15    Patrick Castañeda.

    16            MS. BAHADUE:  Good morning, everyone.  I'm

    17    Suria Bahadue.

    18            MR. PANG:  Hello.  I'm Jay Pang.

    19            SPECIAL AGENT HODGSON:  Hello.  Caleb Hodgson.

11:29AM 20            THE COURT:  And then for the defense.

    21            MR. BROWN:  Good morning, everyone.  My name is

    22    Charles Brown.  I represent Mirela Todorova.  She's present

    23    today in court.

    24            Do you want to introduce yourselves?

11:30AM 25            MR. ZENTENO:  Good morning.  My name is
```

|         |    |                                                              |
|---------|----|--------------------------------------------------------------|
|         | 1  | Armando Zenteno.  I'm a paralegal with Mr. Brown, assisting -- |
|         | 2  | regarding Ms. Todorova.                                       |
|         | 3  | MS. VERAL:  Good morning.  My name is Mary Veral.            |
|         | 4  | MR. GENTILLALLI:  Good morning.  My name is                 |
| 11:30AM | 5  | Rick Gentillalli.  I'm an investigator for Attorney         |
|         | 6  | Charles Brown.                                                |
|         | 7  | THE DEFENDANT:  Good morning.  I'm the defendant,           |
|         | 8  | Mirela Todorova.                                              |
|         | 9  | THE COURT:  All right.  Thank you.                          |
| 11:30AM | 10 | MR. BROWN:  Thank you very much, Your Honor.                |
|         | 11 | THE COURT:  Now, every criminal case begins via form        |
|         | 12 | of an Indictment.  An Indictment has been filed in this case. |
|         | 13 | But it's important that you know that an Indictment is not   |
|         | 14 | evidence.  Okay?  It's the way a case begins, but it is not  |
| 11:30AM | 15 | evidence.                                                    |
|         | 16 | Ms. Todorova has been indicted in this case, and she        |
|         | 17 | has denied all the charges.  And you are not to presume by   |
|         | 18 | virtue of the fact that an Indictment was filed that         |
|         | 19 | Ms. Todorova is guilty.                                      |
| 11:30AM | 20 | I'm going to read you a statement of the case just          |
|         | 21 | to give you a sense of what this case is about.             |
|         | 22 | The United States charges Defendant Mirela Todorova         |
|         | 23 | with nine violations of federal criminal law.              |
|         | 24 | Count 1 charges defendant with conspiracy to               |
| 11:31AM | 25 | distribute and possess with the intent to distribute controlled |

substances, in violation of Title 21, United States Code, Section 846.

Specifically, Count 1 alleges that, beginning on a date unknown and continuing until on or about March 24th, 2021, defendant conspired with at least three co-conspirators to knowingly distribute and possess with the intent to distribute cocaine, 3, 4-methylenedioxymethamphetamine, MDMA, ecstasy, or molly, and oxycodone pills.

Count 1 further alleges that the oxycodone pills were counterfeit and, in fact, contained fentanyl, the use of which resulted in the serious bodily injuries of Victims B.L.H., S.L., and H.A.

Count 2 charges the defendant with distribution of fentanyl on or about November 15th and 16th, 2020, in violation of Title 8 -- I'm sorry -- of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C).

Counts 3 through 5 charge defendant with distribution of fentanyl resulting in the serious bodily injuries of Victim B.L.H. on or about November 26, 2020, Victim S.L. on or about December 8th, 2020, and Victim H.A. on or about January 8th, 2021, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C).

Counts 6 through 8 charge defendant with possession of methamphetamine, cocaine, and MDMA, ecstasy, or molly, with the intent to distribute on or about March 24th, 2021, in

**UNITED STATES DISTRICT COURT**

violation of Title 21, United States Code, Sections 841(a)(1),

(b)(1)(A)(viii), (b)(1)(B)(ii), and (b)(1)(C).

Count 9 alleges that on or about December 8th, 2021,

defendant knowingly and willfully made materially false

representations to the Drug Enforcement Administration, knowing

that these statements and representations were untrue, in

violation of Title 18, United States Code, Section 8 -- I'm

sorry -- Section 1001(a)(2).

The defendant has denied the Government's

allegations and has pleaded not guilty to each of the charges

against her.

Now, I'm going to read off a list of potential

witnesses in the case and I'm going to ask you a follow-up

question after I read off all the names.

So some of the potential witnesses are: Larry Ho,

Brittany Lee Ho, Christopher Moreno Nuñez, Mucktarr Kather Sei,

Ian De Leon, Spencer Levine, Caylee Cowan, Hope Adler,

Ashley Johnson, Paramedic Peter Scott, Joseph Soeka, Special

Agent David Dansart, Kristi McGuire, Paramedic Bryan Kasravi,

Special Agent Caleb Hodgson, Chemist Fracia Martinez, Chemist

Susan Zeigler, Chemist Anjail Ameen, Chemist Vien Zhivago,

Chemist Annecia Martin, Dr. Michael Levine, Special Agent

Bob Thomas, and Linda Lowery.

Does anyone in the courtroom recognize or have any

relationship with either myself, any of the lawyers or parties

         1    in the case, or any of the witnesses that were named?  And if

         2    so, please raise your hand.

         3              Okay.  All right.  I see no -- okay.  So at this

         4    stage -- oh, I'm sorry.  Someone have -- I'm sorry.  I didn't

11:36AM  5    see you.  And I'm sorry, give me -- you are Juror Number 28.

         6    Is it Ms. Pal- -- I'm sorry.  No.  It's Ms. Young?

         7              PROSPECTIVE JUROR YOUNG:  Yes.

         8              THE COURT:  Good morning.  Yes.

         9              PROSPECTIVE JUROR YOUNG:  Good morning.

11:36AM  10             I just don't know for sure if I have ever had a case

         11   pending before Your Honor.

         12             THE COURT:  Okay.  Oh, Ms. Young -- okay.  So my

         13   condolences, you must be a lawyer.

         14             PROSPECTIVE JUROR YOUNG:  Yes.

11:36AM  15             THE COURT:  Okay.  And if you don't mind me asking,

         16   what's the nature of your practice?

         17             PROSPECTIVE JUROR YOUNG:  Civil litigation.

         18             THE COURT:  And do you work at a law firm?

         19             PROSPECTIVE JUROR YOUNG:  Yes.

11:37AM  20             THE COURT:  And do you believe you've had -- you

         21   practice in Federal Court?

         22             PROSPECTIVE JUROR YOUNG:  I have, yes.

         23             THE COURT:  Okay.  If you don't mind me asking, can

         24   I ask the name of the firm?

11:37AM  25             PROSPECTIVE JUROR YOUNG:  Currently Barton LLP.

**UNITED STATES DISTRICT COURT**

|       |    |
|-------|----|
|       | 1  | THE COURT: Barton LLP. That name doesn't ring a |
|       | 2  | bell. |
|       | 3  | But do you think that you have had cases in this |
|       | 4  | courtroom before? |
| 11:37AM | 5 | PROSPECTIVE JUROR YOUNG: I -- I don't remember -- I |
|       | 6  | know I've had cases pending in the Central District of |
|       | 7  | California. |
|       | 8  | THE COURT: Okay. Got it. |
|       | 9  | And is there anything about that fact alone that |
| 11:37AM | 10 | would make it difficult for you to sit as a juror in this case? |
|       | 11 | PROSPECTIVE JUROR YOUNG: No. |
|       | 12 | THE COURT: Okay. Great. Thank you, Ms. Young. I |
|       | 13 | appreciate it. We'll come back to you later for sure. |
|       | 14 | I'm sorry. I just want to make sure, Juror -- is it |
| 11:37AM | 15 | 77? |
|       | 16 | PROSPECTIVE JUROR SUNALP: 77, Your Honor. Yes. |
|       | 17 | THE COURT: 77. Let me just make sure I get your |
|       | 18 | name. My apologies. |
|       | 19 | Is that Mr. Sunalp? |
| 11:37AM | 20 | PROSPECTIVE JUROR SUNALP: Yeah. Dr. Sunalp. |
|       | 21 | THE COURT: Dr. Sunalp. Yes, Doctor, what -- what |
|       | 22 | do you want to share? |
|       | 23 | PROSPECTIVE JUROR SUNALP: I'm a physician. So one |
|       | 24 | of the doctors I saw the name as Levine, Dr. Levine. |
| 11:38AM | 25 | THE COURT: Okay. |

1          PROSPECTIVE JUROR SUNALP:  And it's such a common

2    name.  As I said -- I also went to USC and practiced part-time

3    here.  I'm an ophthalmologist.  But somehow he sounds familiar,

4    but I don't know him personally.

11:38AM   5          THE COURT:  You don't know him personally.  Okay.

6          So as you sit here today, though, is there anything

7    about that potential relationship that would make it difficult

8    for you to sit as a fair and impartial juror in this case?

9          PROSPECTIVE JUROR SUNALP:  No.  But I have to be

11:38AM  10    honest that I -- that name has come across my experience in the

11    past.

12          THE COURT:  The last name or the --

13          PROSPECTIVE JUROR SUNALP:  The last name.  I don't

14    know what the first name is.

11:38AM  15          THE COURT:  Let me look --

16          PROSPECTIVE JUROR SUNALP:  Michael is such a common

17    name.

18          THE COURT:  Yeah.  The combination --

19          PROSPECTIVE JUROR SUNALP:  Michael Levine is such a

11:38AM  20    common name for a physician.

21          THE COURT:  Well, I appreciate you letting us know

22    that.

23          PROSPECTIVE JUROR SUNALP:  Thank you, Your Honor.

24          THE COURT:  Thank you.

11:38AM  25          Anyone else?

 1              Okay.  All right.  So why don't we start with our

 2    jurors, please.  And we'll -- and we'll go through the list,

 3    starting with Juror Number 1.

 4              Oh, let's swear the jurors in first, yeah.

11:39AM   5              THE COURTROOM DEPUTY:  All rise and raise your right

 6    hand.  Your response will be "I do."

 7              Ladies and gentlemen, do you solemnly swear that you

 8    will make true answers to such questions as may be put to you

 9    touching upon your qualifications to serve as jurors upon the

11:39AM  10    trial of the cause now before this Court, so help you God?

11              THE PROSPECTIVE JURORS:  (Collectively) I do.

12              THE COURTROOM DEPUTY:  Please be seated.

13              THE COURT:  All right.  So we'll start with Juror

14    Number 1.  If we can get him the microphone, please.

11:39AM  15              THE COURTROOM DEPUTY:  For the record, Juror

16    Number's 1 name is Michael Arana, A-r-a-n-a.

17              THE COURT:  If you don't mind, if I could ask each

18    juror, when you get the microphone, just state your name and

19    spell your first and last name for the record, please.  Okay?

11:39AM  20              And so, now, you should have a list of questions.

21    And these are sort of the generic questions that I'm going to

22    ask.

23              When we talk about area of residence, I don't need

24    to know your exact address -- you know, Van Nuys, San Pedro,

11:40AM  25    South Bay, that's fine.

```
 1                So with that, why don't we start with you,

 2     Mr. Arana.

 3                PROSPECTIVE JUROR ARANA:  My name is Michael Arana.

 4     M-i-c-h-a-e-l, A-r-a-n-a.

 5                THE COURT:  Go ahead.  You can answer the question.

 6     I'm sorry.

 7                PROSPECTIVE JUROR ARANA:  Area of residence,

 8     Whittier, California.  Occupation, I'm a mechanic.  Marital

 9     status is single.  No adult children.  Prior jury service,

10     none.

11                THE COURT:  Okay.  Great.  All right.  Thank you.

12                Let's move on.  Next, is it Mr. Rivera?

13                PROSPECTIVE JUROR RIVERA:  Yes.  My name is

14     Ernest Rivera, E-r-n-e-s-t, R-i-v-e-r-a.

15                Area of residence would be San Gabriel Valley,

16     Baldwin Park area.  I am retired.  Married.  No boyfriend, no

17     girlfriend, just my significant other.  I have adult children.

18     One of them works -- I'm not exactly sure what her job is.  The

19     other one stays at home.  And I have -- I've had prior jury

20     service before.

21                THE COURT:  And how long ago was the prior -- prior

22     service, jury service?

23                PROSPECTIVE JUROR RIVERA:  It's been some time.

24                THE COURT:  Okay.

25                PROSPECTIVE JUROR RIVERA:  Maybe over ten years.
```

1          THE COURT:  Over ten years.

2          Do you remember if it was a criminal or civil case?

3          PROSPECTIVE JUROR RIVERA:  It was a criminal case.

4          THE COURT:  Do you remember the kind of case it was?

11:41AM    5          PROSPECTIVE JUROR RIVERA:  Um, well, yes.  I think

6    it was a person that was -- that crossed the crossing arms of a

7    train that were down and went around it and got hit by a train.

8          THE COURT:  Got it.  Okay.

9          And do you remember if a verdict was reached in the

11:41AM    10   case?

11         PROSPECTIVE JUROR RIVERA:  Yes, it was.

12         THE COURT:  Okay.  And now, look, I know it was

13   ten -- a while back.  You may hear instructions that are

14   similar or different if you serve as a juror in this case.  My

11:42AM    15   question to you is that -- would you be able to set aside those

16   instructions that you heard in the old case and listen to and

17   follow the instructions in this case if you're called as a

18   juror?

19         PROSPECTIVE JUROR RIVERA:  Not a problem because I

11:42AM    20   wouldn't remember anyway.

21         THE COURT:  All right.  Good.

22         And then you said you're retired.  Congratulations.

23   What did you retire from?

24         PROSPECTIVE JUROR RIVERA:  I worked for the phone

11:42AM    25   company, for Pacific Bell for 30 years.  Splicer.

|   |   |
|---|---|
| 1 | THE COURT:  Got it. |
| 2 | And then your spouse -- |
| 3 | PROSPECTIVE JUROR RIVERA:  Stay-at-home wife. |
| 4 | THE COURT:  Got it.  Great. |
| 11:42AM 5 | And then you said you have two kids, one stays at |
| 6 | home and the other -- |
| 7 | PROSPECTIVE JUROR RIVERA:  I have three adult |
| 8 | children, two -- my two oldest -- or my oldest and youngest |
| 9 | daughters live with me, and my son lives with his family. |
| 11:42AM 10 | THE COURT:  And what does your son do? |
| 11 | PROSPECTIVE JUROR RIVERA:  He works for the post |
| 12 | office. |
| 13 | THE COURT:  Post office. |
| 14 | And then you said one stay-at-home and the other |
| 11:42AM 15 | one -- |
| 16 | PROSPECTIVE JUROR RIVERA:  Yeah.  She works for a |
| 17 | place that does contract work for airline companies.  They make |
| 18 | parts and they -- you know, they clean them and send them back |
| 19 | out to -- I guess to places like NASA.  And they're, like, |
| 11:43AM 20 | airplane parts. |
| 21 | THE COURT:  Got it.  Okay.  Thank you. |
| 22 | All right.  Let's move on, sir.  Is it Mr. Reeves? |
| 23 | PROSPECTIVE JUROR REEVES:  Yes. |
| 24 | THE COURT:  Go ahead, sir. |
| 11:43AM 25 | PROSPECTIVE JUROR REEVES:  Sean Reeves, S-e-a-n, |

11:43AM R-e-e-v-e-s. Area of residence is Simi Valley, Santa Susana area. Occupation is an office manager. Married. My wife is in insurance. I have an adult daughter -- I have two kids. The adult daughter is a speech language pathologist. No prior jury.

THE COURT: Okay. And then you said you're an office manager. What type of industry? What is the nature of the work that the office does?

PROSPECTIVE JUROR REEVES: Production company.

11:43AM THE COURT: Television? Film? Both or --

PROSPECTIVE JUROR REEVES: Like, commercials.

THE COURT: Commercials. Got it. Okay.

And then your spouse works in insurance. Is your spouse an adjuster or --

11:44AM PROSPECTIVE JUROR REEVES: I don't know.

THE COURT: Okay. Okay. That's fine. That's okay. Don't worry. I won't send her a transcript of this. Okay?

And then you said you have one adult child and a minor child; correct?

11:44AM PROSPECTIVE JUROR REEVES: Correct.

THE COURT: And no prior jury experience. Okay. Thank you.

Let's move on. Is it Ms. Garcia?

PROSPECTIVE JUROR GARCIA: Yeah.

11:44AM THE COURT: Good morning.

1          PROSPECTIVE JUROR GARCIA:  Michelle,

2    M-i-c-h-e-l-l-e, Garcia, G-a-r-c-i-a.  From Newbury Park.  I'm

3    a librarian at a middle school.  My husband's a mortgage

4    broker.  I have two minor children.  And no prior jury service.

11:44AM  5          THE COURT:  Okay.  Thank you.

6          Let's move on.  Is it Mr. Ken?

7          PROSPECTIVE JUROR KEN:  Eddie Ken.  E-d-d-i-e, last

8    name is Ken, K-e-n.  Areas of residence, I live in La Mirada.

9    Occupation, I'm accounting.  Marital status is divorced.  I

11:45AM 10    have two children.  My son is in third year Cal State

11    Fullerton, and my daughter is in junior year in high school.

12    Prior jury service, don't have.

13          THE COURT:  Okay.  Great.  Thank you.

14          Let's move on to -- is it Ms. Escobar?

11:45AM 15          PROSPECTIVE JUROR ESCOBAR:  Correct.

16          Sara Escobar, S-a-r-a, E-s-c-o-b-a-r.  Area of

17    residence, Pico Rivera.  Occupation, medical assistant.

18    Marital status, single.  No children.  Prior jury service,

19    none.

11:45AM 20          THE COURT:  Okay.  Great.  Okay.  Let's see.

21          We're going to jump down -- we're not going to

22    forget you -- oh, I'm sorry.  Someone has their hand up.

23          UNIDENTIFIED PROSPECTIVE JUROR:  I need to use the

24    restroom.

11:46AM 25          THE COURT:  Okay.  How about this?  It's a quarter

to 12:00.  Let's take our lunch break right now.  I'll have

everyone come back at 1:15, and we'll resume jury service at

that time.

Please -- even though you know nothing about the

case, please do not form or express any opinion about the case

until the matter is finally submitted to you.  Don't talk with

anyone about the case.  Don't allow anyone to talk to you about

the case.  And please do not conduct any research of any kind

on any subject matter connected with the case.

We'll see you all back at 1:15.  Have a good lunch.

Thank you.

THE COURTROOM DEPUTY:  All rise for the jury.

(Out of the presence of the prospective jurors:)

THE COURT:  Before we take a break, I know there's

some folks out in the audience.  I don't know who you are, but

I recognize some faces from prior proceedings.

I just want to let you all know, please do not

communicate in any way, shape, or form with any of the folks or

jurors.  It's just going to make things more complicated.  And

I'm not suggesting anyone would do that, but just be mindful

where you are, if you're in the cafeteria, the conversations

that you have because there will be people wearing juror

badges.  Some may be in this pool, some may be in other pools

for other cases.  So just be mindful of that, please.

All right.  We have a juror who wants to speak to

|  | 1 | the Court, so -- and I'm sorry, for the family -- for the folks |
|---|---|---|
|  | 2 | that are out in the audience, you can leave if you want.  So -- |
|  | 3 | I'm just -- it's Juror Number, I believe, 75. |
|  | 4 | (In the presence of Prospective Juror Number 75:) |
| 11:49AM | 5 | THE COURT:  I'm sorry to put the spotlight on you. |
|  | 6 | If you wouldn't mind, why don't you come up to the lectern so |
|  | 7 | everyone can hear you. |
|  | 8 | And if you wouldn't mind, I see you're Juror |
|  | 9 | Number 75.  You are Ms. Malgieri? |
| 11:49AM | 10 | PROSPECTIVE JUROR MALGIERI:  Malgieri. |
|  | 11 | THE COURT:  Is there something you want to share in |
|  | 12 | private or -- |
|  | 13 | PROSPECTIVE JUROR MALGIERI:  I can say, it's fine. |
|  | 14 | THE COURT:  Okay.  Go ahead, ma'am. |
| 11:49AM | 15 | PROSPECTIVE JUROR MALGIERI:  I'm a recovering |
|  | 16 | addict, so this is very triggering for me.  I'm very |
|  | 17 | uncomfortable with it.  I don't think I would be good on the |
|  | 18 | jury. |
|  | 19 | THE COURT:  Got it.  And I don't mean to pry -- |
| 11:49AM | 20 | PROSPECTIVE JUROR MALGIERI:  No, it's fine. |
|  | 21 | THE COURT:  -- and I appreciate your candor. |
|  | 22 | PROSPECTIVE JUROR MALGIERI:  Uh-huh. |
|  | 23 | THE COURT:  Just the subject matter in and of |
|  | 24 | itself, you think it would be difficult for you to be fair and |
| 11:50AM | 25 | impartial to both sides? |

53

```
 1              PROSPECTIVE JUROR MALGIERI:  Correct.

 2              THE COURT:  Okay.  Let me have counsel at sidebar,

 3      please.

 4              If you just would hang tight there.

 5                  (At sidebar:)

 6              THE COURT:  So I just wanted to just -- do either --

 7      either side wish me to ask any further questions?  What are the

 8      thoughts with respect to Ms. Malgieri?  She's indicated that,

 9      you know, this might be too triggering.  I did not probe one

10      side or the other, but she made it a point, she asked our

11      courtroom deputy to speak so --

12              MS. BAHADUE:  If you would like to go first.

13              THE COURT:  Government goes.

14              MS. BAHADUE:  She did say that she can't be fair and

15      impartial, this is triggering.  We're not pretty far in, so

16      it's going to get worse, I think.

17              MR. BROWN:  There's no objection, Your Honor.

18              THE COURT:  So I'll -- there's no objection, I'll

19      excuse her for cause.

20              MS. BAHADUE:  Yes, Your Honor.

21              MR. BROWN:  Thank you.

22                  (In the presence of the Prospective Juror 75:)

23              THE COURT:  Okay.  Ms. Malgieri, I want to thank you

24      again for your candor.  Appreciate it.  You're excused.  You

25      can return back to the jury assembly room for further
```

Timestamps in left margin:
11:50AM (line 5)
11:50AM (line 10)
11:50AM (line 15)
11:51AM (line 20)
11:51AM (line 25)

54

|   |   |
|---|---|
| 1 | instructions.  You don't have to come back this afternoon. |
| 2 | PROSPECTIVE JUROR MALGIERI:  Okay.  Thank you. |
| 3 | THE COURT:  Thank you.  All right. |
| 4 | (Out of the presence of the prospective jurors:) |
| 5 | THE COURT:  Is there anything further from the |
| 6 | Government that we need to discuss? |
| 7 | MR. CASTAÑEDA:  Yes, Your Honor, one matter. |
| 8 | Last week we had e-mailed the Court to ask if we |
| 9 | could bring in physical drug exhibits.  I believe there's an |
| 10 | objection from defense counsel so we just wanted -- |
| 11 | THE COURT:  I just want to make sure, what are we |
| 12 | bringing in exactly?  My apologies.  I did read it, but I |
| 13 | wasn't sure -- forgive me, I just wasn't sure exactly what you |
| 14 | were trying to bring in. |
| 15 | MR. CASTAÑEDA:  It would be the physical drug |
| 16 | exhibits of the Adderall pills that tested positive for |
| 17 | methamphetamine and the MDMA but not, of course, the fentanyl. |
| 18 | THE COURT:  Got it. |
| 19 | And what is -- |
| 20 | MR. CASTAÑEDA:  And -- excuse me.  And the cocaine |
| 21 | as well. |
| 22 | THE COURT:  And how much are we talking about? |
| 23 | MR. CASTAÑEDA:  The pills are three to four kind |
| 24 | of -- it's over a thousand pills, but it's pretty tightly |
| 25 | packaged.  The cocaine is a brick and some smaller -- smaller |

The time stamps in the left margin are: 11:51AM (line 5), 11:51AM (line 10), 11:52AM (line 15), 11:52AM (line 20), 11:52AM (line 25).

packages for distribution.  And the MDMA pills are sort of an

assortment that is smaller than the Adderall pills.

THE COURT:  And dare I ask, I assume you have

photographs and all that other stuff.  What's the -- what's the

11:52AM   urgency in having them brought here physically?

MR. CASTAÑEDA:  Well, we have the photographs,

Your Honor, and a witness will be testifying to sort of the

chain of custody.  But it is to show the volume.  It goes

towards it being more likely than not for distribution purposes

11:53AM   rather than for personal consumption.

THE COURT:  All right.  Mr. Brown, I know you

objected, but what's the -- I want to hear it again, sort of

the basis of the objection.  I mean, the evidence is the

evidence.  Wrong or right, the Government -- I mean, it's the

11:53AM   evidence in the trial.  I don't know if there's a way -- I

don't think there's a legal basis by which I can exclude them

from bringing it in.

MR. BROWN:  Your Honor, I would just object under

403, Your Honor.  I think it's more prejudicial than probative.

11:53AM   We have a photo of the exhibit.  I don't know -- I think for a

juror to see this live -- live drugs is going to be incredibly

inflammatory, Your Honor.

Also I think there's some safety concerns about

having, you know, these kind of narcotics in the courtroom.

11:53AM   I -- I would just -- 403, Your Honor.

1          THE COURT:  All right.  Thank you.

2          So I just want to make sure, they're going to be

3     brought in for display and then they're gone after that?

4          MR. CASTAÑEDA:  Yes, Your Honor.  They'll be brought

11:53AM   5     in through, I believe, Special Agent Dansart.

6          THE COURT:  And he'll leave with them?

7          MR. CASTAÑEDA:  They will come in and out with the

8     witness, Your Honor.

9          THE COURT:  Look, it's the evidence.  I don't think

11:54AM   10    there's a legal basis by which I can exclude it.  I don't think

11    it's more prejudicial than probative just given it's what's

12    alleged in the case.  If there's a foundation to bring it in,

13    then it will be -- the agent can bring in the physical

14    exhibit -- the physical drugs, with the exception of the

11:54AM   15    fentanyl.

16          All right.  Anything else from the Government?

17          MR. CASTAÑEDA:  Anything else?

18          No, Your Honor.

19          THE COURT:  Mr. Brown, anything further?

11:54AM   20    MR. BROWN:  No, Your Honor.  All right.  Thank you

21    very much, Your Honor.

22          THE COURT:  So we'll see you all at 1:15, then.

23          THE COURTROOM DEPUTY:  All rise.  This court is in

24    recess.

11:54AM   25          (Noon recess taken.)

|  | 1 | (In the presence of the prospective jurors:) |
|--|---|--|

1          (In the presence of the prospective jurors:)

2          THE COURT:  All right.  Sorry.  Welcome back.  Let's

3  continue with our jury selection.

4          I think we last left off with Ms. Escobar, so we're

01:26PM  5  going to jump to Mr. Lo.  And don't worry Mr. Goodman, we'll

6  get back to you.  Okay?

7          All right.  Mr. Lo, good afternoon, sir.

8          PROSPECTIVE JUROR LO:  Good afternoon.

9          THE COURT:  You can answer the questions.

01:26PM  10          PROSPECTIVE JUROR LO:  My name is Eric Lo, E-r-i-c,

11  L-o.  I'm from Alhambra, California.  My occupation is a data

12  analyst.  I'm not married.  I have a girlfriend.  She's a

13  lawyer.  Yeah.  That's -- okay.

14          THE COURT:  Any prior jury service?

01:26PM  15          PROSPECTIVE JUROR LO:  No.

16          THE COURT:  Okay.  No kids; right?

17          PROSPECTIVE JUROR LO:  No.

18          THE COURT:  And if you don't mind me asking, what

19  type of law does your girlfriend practice?

01:27PM  20          PROSPECTIVE JUROR LO:  Antitrust and competition.

21          THE COURT:  And to your knowledge, has she ever

22  tried any cases in State or Federal Court?

23          PROSPECTIVE JUROR LO:  No.

24          THE COURT:  And how long has she been a lawyer?

01:27PM  25          PROSPECTIVE JUROR LO:  Two years.

|   |   |
|---|---|
| 1 | THE COURT:  Okay.  So she's in the -- in the |
| 2 | dungeons, if you will, going over documents; right? |
| 3 | PROSPECTIVE JUROR LO:  Yes. |
| 4 | THE COURT:  All right.  And she hasn't said any bad |
| 5 | stories about judges in Federal Court or anything like that? |
| 6 | PROSPECTIVE JUROR LO:  None that I've heard. |
| 7 | THE COURT:  All right.  Just checking. |
| 8 | One last thing.  You said data analyst.  What type |
| 9 | of data, if you don't mind me asking? |
| 10 | PROSPECTIVE JUROR LO:  Healthcare. |
| 11 | THE COURT:  Healthcare.  Okay.  Great.  Thank you. |
| 12 | Is it Mr. Nguyen? |
| 13 | PROSPECTIVE JUROR NGUYEN:  Yes. |
| 14 | THE COURT:  Good afternoon. |
| 15 | PROSPECTIVE JUROR NGUYEN:  First name is Ai, A-i, |
| 16 | last name is Nguyen, N-g-u-y-e-n.  Area of residence is |
| 17 | Torrance.  Occupation, I'm electrical engineer.  No girlfriend. |
| 18 | No kid.  Prior jury, criminal, yes.  State.  Verdict, yes. |
| 19 | DUI. |
| 20 | THE COURT:  Okay.  How long ago was this? |
| 21 | PROSPECTIVE JUROR NGUYEN:  Um, I would say over ten |
| 22 | years ago. |
| 23 | THE COURT:  Ten years ago.  Okay. |
| 24 | So I'll ask you the same question I think I asked |
| 25 | Mr. Rivera earlier.  You're going to hear instructions in this |

01:27PM (line 5)
01:27PM (line 10)
01:27PM (line 15)
01:28PM (line 20)
01:28PM (line 25)

```
 1    case if you are asked to serve as a juror.

 2              Will you be able to put aside any instructions that

 3    you may have heard in your prior case and listen to and follow

 4    the instructions here?

 5              PROSPECTIVE JUROR NGUYEN:  Yes.

 6              THE COURT:  Okay.  Great.  Thank you.

 7              All right.  Is it Mr. McPhilamy?

 8              PROSPECTIVE JUROR MCPHILAMY:  McPhilamy.

 9              First name Sean, last name McPhilamy.  That's

10    S-e-a-n, M-c-P-h-i-l-a, m as in Mary, y.  Area of residence is

11    the city of Los Angeles.  Occupation, I am a retail sales

12    manager.  I am married.  My wife is a stay-at-home mom.  We

13    have two underaged daughters.  And no prior jury service.

14              THE COURT:  Okay.  And if you don't mind me asking,

15    what type of retail are you involved in?

16              PROSPECTIVE JUROR MCPHILAMY:  Video games.

17              THE COURT:  Video games.  Okay.

18              PlayStation?

19              PROSPECTIVE JUROR MCPHILAMY:  All of the above.

20              THE COURT:  All of the above.  Can you get my kids

21    some discounts?  I'm just kidding.

22              Thank you.  All right.

23              Is it Ms. Tchekmedyian?

24              PROSPECTIVE JUROR TCHEKMEDYIAN:  Tchekmedyian.

25              THE COURT:  Good afternoon.
```

01:28PM (line 5)
01:28PM (line 10)
01:28PM (line 15)
01:29PM (line 20)
01:29PM (line 25)

```
 1                PROSPECTIVE JUROR TCHEKMEDYIAN:  My first name is

 2      Sareen, S-a-r-e-e-n, Tchekmedyian, T-c-h-e-k-m-e-d-y-i-a-n.  I

 3      live in central Los Angeles.  My occupation is performing

 4      artist, ballet dancer, musical theater performer, actor.  I am

 5      not married.  No significant other.  No children.  And no prior

 6      jury service.

 7                THE COURT:  All right.  Great.  Thank you.

 8                Are you on your way to an EGOT?  Trying?  Okay.  All

 9      right.  Good, good, good.

10                Ms. Chambers.

11                PROSPECTIVE JUROR CHAMBERS:  Hi.  It's

12      Karen Chambers, K-a-r-e-n, C-h-a-m-b-e-r-s.  I live on the west

13      side of L.A.  I'm an administrator and theology teacher at a

14      Catholic high school.  Single.  No significant other.  No

15      children.  And I served on a jury about 20 years ago for

16      assault with a deadly weapon, and we came to a verdict.

17                THE COURT:  Okay.  20 years -- okay.  I'll ask you

18      the same question I asked the others.  You heard jury

19      instructions in that case.  They're likely going to be

20      different that what you hear in this case.

21                If you are selected as a juror, would you be able to

22      set aside and listen to and follow only the instructions in

23      this case?

24                PROSPECTIVE JUROR CHAMBERS:  Yeah.

25                THE COURT:  Okay.  And if you don't mind me asking,
```

01:29PM (line 5)
01:29PM (line 10)
01:30PM (line 15)
01:30PM (line 20)
01:30PM (line 25)

1    you said you are a theology teacher at a Catholic high school

2    in L.A.?

3                    PROSPECTIVE JUROR CHAMBERS:  In Inglewood.

4                    THE COURT:  In Inglewood.  Okay.  Great.  Thank you.

01:30PM  5                    All right.  Let's move on -- I guess it is

6    Ms. Sanchez.

7                    PROSPECTIVE JUROR SANCHEZ:  Yes.  Karina Sanchez,

8    K-a-r-i-n-a, S-a-n-c-h-e-z.  West Covina, California.

9    Occupation, student, I guess.  Single.  No boyfriend.  No

01:31PM  10   children.  And no prior jury service.

11                    THE COURT:  What are you studying?

12                    PROSPECTIVE JUROR SANCHEZ:  Mathematics, actuarial

13   science.

14                    THE COURT:  And you are in school right now?

01:31PM  15                    PROSPECTIVE JUROR SANCHEZ:  Yes.

16                    THE COURT:  Okay.  Great.  Thank you.

17                    Let's move the mic, if we could, to -- is it Ms. --

18   is it Ms. Haghverdian?

19                    PROSPECTIVE JUROR HAGHVERDIAN:  Yes.

01:31PM  20                    THE COURT:  No.  Up front.

21                    PROSPECTIVE JUROR HAGHVERDIAN:  My name is

22   Petrina Haghverdian.  That's P-e-t-r-i-n-a, last name

23   H-a-g-h-v-e-r-d-i-a-n.  Area of residence is Glendale,

24   California.  Occupation, I'm a medical student.  Single.  No

01:31PM  25   children.  And no prior jury service.

```
 1              THE COURT:  Okay.  Well, congratulations.

 2              How much -- how far are you into medical school?

 3              PROSPECTIVE JUROR HAGHVERDIAN:  I'm in my fourth

 4   year.

 5              THE COURT:  All right.  Good for you.

 6              Do you know what you want to practice?

 7              PROSPECTIVE JUROR HAGHVERDIAN:  Foot and ankle

 8   surgery.

 9              THE COURT:  Okay.  Wonderful.  All right.

10              Okay.  Thank you.

11              Let's move on to -- Ms. Provencio?

12              PROSPECTIVE JUROR PROVENCIO:  Yes.

13              THE COURT:  Good afternoon.

14              PROSPECTIVE JUROR PROVENCIO:  Good afternoon.

15              I'm Marla, M-a-r-l-a, Provencio, P-r-o-v-e-n-c-i-o.

16   I reside in Arcadia.  I'm a chief creative strategist for a

17   marketing agency.  I'm married.  I have a son who's an

18   executive director at Ghetto Film School.  I have had -- been

19   on two other juries, civil.

20              THE COURT:  All right.  You've been on two other

21   juries.  Were they criminal, civil, or both?

22              PROSPECTIVE JUROR PROVENCIO:  They were both civil.

23              THE COURT:  I'm sorry, I misheard you.

24              PROSPECTIVE JUROR PROVENCIO:  That's okay.

25              One was medical malpractice and the other one
```

Timestamps in left margin: 01:31PM (line 5), 01:32PM (line 10), 01:32PM (line 15), 01:32PM (line 20), 01:32PM (line 25)

where -- was one where a masseuse did something inappropriate

at a massage parlor.

        THE COURT:  Were verdicts reached in both cases?

        PROSPECTIVE JUROR PROVENCIO:  I believe so, yes.

        THE COURT:  And how long ago was this?

        PROSPECTIVE JUROR PROVENCIO:  Oh, 10, 15 years ago.

        THE COURT:  So I'm going to ask you a slight

variation of the questions that I asked for others that served

on a jury.  And it is somewhat important.  Because the burden

of proof in a civil case is different than in a criminal case.

And so it's important that -- for me to make sure that you

understand that in and of itself and know that, if you were

selected as a juror, I will be asking you to set aside and

not -- and make sure that you work with the appropriate burden

of proof.

        Would you be willing and able to do that if you were

asked to serve as a juror on this case?

        PROSPECTIVE JUROR PROVENCIO:  Yes.

        THE COURT:  Okay.  Great.

        PROSPECTIVE JUROR PROVENCIO:  I do have to sidebar,

though, for some other medical procedure that I'm going to have

to do during this period of time.

        THE COURT:  Okay.  Do you want to do that right now?

        PROSPECTIVE JUROR PROVENCIO:  Whenever is

appropriate.

|  | 1 | THE COURT:  Why don't we do that right now, if you |
|  | 2 | don't mind.  Just walk around and we'll talk. |
|  | 3 | (At sidebar in the presence of |
|  | 4 | Prospective Juror No. 14:) |
| 01:33PM | 5 | THE COURT:  So if you wouldn't mind, everybody's got |
|  | 6 | to be around you, we'll wait for the lawyers to get here. |
|  | 7 | PROSPECTIVE JUROR PROVENCIO:  On March 5th, I'm |
|  | 8 | going to have an ultrasound to determine whether I have breast |
|  | 9 | cancer. |
| 01:34PM | 10 | THE COURT:  Okay.  March 5th? |
|  | 11 | PROSPECTIVE JUROR PROVENCIO:  5th. |
|  | 12 | THE COURT:  I just want to make sure all the lawyers |
|  | 13 | heard. |
|  | 14 | Mr. Brown, did you hear? |
| 01:34PM | 15 | MR. BROWN:  No. |
|  | 16 | THE COURT:  I'm sorry. |
|  | 17 | PROSPECTIVE JUROR PROVENCIO:  On March 5th, I'm |
|  | 18 | going to have to do an ultrasound to determine whether I have |
|  | 19 | breast cancer. |
| 01:34PM | 20 | MR. BROWN:  I'm so sorry. |
|  | 21 | THE COURT:  So we'll keep that in mind, and we'll |
|  | 22 | talk amongst the lawyers.  But thanks for letting us know. |
|  | 23 | We'll talk about it after. |
|  | 24 | (In the presence of the prospective jurors:) |
| 01:34PM | 25 | THE COURT:  And, Ms. Provencio, one follow-up |

```
 1   question if we --
 2              PROSPECTIVE JUROR PROVENCIO:  Sure.
 3              THE COURT:  You said you're married.  Does your
 4   spouse work outside the home?
 5              PROSPECTIVE JUROR PROVENCIO:  He's retired.
 6              THE COURT:  And what did he retire from?
 7              PROSPECTIVE JUROR PROVENCIO:  He was an audio
 8   specialist.
 9              THE COURT:  Got it.  Okay.  Great.  Thank you.
10              All right.  Mr. Conrad, good afternoon, sir.
11              PROSPECTIVE JUROR CONRAD:  Hello.  My name is
12   Joseph Conrad.  J-o-s-e-p-h, Conrad, C-o-n-r-a-d.  I'm a
13   retired food broker.  I am married.  My wife is a mortgage
14   underwriter.  I have no children.  And I did participate in
15   jury service.  It was a criminal case in state court.  There
16   was a verdict.  And it was murder/manslaughter.
17              THE COURT:  How long ago was this?
18              PROSPECTIVE JUROR CONRAD:  2016.
19              THE COURT:  2016.  Okay.  So not too long ago.
20              You know, I'll ask you as I asked the others.  You
21   heard jury instructions in that case.  They're going to be
22   different than the jury instructions that you hear in this
23   case.  Will you able to set aside those instructions and what
24   you heard and listen to and follow the instructions in this
25   case if you're selected?
```

```
 1              PROSPECTIVE JUROR CONRAD:  Absolutely.

 2              THE COURT:  All right.  Great.  Thank you, sir.

 3     Appreciate it.

 4              Gaspar.

 5              PROSPECTIVE JUROR GASPAR:  That's correct.

 6              THE COURT:  All right.  Good afternoon, sir.

 7              PROSPECTIVE JUROR GASPAR:  Good afternoon.  My name

 8     is Tomas Gaspar.  T as in today, o, m as in Mary, a, s as in

 9     Sam; Gaspar, G as in go, a, s as in Sam, p as in Paul, a-r.

10              It's been misspelled many times.  That's why I spell

11     it.

12              Let me see the questions.  I guess occupation,

13     I'm -- oh, I'm from south Pasadena.  I live in south Pasadena.

14     I'm retired.  I'm married.  And we have an adult daughter.  And

15     I've not had any jury service.

16              THE COURT:  Okay.  And then you're retired.  What

17     did you retire from?

18              PROSPECTIVE JUROR GASPAR:  I'm a retired

19     continuation high school counselor.

20              THE COURT:  Okay.  And then your spouse, did you say

21     your spouse is also retired?

22              PROSPECTIVE JUROR GASPAR:  No, no.  She's a teacher

23     for the L.A. County Office of Ed.

24              THE COURT:  Okay.  All right.  And your adult

25     daughter, does she work?
```

01:35PM (line 5)
01:36PM (line 10)
01:36PM (line 15)
01:36PM (line 20)
01:37PM (line 25)

```
        1              PROSPECTIVE JUROR GASPAR:  Yes.  Well, she's an
        2   artist.
        3              THE COURT:  Okay.  That's work.  Okay.
        4              I don't want to get Ms. Tchekmedyian upset.  Artists
01:37PM  5   work.
        6              Okay.  And no prior jury service.  Okay.  Great.
        7   Thank you.
        8              Is it Ms. Argenis Ruvalcaba?  Mr. Ruvalcaba?
        9              PROSPECTIVE JUROR RUVALCABA:  Yeah, Mister.
01:37PM 10   Argenis Octavio Ruvalcaba.  That's A-r-g-e-n-i-s and then
       11   O-c-t-a-v-i-o.  Ruvalcaba is R-u-v-a-l-c-a-b-a.
       12              THE COURT:  All right.
       13              PROSPECTIVE JUROR RUVALCABA:  I live in Glendora.
       14   I'm a research project manager for a medical school, the Kaiser
01:37PM 15   Permanente Medical School.  I am not married, but I am engaged.
       16   My fiancée is a middle school math teacher.  No children yet.
       17   And then, no, I've never been to a jury before.
       18              THE COURT:  All right.  Well, congratulations on the
       19   engagement.  All right.
01:37PM 20              PROSPECTIVE JUROR RUVALCABA:  Thank you.
       21              THE COURT:  Let's move on to -- is it Ms. Gritman?
       22              PROSPECTIVE JUROR GRITMAN:  Yes.
       23              THE COURT:  Good afternoon, ma'am.
       24              PROSPECTIVE JUROR GRITMAN:  Good afternoon.
01:38PM 25   Donna Gritman, D-o-n-n-a, G-r-i-t-m-a-n.  Live in La Mirada.  I
```

```
 1    was retired.  I came out of retirement in October.  My husband

 2    is retired.  I have three adult children.  One is a medical

 3    director, one is a manager of payroll, and the other one is a

 4    manager of HR and payroll.  And I did jury duty about -- I want

 5    to say it's like 30-plus years maybe.  I served on a jury.

 6                THE COURT:  Do you remember what type of case it

 7    was?

 8                PROSPECTIVE JUROR GRITMAN:  It was a child

 9    molestation.

10                THE COURT:  Do you remember whether a verdict was

11    reached or not?

12                PROSPECTIVE JUROR GRITMAN:  We did.

13                THE COURT:  Okay.  Let me ask couple of follow-up

14    questions.

15                You said you were retired.  What did you retire

16    from?

17                PROSPECTIVE JUROR GRITMAN:  I was in

18    telecommunications.

19                THE COURT:  Got it.

20                And then, now you're -- you came out of retirement.

21    Are you doing telecommunications again?

22                PROSPECTIVE JUROR GRITMAN:  No.  I'm working just

23    part-time in a medical office.

24                THE COURT:  Okay.  Got it.

25                And then your husband, I think you said, was --
```

01:38PM (line 5)
01:38PM (line 10)
01:38PM (line 15)
01:38PM (line 20)
01:39PM (line 25)

```
 1                PROSPECTIVE JUROR GRITMAN:  Retired.  Electrician.

 2                THE COURT:  Electrician.  Great.  Okay.

 3                And then it's 30 years ago.  So I don't know if you

 4      even remember the instructions.  But will you be able to put

 5      those aside and listen to and follow the instructions in this

 6      case if you are selected as a juror?

 7                PROSPECTIVE JUROR GRITMAN:  Yes.

 8                THE COURT:  Okay.  Now, if we could, we'll jump back

 9      to Mr. Goodman.  If you could bring the microphone back up

10      there, please.

11                Good afternoon, sir.

12                PROSPECTIVE JUROR GOODMAN:  I'm Joseph Goodman,

13      J-o-s-e-p-h, G-o-o-d-m-a-n.  From Long Beach.  I'm a

14      semi-retired realtor.  No significant others.  No children.  No

15      prior jury service.

16                THE COURT:  Okay.  Thank you.

17                PROSPECTIVE JUROR GOODMAN:  And I would at some

18      point like to request a medical sidebar.

19                THE COURT:  Why don't we do that now, if you don't

20      mind.

21                PROSPECTIVE JUROR GOODMAN:  Should I --

22                THE COURT:  Yes.  Then we'll come over.

23                     (At sidebar in the presence of

24                      Prospective Juror No. 19:)

25                THE COURT:  Sorry.  We just have to have everyone
```

01:39PM (line 5)
01:39PM (line 10)
01:39PM (line 15)
01:40PM (line 20)
01:40PM (line 25)

     1    here.

     2              Go ahead.

     3              PROSPECTIVE JUROR GOODMAN:  I apologize.  I've got

     4    two major medical things.  I have letters but nobody cared.

01:40PM  5    I've got a cardio situation.  I have lots of blockages.  I've

     6    had a stent put in recently.  And I get angina all the time,

     7    which I did today when I ran to the car to get some pills.

     8              I also have severe back pain.  They're suggesting --

     9    I'm sorry, I'm talking so fast -- four levels of plates and

01:40PM 10    screws.  But they're saying wait as long as you can until the

    11    pain is unbearable because it may make things worse.  And

    12    sitting, for me, is very difficult.

    13              The way I live my life is I change positions all the

    14    time.  I'll sit at a desk for as much as an hour, but then I

01:41PM 15    have to lie on my back.  And I have to sit in a chair.  And

    16    that's how I have to live, but it's working for now.

    17              THE COURT:  Okay.

    18              PROSPECTIVE JUROR GOODMAN:  So it makes it tough.

    19              THE COURT:  I appreciate you letting us know that.

01:41PM 20    We're going to continue on, but that's important for us to know

    21    this.  Okay?  Thank you.

    22              PROSPECTIVE JUROR GOODMAN:  Thank you.

    23              (In the presence of the prospective jurors:)

    24              THE COURT:  All right.  We'll continue on.

01:41PM 25              Is it Ms. Oropeza?

1      PROSPECTIVE JUROR OROPEZA:  Correct.

2      THE COURT:  All right.  Good afternoon, ma'am.

3      PROSPECTIVE JUROR OROPEZA:  My name is

4  Sofia Oropeza, S-o-f-i-a, O-r-o-p-e-z-a.  Area of residence,

01:41PM   5  Los Angeles.  Occupation, elementary teacher.  Marital status,

6  divorced.  No significant other.  Three adult children.  Two of

7  them are full-time college students.  One of them is a human

8  resource representative for a retail store.  And no prior jury

9  service.

01:42PM  10      THE COURT:  Okay.  All right.  And so you indicated

11  that you're divorced.  What does your former -- does your

12  former spouse work?

13      PROSPECTIVE JUROR OROPEZA:  No, I don't have a

14  former spouse.

01:42PM  15      THE COURT:  Oh.  I thought you said you were

16  divorced.  No?

17      PROSPECTIVE JUROR OROPEZA:  Oh, yes.  What was the

18  question?

19      THE COURT:  Your former spouse, does your former

01:42PM  20  spouse work?

21      PROSPECTIVE JUROR OROPEZA:  Yes.

22      THE COURT:  What does your former spouse do?

23      PROSPECTIVE JUROR OROPEZA:  Systems administrator.

24      THE COURT:  Okay.  Got it.

01:42PM  25      All right.  And then you said you're an elementary

         1    school teacher.  What grade do you teach?

         2              PROSPECTIVE JUROR OROPEZA:  Second and third.

         3              THE COURT:  Second and third.  Okay.

         4              My mom was my first grade teacher, and I have the

01:42PM  5    therapy results -- receipts to prove it.  No, I'm just kidding.

         6              Okay.  All right.  Let's move on, if we could.

         7              Is it Mr. Cerda?

         8              PROSPECTIVE JUROR CERDA:  Yes.

         9              THE COURT:  Thank you.

01:42PM  10             PROSPECTIVE JUROR CERDA:  Good afternoon.  Area of

         11   residence is city of Los Angeles.  Occupation, delivery truck

         12   driver.  Status, single.  No adult children.  And prior jury

         13   service, none.

         14             THE COURT:  Okay.  Great.

01:43PM  15             Okay.  Thank you.

         16             And then is it Ms. Schwenke?

         17             PROSPECTIVE JUROR SCHWENKE:   Schwenke.

         18             THE COURT:  Good afternoon, ma'am.

         19             PROSPECTIVE JUROR SCHWENKE:  Good afternoon.

01:43PM  20   Karen Schwenke, K-a-r-e-n, S-c-h-w-e-n-k-e.  And I live in

         21   La Mirada.  Occupation, I'm a retired professor and now working

         22   as a tutor at a community college.  Single.  No children.  And,

         23   yes, I've had prior jury service in a state court.  It was

         24   attempted murder, and we did reach a verdict.

01:43PM  25             THE COURT:  And how long ago was this?

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 01:43PM | 5 |

PROSPECTIVE JUROR SCHWENKE:  15 to 20 years ago.

THE COURT:  Will you be able to put aside any instructions you heard in that case and listen to and follow the instructions in this case?

PROSPECTIVE JUROR SCHWENKE:  Yes.  But -- I don't know if this is the appropriate moment, but there's something with the subject of this case that might --

THE COURT:  We'll get to that in a moment.  Okay? All right.  Great.  Thank you very much.

Okay.  So now we're going to move out into the -- into the Netherlands, into the audience here.  So we're going to start, I believe, with Ms. Vargas.

PROSPECTIVE JUROR VARGAS:  Yes.  My name is Dahlia Vargas.  That's D-a-h-l-i-a, last name Vargas, V-a-r-g-a-s.  I am from the Antelope Valley, in the city of Lancaster.  I am a third grade teacher.  I'm married.  My husband is a handyman.  No adult children but four minor children.  And no prior jury service.

THE COURT:  Okay.  So you got your hands full, huh? All right.  Thank you.

Is it Mr. Alvarado?

PROSPECTIVE JUROR ALVARADO:  Yes.

THE COURT:  Good afternoon, sir.

PROSPECTIVE JUROR ALVARADO:  Good afternoon.

THE COURT:  Go ahead.

```
 1              PROSPECTIVE JUROR ALVARADO:  My name is

 2   Ruben Alvarado.  R-u-b-e-n, Alvarado, A-l-v-a-r-a-d-o.  Area of

 3   residence is Long Beach.  Occupation, I work in the refinery.

 4   I've been married for 30 years.  I have three adult children,

 5   one minor.  One of them is a veteran -- veterinarian assistant

 6   and the other one disassembles the new electrical batteries for

 7   the cars and the other one goes to college.  The fourth one is

 8   in high school.  No prior jury service.

 9              THE COURT:  Great.

10              And you said you're married.  Congratulations on

11   30 years of marriage.

12              Does your spouse work outside the home?

13              PROSPECTIVE JUROR ALVARADO:  Yes.  She -- she works

14   at the supermarket.

15              THE COURT:  Okay.  What does she do there?

16              PROSPECTIVE JUROR ALVARADO:  She is -- she is a

17   manager, general manager for the store.

18              THE COURT:  Got it.

19              And then what do you do at the refinery?

20              PROSPECTIVE JUROR ALVARADO:  What we do is -- right

21   now we're in a turnaround.  And basically what we do, we

22   provide temporary energy for the refinery for anything that is,

23   like, going into service.

24              THE COURT:  Got it.  Okay.  Great.  Thank you.

25              PROSPECTIVE JUROR ALVARADO:  Auto service, I'm
```

01:45PM (line 5)
01:45PM (line 10)
01:45PM (line 15)
01:46PM (line 20)
01:46PM (line 25)

```
 1    sorry.  Auto service.

 2                THE COURT:  Auto service, okay.

 3                All right.  Let's move on.  Is it -- let's see --

 4    Ms. Kelly.

 5                PROSPECTIVE JUROR KELLY:  Yes.  My name is

 6    Marie Kelly, M-a-r-i-e, K-e-l-l-y.  Retired.  Married.  And

 7    I've got Ruben beat, going to be 60 years in June.

 8                THE COURT:  Oh, wonderful.

 9                PROSPECTIVE JUROR KELLY:  And we have two adult

10    children, Julie who is a personal trainer and Patrick who is an

11    accountant.  And no prior jury service.

12                THE COURT:  You said you're married for 60 years.

13    That's incredible.

14                PROSPECTIVE JUROR KELLY:  In June, yeah.

15                THE COURT:  And your spouse, does he work outside

16    the home?

17                PROSPECTIVE JUROR KELLY:  No.  He's retired also.

18                THE COURT:  And what did he retire from?

19                PROSPECTIVE JUROR KELLY:  He was in sales.  He sold

20    garbage trucks and street sweepers.

21                THE COURT:  What did you retire in?

22                PROSPECTIVE JUROR KELLY:  I was a registered nurse.

23                THE COURT:  Okay.  All right.  Wonderful.  Thank

24    you.

25                All right.  Is it Ms. -- is it Ms. Palencia?
```

01:46PM (line 5)
01:46PM (line 10)
01:47PM (line 15)
01:47PM (line 20)
01:47PM (line 25)

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 01:47PM | 5 |

        1           PROSPECTIVE JUROR PALENCIA:  Yes.  Hi.  My name is

        2   Daysi Palencia, D-a-y-s-i, last name P-a-l-e-n-c-i-a.  And my

        3   area of residence, San Fernando Valley.  And I'm a cashier at

        4   the supermarket, and I'm married.  And my husband is a

01:47PM 5   technician.  And I have two minors, children.  And no prior

        6   jury service.

        7           THE COURT:  Okay.  Great.  Thank you.

        8           Ms. Romero.

        9           PROSPECTIVE JUROR ROMERO:  My name is Angie Romero.

01:48PM 10  A-n-g-i-e, last name Romero, R-o-m-e-r-o.  I live in Hollywood.

        11  Occupation, right now I'm unemployed.  I was previously a

        12  banker.  Single.  No kids.  And I have prior jury service.  It

        13  was a criminal case.  State court.  It did reach a verdict.

        14  And it was attempted rape.

01:48PM 15          THE COURT:  How long ago was this?

        16          PROSPECTIVE JUROR ROMERO:  2011.

        17          THE COURT:  Would you be able to set aside any

        18  instructions that you heard in that case and listen to and

        19  follow the instructions just in this case?

01:48PM 20          PROSPECTIVE JUROR ROMERO:  Yes.

        21          THE COURT:  Great.  Thank you.

        22          All right.  And let's -- counsel, okay.  Oops.

        23  Ms. Young.

        24          PROSPECTIVE JUROR YOUNG:  Yes.  It's

01:48PM 25  Georgiana Young, G-e-o-r-g-i-a-n-a, Y-o-u-n-g.  Area of

```
 1   residence is San Fernando Valley.  Occupation, attorney.
 2   Marital status, I'm married.  My husband works in the I.T.
 3   field.  I do not have adult children.  I have minor children.
 4   And I have not had prior jury service.
 5            THE COURT:  Okay.  Great.  Thank you.
 6            Ms. Manning.  Good afternoon.
 7            PROSPECTIVE JUROR MANNING:  Hello.
 8   Jennifer Manning, J-e-n-n-i-f-e-r, M-a-n-n-i-n-g.  I'm director
 9   of product development.  And I'm married.  My husband is a
10   design director.  And we have a minor child.  He thinks he
11   makes product for a living.  And no prior jury service.
12            THE COURT:  And what part of town do you live in?
13            PROSPECTIVE JUROR MANNING:  I'm in
14   Rancho Palos Verdes.
15            THE COURT:  All right.  Okay.
16            Ms. Ramirez.
17            PROSPECTIVE JUROR RAMIREZ:  Yes.  This is
18   Kelsey Ramirez.  K-e-l-s-e-y, R-a-m-i-r-e-z.  I live in
19   Norwalk.  I'm a medical receptionist.  Not married.  I have a
20   boyfriend.  No children.  And no prior jury service.
21            THE COURT:  And what does your boyfriend do?
22            PROSPECTIVE JUROR RAMIREZ:  Warehouse dispatcher.
23            THE COURT:  Okay.  Great.  Thank you.
24            We're going to jump back to Ms. -- is it
25   Garret Frechette?  Is that behind -- going back there.  Okay.
```

01:49PM (line 5)
01:49PM (line 10)
01:49PM (line 15)
01:49PM (line 20)
01:50PM (line 25)

1    Great.

2              PROSPECTIVE JUROR FRECHETTE:  Hi.  I'm

3    Garret Frechette.  G-a-r-r-e-t, last name F-r-e-c-h-e-t-t-e.  I

4    live in Woodland Hills.  I'm a service technician.  Married.

01:50PM  5    My wife at the moment is unemployed.  No kids.  And no prior

6    jury service.

7              THE COURT:  And when you say you're a service

8    technician, what field?

9              PROSPECTIVE JUROR FRECHETTE:  I help take care of

01:50PM  10   sick and diseased plants and trees.

11             THE COURT:  Got it.  Okay.

12             And then you said you -- I thought you said that

13   your wife is currently unemployed.  What did she do before

14   unemployment?

01:50PM  15             PROSPECTIVE JUROR FRECHETTE:  She helped 3D print

16   and build backdrops and signs for the TV and movie industry.

17             THE COURT:  Got it.  Okay.  Thank you.

18             Is it Ms. Szum- -- I'm sorry -- Ms. Szumski?

19             PROSPECTIVE JUROR SZUMSKI:  Yes.  Meradith Szumski,

01:51PM  20   M-e-r-a-d-i-t-h, S-z-u-m-s-k-i.  I'm from Simi Valley.  I teach

21   2-year-olds at an infant and toddler center.  I'm married.  My

22   husband is a buyer at a medical supply company.  I have two

23   minor children and no prior jury service.

24             THE COURT:  Okay.  Thank you.

01:51PM  25             All right.  Mr. Scott?

**UNITED STATES DISTRICT COURT**

|   | |
|---|---|
| 1 | PROSPECTIVE JUROR SCOTT:  Yes. |
| 2 | THE COURT:  Good afternoon. |
| 3 | PROSPECTIVE JUROR SCOTT:  My name is Raymond Scott, |
| 4 | R-a-y-m-o-n-d, S-c-o-t-t.  I'm retired civil engineer. |
| 5 | Married.  And I have four adult children.  No prior jury |
| 6 | service. |
| 7 | THE COURT:  And married.  Does your spouse work |
| 8 | outside the home? |
| 9 | PROSPECTIVE JUROR SCOTT:  No.  She's retired too. |
| 10 | THE COURT:  What did she retire from? |
| 11 | PROSPECTIVE JUROR SCOTT:  Accountant. |
| 12 | THE COURT:  Accountant.  Okay. |
| 13 | And you have four adult children.  Are they working? |
| 14 | PROSPECTIVE JUROR SCOTT:  Yes. |
| 15 | THE COURT:  What do they do? |
| 16 | PROSPECTIVE JUROR SCOTT:  One is a scientist at |
| 17 | Kaiser laboratories.  And the other one is a pharmacist working |
| 18 | for Costco.  And the other one is a doctor working for -- I |
| 19 | forgot the hospital. |
| 20 | THE COURT:  Okay.  So that's three.  You got one |
| 21 | more. |
| 22 | PROSPECTIVE JUROR SCOTT:  One is a student at |
| 23 | McGeorge Law School.  It's -- |
| 24 | THE COURT:  Okay.  Got it. |
| 25 | Are you sure he wants to become a lawyer? |

01:51PM (line 5)
01:52PM (line 10)
01:52PM (line 15)
01:52PM (line 20)
01:52PM (line 25)

**UNITED STATES DISTRICT COURT**

1          PROSPECTIVE JUROR SCOTT:  No.

2          THE COURT:  I can talk him out of it if you need me

3    to.  No, I'm just kidding.

4          All right.  Thank you very much.

01:52PM  5          Is it Ms. Gottesfield?

6          PROSPECTIVE JUROR GOTTESFELD:  Gottesfeld.

7          THE COURT:  Gottesfeld.  Sorry.

8          PROSPECTIVE JUROR GOTTESFELD:  No problem.

9          Terra Gottesfeld, T-e-r-r-a, G-o-t-t-e-s-f-e-l-d.  I

01:53PM 10   live in Burbank.  I am in product marketing at a tech company.

11   I am married.  My husband is an attorney.  I have two minor

12   children.  And no prior jury service.

13         THE COURT:  And your husband is an attorney.  My

14   condolences.

01:53PM 15         PROSPECTIVE JUROR GOTTESFELD:  Thank you.

16         THE COURT:  What's the nature of his practice, if

17   you know?

18         PROSPECTIVE JUROR GOTTESFELD:  He was practicing at

19   Davis Polk and then Munger and now is the head of Global

01:53PM 20   Privacy at TikTok.

21         THE COURT:  At TikTok.  Okay.  Got it.

22         And so his time at Munger and at Davis, was he a

23   litigator or corporate?

24         PROSPECTIVE JUROR GOTTESFELD:  Corporate, yeah.

01:53PM 25         THE COURT:  Okay.  To your knowledge, did he try any

|      |                                                                      |
|------|----------------------------------------------------------------------|
| 1    | cases in State or Federal Court?                                      |
| 2    | PROSPECTIVE JUROR GOTTESFELD:  No.  He worked with                    |
| 3    | some people who were, you know, DOJ related, but he never             |
| 4    | himself --                                                            |

01:53PM  5    THE COURT:  Got it.  Okay.

6    PROSPECTIVE JUROR GOTTESFELD:  Yeah.

7    THE COURT:  And is there anything about the

8    relationship that you have with him, I mean, war stories that

9    he may have shared with you about angry judges or the justice

01:53PM  10   system in general that would make it difficult for you to sit

11   as a fair and impartial juror in this case?

12   PROSPECTIVE JUROR GOTTESFELD:  No.  Positive things

13   about judges.

14   THE COURT:  Okay.  That's important.  Okay.  Thank

01:54PM  15   you.

16   Mr. Ornelas.

17   PROSPECTIVE JUROR ORNELAS:  Eduardo Ornelas,

18   E-d-u-a-r-d-o, O-r-n-e-l-a-s.  San Fernando Valley,

19   North Hills.  Retired letter carrier.  Married.  Wife,

01:54PM  20   Auto Club dispatcher.  No adult children, no children.  And I

21   did jury duty in Burbank for personal injury.

22   THE COURT:  Okay.

23   PROSPECTIVE JUROR ORNELAS:  And the conclusion

24   was --

01:54PM  25   THE COURT:  There was a verdict?

**UNITED STATES DISTRICT COURT**

1        PROSPECTIVE JUROR ORNELAS:  A verdict.

2        THE COURT:  And how long ago was that?

3        PROSPECTIVE JUROR ORNELAS:  20 years ago.

4        THE COURT:  Okay.  The burden of proof in a civil

01:54PM  5  case, you may have heard me mention, is different.  And so,

6  again, it's important that I get assurances from you that

7  you'll be able to set aside those instructions that you heard

8  in that case and listen to and follow the instructions in this

9  case, particularly as it relates to the burden of proof.  Is

01:55PM  10  that going -- will you have any problem doing that?

11        PROSPECTIVE JUROR ORNELAS:  No problem.

12        THE COURT:  Okay.  Great.  Thank you, sir.

13  Appreciate it.

14        Ms. Vasquez.

01:55PM  15        PROSPECTIVE JUROR VASQUEZ:  Hi.  My name is

16  Ashley Vasquez.  It's A-s-h-l-e-y, V-a-s-q-u-e-z.  Right now,

17  I'm the receptionist at Department of Children and Family

18  Services in Torrance.  And I'm like an artist on the side.  I'm

19  not married.  I have a boyfriend.  He's a metal -- metal

01:55PM  20  fabricator for race cars.  He does the roll cages.  No kids

21  yet.  And no prior -- no prior jury service.

22        THE COURT:  All right.  Great.  Thank you.

23        Is it Ms. Salguero?

24        PROSPECTIVE JUROR SALGUERO:  Yes, Salguero.

01:55PM  25        My name is Sonia Salguero, S-o-n-i-a,

S-a-l-g-u-e-r-o.  I am a server assistant.  I'm not married,
but I do have a boyfriend.  He works security.  No children.
And also no prior jury service.

        THE COURT:  Okay.  Great.

        Ms. Aleman.

        PROSPECTIVE JUROR ALEMAN:  Josseline Aleman.
J-o-s-s-e-l-i-n-e, Aleman, A-l-e-m-a-n.  I'm a package handler
and a kitting clerk.  Single.  No children.  No prior jury
service.

        THE COURT:  Okay.  And what part of town do you live
in?

        PROSPECTIVE JUROR ALEMAN:  South Central L.A.

        THE COURT:  I'm sorry, Ms. Salguero.  I don't know
if I asked you, what part of town do you live in?

        PROSPECTIVE JUROR SALGUERO:  I live in
Thousand Oaks, California.

        THE COURT:  Okay.  Great.  Thank you.  All right.

        Let's move on.  Is it Mr. Jump?

        PROSPECTIVE JUROR JUMP:  Yes.

        THE COURT:  There we are.

        PROSPECTIVE JUROR JUMP:  My name is Eric Jump,
E-r-i-c, J-u-m-p.  I live in San Gabriel Valley.
Self-employed.  My wife is a chief medical officer.  We have no
adult children and no prior jury service.

        THE COURT:  Okay.  And you're self-employed.  What's

|     |     |
| --- | --- |
| | 1 | the nature of your work? |
| | 2 | PROSPECTIVE JUROR JUMP:  I'm an art dealer. |
| | 3 | THE COURT:  Okay.  Great.  Thank you.  All right. |
| | 4 | Is it Ms. Jenkins?  There we go.  We'll get the |
| 01:57PM | 5 | microphone back to you. |
| | 6 | PROSPECTIVE JUROR JENKINS:  Hello.  Orissa Jenkins |
| | 7 | spelled O-r-i-s-s-a, last name Jenkins, J-e-n-k-i-n-s.  Area of |
| | 8 | residence, Burbank.  Occupation, currently unemployed but |
| | 9 | formerly layout design for animation.  Marital status, not |
| 01:57PM | 10 | married.  Significant other, significant other in -- software |
| | 11 | engineer.  No children.  I've had one prior jury duty service. |
| | 12 | I was an alternate for a civil case.  State.  There was a |
| | 13 | verdict. |
| | 14 | THE COURT:  How long ago was that, if you remember? |
| 01:58PM | 15 | PROSPECTIVE JUROR JENKINS:  Um, about eight years |
| | 16 | ago. |
| | 17 | THE COURT:  Got it. |
| | 18 | And did you actually join in the deliberations if |
| | 19 | you remember? |
| 01:58PM | 20 | PROSPECTIVE JUROR JENKINS:  No. |
| | 21 | THE COURT:  Okay. |
| | 22 | PROSPECTIVE JUROR JENKINS:  I was just a backup. |
| | 23 | THE COURT:  Backup.  Got it.  All right.  Thank you. |
| | 24 | All right.  Mr. Turner. |
| 01:58PM | 25 | PROSPECTIVE JUROR TURNER:  Yeah. |

```
 1            THE COURT:  Good afternoon, sir.

 2            PROSPECTIVE JUROR TURNER:  Good afternoon.

 3            Isaiah Turner, I-s-a-i-a-h, T-u-r-n-e-r.  Inglewood,

 4   area of residence.  Occupation, I worked at a gym and stream.

 5   No, I'm not married.  No significant other.  No children.  No

 6   prior jury service.

 7            THE COURT:  Okay.  Great.

 8            And I'm sorry, I may have missed -- you said you

 9   work at a gym and you stream; correct?

10            PROSPECTIVE JUROR TURNER:  Yes.

11            THE COURT:  Okay.  And streaming gym content?

12            PROSPECTIVE JUROR TURNER:  No.  It's just, like --

13   like, I game and day-to-day life, all that stuff.

14            THE COURT:  Got it.  I've got teenagers, so I can

15   tell them that I understood what you were talking about.  Okay.

16   All right.

17            Let's move on to Mr. -- is it Navejas?

18            PROSPECTIVE JUROR NAVEJAS:  Navejas.

19            THE COURT:  Good afternoon, sir.

20            PROSPECTIVE JUROR NAVEJAS:  Good afternoon.

21            I live in El Monte, California.  My occupation is an

22   I.T. help desk analyst.  I am not married.  Single.  No

23   children.  And no prior jury service.

24            THE COURT:  Okay.  And then is it Mr. Radanovich?

25            PROSPECTIVE JUROR RADANOVICH:  You got it.
```

         1          My name is Nicholas Radanovich, N-i-c-h-o-l-a-s,

         2   R-a-d-a-n-o-v-i-c-h.  I currently live in the South Bay.  I do

         3   sales for an accounting firm.  I do not have a significant

         4   other.  No children that I know of.  And no jury -- no prior

01:59PM  5   jury service.

         6          THE COURT:  Okay.  I'll leave that alone.  Okay.

         7   All right.

         8          Mr. Burgos.

         9          PROSPECTIVE JUROR BURGOS:  Hi.  My name is

02:00PM  10  Oscar Burgos, O-s-c-a-r, B as in beta, u-r-g-o-s.  Area of

         11  residence, Rowland Heights.  Occupation, carpenter.  Marital

         12  status, single.  I do have a girlfriend.  She works for Costco.

         13  No children.  And no prior jury service.

         14         THE COURT:  Okay.  All right.  Is it Ms. Fonseca?

02:00PM  15         PROSPECTIVE JUROR FONSECA:  Yes.

         16  Bernadette Fonseca, B-e-r-n-a-d-e-t-t-e, F-o-n-s-e-c-a.  I live

         17  in South El Monte.  My occupation, I work for L.A. County

         18  Department of Public Social Services as an eligibility worker.

         19  Never married.  I do have a boyfriend.  He's an ironworker.  No

02:00PM  20  children.  And no prior jury service.

         21         THE COURT:  All right.  Is it Stacey Richards?

         22         PROSPECTIVE JUROR RICHARDS:  Yes.  Stacey Richards,

         23  S-t-a-c-e-y, R-i-c-h-a-r-d-s.  I live in West Hollywood.

         24  Occupation, I'm in music publishing.  And I'm married, of

02:01PM  25  29 years.  And he is a professional guitar player in a band.

And no children.  Prior jury service, I've had two -- I've been
on two juries before.  And one -- the last one was three years
ago.  It was a criminal -- assault with a deadly weapon and
senior abuse, and we did reach a verdict in that one.  And then
prior to that, it was a state case for a DUI.

THE COURT:  How long ago was that one?

PROSPECTIVE JUROR RICHARDS:  That one was probably
about 15 years ago.

THE COURT:  Okay.  And was a verdict reached in that
case?

PROSPECTIVE JUROR RICHARDS:  Yes.

THE COURT:  Okay.  Like I've asked the others, would
you be able to set aside those instructions and listen to and
follow the instructions in this case if you were called to
serve as a juror?

PROSPECTIVE JUROR RICHARDS:  Yes.

THE COURT:  All right.  And then may I ask -- you
don't have to answer, I suppose -- you said that your husband
is a professional guitar player in a band.

PROSPECTIVE JUROR RICHARDS:  Yes.

THE COURT:  A band that we might have heard of or --

PROSPECTIVE JUROR RICHARDS:  Maybe, maybe not.
California Guitar Trio.  They travel all over the world so --

THE COURT:  Okay.  All right.  Wonderful.

All right.  Let's move on to -- is it Frances Horne?

|   |   |
|---|---|
| 1 | PROSPECTIVE JUROR HORNE:  I'm in the corner. |
| 2 | THE COURT:  Okay.  Good afternoon. |
| 3 | PROSPECTIVE JUROR HORNE:  Good afternoon. |
| 4 | THE COURT:  Go ahead. |
| 5 | PROSPECTIVE JUROR HORNE:  Frances Horne, |

02:02PM  5      PROSPECTIVE JUROR HORNE:  Frances Horne,

6   F-r-a-n-c-e-s, H-o-r-n-e.  I live in Inglewood.  I'm retired.

7   I'm a widower -- or a widow.  I guess, huh?  I have no

8   boyfriend or girlfriend.  I have one adult child and he works

9   for Cox in communication.  And my -- I was on a civil grand --

02:02PM  10  jury; there was no verdict.  I've been on a criminal; there was

11  a verdict.  It was so long ago, I can't remember what it was.

12  I think it was something to do with a happy hooker.  And then

13  there's -- I've done two times civil grand jury.

14      THE COURT:  Got it.  Okay.

02:03PM  15      So let me just try to unpack some of that -- so you

16  retired.  Congratulations.

17      PROSPECTIVE JUROR HORNE:  I did it good, huh?

18      THE COURT:  You did, yeah.

19      What did you retire from?

02:03PM  20      PROSPECTIVE JUROR HORNE:  I'm a hairdresser.

21      THE COURT:  You said you're a widower.  My

22  condolences.  Your former spouse, what did your spouse do?

23      PROSPECTIVE JUROR HORNE:  He did, like, charge-backs

24  and stuff for a retail store.

02:03PM  25      THE COURT:  Got it.  Okay.

**UNITED STATES DISTRICT COURT**

```
 1              And then one son who's working.

 2              So you've done two -- you've been on a civil grand

 3       jury.  How long were you on the civil grand jury for?

 4              PROSPECTIVE JUROR HORNE:  That's -- that's a year --

 5       two of them.

 6              THE COURT:  So you did it twice.  So it was two

 7       years.  That's what I -- okay.  Got it.

 8              And then one civil trial that you served as a juror?

 9              PROSPECTIVE JUROR HORNE:  Yes.

10              THE COURT:  How long ago was that?

11              PROSPECTIVE JUROR HORNE:  Oh, golly.  Maybe 15 years

12       ago.

13              THE COURT:  And what kind of case was it, if you

14       remember?

15              PROSPECTIVE JUROR HORNE:  I think she was suing a

16       hospital.

17              THE COURT:  Okay.  You think maybe medical

18       malpractice?

19              PROSPECTIVE JUROR HORNE:  Well, she was trying to go

20       for medical malpractice.

21              THE COURT:  Got it.

22              PROSPECTIVE JUROR HORNE:  I don't know.

23              THE COURT:  Got it.

24              And then the criminal -- okay.  You talked about the

25       criminal case.
```

**UNITED STATES DISTRICT COURT**

```
 1              PROSPECTIVE JUROR HORNE:  I don't know.

 2              THE COURT:  Okay.  I think that's it.  Thank you

 3   very much.  Appreciate it.

 4              Ms. Arredondo?

 5              PROSPECTIVE JUROR ARREDONDO:  Yes.

 6              THE COURT:  All right.  Go ahead.

 7              PROSPECTIVE JUROR ARREDONDO:  Hi.  I'm

 8   Lynnae Arredondo.  L-y-n-n-a-e, last name A-r-r-e-d-o-n-d-o.  I

 9   live in Northridge.  I'm a children and family therapist.  I'm

10   married.  No children.  And no prior jury service.

11              THE COURT:  And married, does your spouse work

12   outside the home?

13              PROSPECTIVE JUROR ARREDONDO:  Yeah.  He's a product

14   manager.

15              THE COURT:  For what types of products?

16              PROSPECTIVE JUROR ARREDONDO:  He works at Microsoft.

17              THE COURT:  Okay.  Got it.  Okay.

18              Thank you.

19              Is it Jovana Johnson?

20              PROSPECTIVE JUROR JOHNSON:  Yes.  Hi.

21              My name is Jovana Johnson.  It's J-o-v-a-n-a,

22   J-o-h-n-s-o-n.  I live in Santa Clarita Valley.  I am

23   self-employed.  I co-own a plunge pool company.  My husband --

24   I'm married.  And he works in the I.T. field.  I have two adult

25   children.  One is 18.  He's still in high school.  And the
```

1    other is 25.  He works in the warehouse as a warehouse clerk.

2    And I have no prior jury service.

3              THE COURT:  Okay.  And I'm sorry, I may not -- you

4    said that you're self-employed in the punch bowl --

02:05PM    5              PROSPECTIVE JUROR JOHNSON:  Plunge pool.  I own a

6    plunge pool business.  Plunge pool.

7              THE COURT:  What is that?

8              PROSPECTIVE JUROR JOHNSON:  Pools that you plunge

9    in, either cold or hot.

02:05PM   10              THE COURT:  Oh, right.  The cold plunge and the hot

11    plunge.  Okay.

12              PROSPECTIVE JUROR JOHNSON:  I co-own that business.

13              THE COURT:  Oh, I need a hookup.  I'm sorry.  I've

14    been hearing all -- a lot of friends of mine that rave about

02:06PM   15    this.  Okay.  Plunge pool.  Okay.

16              And do you -- do you plunge?

17              PROSPECTIVE JUROR JOHNSON:  Yes.

18              THE COURT:  Hot or cold?

19              PROSPECTIVE JUROR JOHNSON:  Both.  I jump in the hot

02:06PM   20    then go -- or do the cold then the hot.

21              THE COURT:  Three minutes each or longer?

22              PROSPECTIVE JUROR JOHNSON:  Longer.

23              THE COURT:  Okay.

24              PROSPECTIVE JUROR JOHNSON:  So five minutes each.

02:06PM   25              THE COURT:  Whew.  Okay.  My hat's off to you.

**UNITED STATES DISTRICT COURT**

|     |     |
| --- | --- |
|          | 1 |
|          | 2 |
|          | 3 |
|          | 4 |
| 02:06PM | 5 |
|          | 6 |
|          | 7 |
|          | 8 |
|          | 9 |
| 02:06PM | 10 |
|          | 11 |
|          | 12 |
|          | 13 |
|          | 14 |
| 02:07PM | 15 |
|          | 16 |
|          | 17 |
|          | 18 |
|          | 19 |
| 02:07PM | 20 |
|          | 21 |
|          | 22 |
|          | 23 |
|          | 24 |
| 02:07PM | 25 |

1              Okay.  All right.  Let's move on.

2              Mr. Blue.

3              PROSPECTIVE JUROR BLUE:  Hi.  David Blue.

4    D-a-v-i-d, last name B-l-u-e.  Area of residence, West L.A.

5    Occupation, aerospace engineer.  Unmarried.  Single.  No adult

6    children, no children.  I was on a criminal case about three

7    years ago for assault with a deadly weapon, and we did reach a

8    verdict.

9              THE COURT:  Will you be able to set aside any

10   instructions that you may have heard in that prior case and

11   listen to and follow the instructions in this case?

12             PROSPECTIVE JUROR BLUE:  Yes.

13             THE COURT:  Okay.  All right.  Great.  Thank you.

14             Okay.  So we've been going at it for a little bit

15   now.  Why don't we take a 10-minute -- 15-minute recess.

16             Do not form or express any opinion about the case

17   until the matter is finally submitted to you.  Don't talk with

18   anyone about the case.  Don't allow anyone to talk to you about

19   the case.  And do not conduct any research of any kind on any

20   subject matter connected with the case.

21             Let's have you come back -- I'm looking at the

22   clock.  It says 2:10.  So 2:25, please.  Thank you.

23             THE COURTROOM DEPUTY:  All rise for the jury.

24             (Out of the presence of the prospective jurors:)

25             THE COURT:  All right.  So we're outside the

presence of the jury.

So we have -- I have done 50 jurors right now for preliminary -- preliminary questions.  I can do the full 80 or I could begin the more probing questions with this 50 and see how things go and go from there.  I don't know if either side has a preference, but I'm throwing that out there.

For the Government, any preference one way or the other?

MR. PANG:  Your Honor, I think we can start with the first 50.

THE COURT:  From the defense?

MR. BROWN:  No objection, Your Honor.

THE COURT:  So then I'll -- we'll do the general questions of the 50, see if there are issues for cause and things of that nature and see where we are.

All right.  So we'll see you all back at 2:25.

MR. PANG:  Your Honor, just very quickly, after these dismissals for cause are conducted, will the causes for strike be within the first 12?

THE COURT:  Yes.  That's generally how I do it. Here's -- well, I was just talking about this with some of the externs.  Historically what I've done is you do the challenges from the 12 and then everyone kind of fills in the seats.  But because of all these moving parts, it's going to be challenging to have people keep moving.

|   |   |
|---|---|
| | 1 |
| | 2 |

            But -- so I'm going to excuse them and leave
everyone as is.  And after everyone's done with their
peremptories or both sides pass, I will pick the first 12.

            Does that make sense?

02:10PM      MR. PANG:  Yes, Your Honor.

            THE COURT:  Okay.  And then we'll go to the
alternates and deal with the alternates.

            MR. PANG:  Very good, Your Honor.

            THE COURT:  Okay.  All right.  See you back at 2:25.

02:10PM      MR. BROWN:  Thank you, Your Honor.

            THE COURTROOM DEPUTY:  All rise.  This court is in
recess.

                (Break taken.)

                (In the presence of the prospective jurors:)

02:31PM      THE COURT:  Okay.  So welcome back.

            So I think we polled about 50 or so of you
initially.  So I'm going to ask some general questions of the
group.  If you have an answer, please raise your hand and we'll
make sure the microphone gets to you.  So bear with us because
02:32PM we've got a lot of people here.

            And for those of you that haven't been questioned,
as I said to you this morning, listen, think about how you
might answer those questions because it is more than likely
that we will get to you at some point this afternoon.

02:32PM      So with that in mind, let's go through some of the

```
        1   questions that should be in the handout that you have.

        2            Is there anyone here who feels that, because

        3   Ms. Todorova is charged with an offense, that she must have

        4   done something wrong?

02:32PM  5            I ask that question because I think you all know, in

        6   our system of justice, you are presumed innocent until and

        7   unless the Government has proved each and every element of the

        8   case beyond a reasonable doubt.

        9            So is there anyone here that feels that simply

02:32PM 10   because Ms. Todorova has been charged with a crime, that she

       11   must have done something wrong?

       12            PROSPECTIVE JUROR WIZINSKY:  I have a question.

       13            THE COURT:  Yes.  I'm sorry.  Let's get the

       14   microphone to you.  If you wouldn't mind -- I don't see your

02:32PM 15   number.

       16            PROSPECTIVE JUROR WIZINSKY:  I'm 74.

       17            THE COURT:  54?

       18            PROSPECTIVE JUROR WIZINSKY:  74.

       19            THE COURT:  Oh, 74.  Okay.  Hold on a second.  Is it

02:32PM 20   Ms. Wizinsky?

       21            PROSPECTIVE JUROR WIZINSKY:  That's correct.

       22            THE COURT:  All right.

       23            PROSPECTIVE JUROR WIZINSKY:  That's correct.

       24            THE COURT:  Yes.

02:33PM 25            PROSPECTIVE JUROR WIZINSKY:  If we haven't been
```

screened with the general questions, are we supposed to reply

to this?  Are we excluded since we haven't been prescreened?

THE COURT:  It doesn't apply to you yet, but I want

you to think about how you might answer those questions.  Okay?

PROSPECTIVE JUROR WIZINSKY:  All right.

THE COURT:  I like that you're paying attention.  I

appreciate that.  Okay.  That's great.

Anyone out of the first 50?

All right.  Does anyone here in the first group, I

should say, think that Ms. Todorova must prove to you that she

is innocent?

Again, touching upon the theme, our bedrock

principles in our country, anyone who's charged with a crime is

presumed innocent, does not have to prove anything to you

until -- the burden is entirely up to the Government.

Anyone have any questions or heartburn about that?

Yes, Ms. Garcia.

PROSPECTIVE JUROR GARCIA:  I guess for the first one

and the second one, it's just a lot of charges over a lot of

years.  So I don't know.

THE COURT:  Well, okay.  So I guess -- let me try to

ask you this question here.  I mentioned earlier, anyone who's

charged with a crime is presumed innocent.  As you sit here

today, you have not heard anything about the case.

If you had to make a vote right now, what would your

```
 1   verdict be, guilty or not guilty?

 2              PROSPECTIVE JUROR GARCIA:  Guilty.

 3              THE COURT:  Guilty.  Even though you've not heard a

 4   single piece of evidence?

 5              PROSPECTIVE JUROR GARCIA:  (No audible response.)

 6              THE COURT:  And that's because you're presuming that

 7   she is guilty without hearing anything?

 8              PROSPECTIVE JUROR GARCIA:  Unfortunately, yes.

 9              THE COURT:  Okay.  I just want to -- I just want to

10   be clear.  I'm not trying to put you on the spot.

11              Just so everyone understands, though, right now

12   there's not been a shred of evidence presented at all.  She's

13   presumed innocent.  So if I had to ask each and every one of

14   you based on what you heard right now, the answer should be not

15   guilty because there's been no evidence presented.

16              But you feel differently and I respect that, so

17   thank you for letting us know.  All right?

18              Anyone else?

19              Oh, you're not in the 50.

20              UNIDENTIFIED PROSPECTIVE JUROR:  Oh, sorry.

21              THE COURT:  We'll get to you.  Okay?  Or maybe not.

22   We'll see.  Okay?

23              All right.  Would anyone here hold it against

24   Ms. Todorova if she did not testify?

25              And, again, I touch upon that because, again -- I
```

02:34PM (line 5)
02:34PM (line 10)
02:34PM (line 15)
02:35PM (line 20)
02:35PM (line 25)

keep harping on this because it's important.  The burden of

proof is on the Government.  You heard it all -- well, I

suspect you may have heard in television shows, if you watch

*Law & Order*, *Dragnet*, you always hear you have a right to

remain silent.  That's the truth.  There's a Fifth Amendment

privilege against self-incrimination.

Anyone who's charged with a crime absolutely does

not have to testify.  They don't have to prove anything.  It's

up to the Government to prove each and every element of the

offense.

Anyone have any heartburn about that at all?

Okay.  Now, there are some people, whether it's for

moral, religious, or ethical reasons, they believe that it's

not proper or they find it difficult to pass judgment on the

conduct of others.  Do any one of you hold such beliefs?

Let me -- let's go in the back.  What number, I'm

sorry, just because it's hard for me to see you in the back?

THE COURTROOM DEPUTY:  53, Your Honor.

THE COURT:  Okay.  We haven't talked to you yet.

I'm sorry.  Forgive me.  This is my fault.  I'm just talking to

the first group of 50 that we've initially voir dired.  Okay?

I'm sorry.  Mr. Goodman, did you have your hand up?

PROSPECTIVE JUROR GOODMAN:  Well, yeah.  I mean, I

do have a problem with that.

THE COURT:  Let's get the microphone just so our

1    court reporter can hear you.

2            PROSPECTIVE JUROR GOODMAN:  I mean, I do have a

3    problem with that.  I think I can be fair and open-minded, but

4    I really don't want to be in that position.  And I have strong

02:36PM  5    feelings on this subject, but I would try to withhold them and

6    listen.  But I -- I hate being in that position.

7            THE COURT:  Okay.  And, look, I can appreciate that.

8    Look, we're asking folks to come in from the street, listen to

9    and make important decisions on cases.  And I think you said --

02:37PM  10   and I may have -- if I misspoke, please correct me.  You think

11   you could be fair.  Or is that --

12           PROSPECTIVE JUROR GOODMAN:  I would like -- I would

13   like to think that.

14           THE COURT:  But you have some heartburn about being

02:37PM  15   a juror?

16           PROSPECTIVE JUROR GOODMAN:  Right.  And a lot of

17   feelings about the possibilities, but I know I haven't heard

18   anybody testify.  But I read that when you had it up, and I'm,

19   like, wow, I hate that.  So --

02:37PM  20           THE COURT:  Okay.  Look, that is not an unreasonable

21   feeling.  I mean, look, we are all shaped by our experiences;

22   right?  And we come in with that on the table.  And I

23   appreciate your candor in letting us know but, okay, you

24   know -- it's an awesome responsibility, and it does make you

02:37PM  25   pause.  So I appreciate that.  Thank you.

```
 1              Anyone else?

 2              Yes, Mr. -- let's see.  41; right?  Mr. -- oh,

 3      before we get -- yes.  Mr. Gaspar.

 4              PROSPECTIVE JUROR GASPAR:  Yes.

 5              THE COURT:  Go ahead, sir.

 6              PROSPECTIVE JUROR GASPAR:  Your Honor, I don't fear

 7      being on a jury.

 8              THE COURT:  Okay.

 9              PROSPECTIVE JUROR GASPAR:  I've never been on a

10      jury.

11              THE COURT:  Okay.

12              PROSPECTIVE JUROR GASPAR:  But what I do fear is the

13      jury coming to a wrong conclusion and an injustice being

14      carried and being part of that.  That -- that does bother me.

15              THE COURT:  Got it.

16              PROSPECTIVE JUROR GASPAR:  It's a difficult

17      philosophical question, and it really comes down to the time

18      and the place when it comes to fruition.  But, you know, it

19      just -- in an abstract theoretical way, it's kind of

20      troublesome.  But you have to bear down and deal with it when

21      the time comes, if you're chosen.

22              THE COURT:  Look, isn't that one of the reasons -- I

23      mean, it's a very interesting, you're right, philosophical

24      discussion.  One might argue that's the very reason why we need

25      good people like you that say, hey, I don't fear being on a
```

02:37PM (line 5)
02:38PM (line 10)
02:38PM (line 15)
02:38PM (line 20)
02:38PM (line 25)

jury.  I fear about possible injustices.

But one might argue, in order to avoid injustices,
you need good people with good moral compasses that would
evaluate the evidence on both sides and deliberate with their
fellow jurors to try to see if they can come up with a verdict.
Right?

PROSPECTIVE JUROR GASPAR:  (No audible response.)

THE COURT:  Okay.  And, again, I greatly appreciate
the answer.  Thank you.

Was there anyone else in the -- just call the bottom
section here.  Oh, I'm sorry.  Mr. Ruvalcaba.

PROSPECTIVE JUROR RUVALCABA:  Yes.  So one of the
things that might sway me is my religion.  I'm Catholic.  So
some of the experiences that I, you know, grew up hearing, that
might sway my decision, as -- as anybody who has a religious
inclination.

THE COURT:  And help me a little bit here.  For what
it's worth, I'm Catholic as well.  Is it a concern that you
believe that there's only one sort of person that can make a
judgment on a -- in life, that is God, or is it that something
that you heard in your Catholic -- you know, whether it's
schooling or church that would make you hesitate to be a juror,
which is it or is it both?

PROSPECTIVE JUROR RUVALCABA:  Mostly, like, if an
action led to life being taken -- I think something about

```
      1  fentanyl came up, but I don't know the specifics.  But that

      2  kind of sways my decision too.

      3           THE COURT:  But is that because of your religion or

      4  more because of the nature of the -- the fact that, as you

02:40PM  5  pointed out, fentanyl has been discussed?

      6           PROSPECTIVE JUROR RUVALCABA:  Um, I think my -- I

      7  think it's my religion.  I think the religion has a stance on,

      8  like, life in general.  And if someone's life was taken, my

      9  stance will kind of sway in that direction.

02:40PM  10          THE COURT:  Got it.  Okay.  All right.  Thank you.

     11  I appreciate that.

     12          All right.  And then --

     13          MR. BROWN:  Your Honor, can we have a -- may we have

     14  a sidebar?

02:40PM  15          THE COURT:  Yeah.  Let me just -- let me just hear

     16  from Mr. -- I think Mr. -- is it Turner?

     17          PROSPECTIVE JUROR TURNER:  Yeah.

     18          THE COURT:  Yes.  Go ahead, sir.

     19          PROSPECTIVE JUROR TURNER:  Um, so the second

02:41PM  20  question, like, do I have any feelings regarding the criminal

     21  justice system?  Um, like --

     22          THE COURT:  Okay.

     23          PROSPECTIVE JUROR TURNER:  Like, I know people that

     24  have been through certain things with that and, like, people

02:41PM  25  close to me.  So it might sway my decision just off the things
```

1    that I've seen, you know.  So I'm just saying.

2           THE COURT:  Okay.  And, again, I think what I said

3    earlier is that, look, we all are a product of our experiences;

4    right?  And our friends and families may have had experiences

5    that may have been less than desirable.

6           So I guess the question I have for you, Mr. Turner,

7    is that do you think, because of those experiences, it might

8    make it difficult for you to be fair and impartial to either

9    side in the case?

10          PROSPECTIVE JUROR TURNER:  Um, I mean, I'm not going

11   to say yeah -- I don't know.  It's kind of like a tricky -- I

12   don't know.

13          THE COURT:  Well -- and, look, part of it -- it's

14   not designed to be tricky, but it is designed to make people

15   think.  Right?

16          And so, look, I think we would be naive to suggest

17   that people in our society may have had positive and/or

18   negative experiences with our criminal justice system.  You

19   heard me say in the beginning, it's not a perfect system.  The

20   question is that -- whether or not, because of those

21   experiences, you would say, you know what?  I can't make a

22   decision because I would automatically view -- go in one

23   person's favor or the other?  Or is it more, look, this is who

24   I am, this is what I bring to the table.  I can listen to the

25   evidence.  It may be informed or shaped by my own personal

02:41PM (5)
02:41PM (10)
02:42PM (15)
02:42PM (20)
02:42PM (25)

```
 1    experiences, but I'm willing to listen to the evidence, work

 2    with my fellow jurors, and see if a verdict can be reached?

 3              PROSPECTIVE JUROR TURNER:  Yeah.

 4              THE COURT:  Do you think you can do that?

 5              PROSPECTIVE JUROR TURNER:  Yes.  Yeah.

 6              THE COURT:  Okay.  Thank you.  Let's have a brief

 7    sidebar, Mr. Brown.

 8                   (At sidebar:)

 9              MR. BROWN:  Thank you, Your Honor.

10              THE COURT:  Sure.

11              All right.  Mr. Brown.

12              MR. BROWN:  Your Honor, I guess my only concern is

13    that Mr. Ruvalcaba indicated that he thought that this case

14    involved someone's loss of life.  And I just would ask that the

15    Court perhaps clarify with the panel that it's about great

16    bodily injury but not that -- that no one's died.  Or is that

17    too premature?

18              THE COURT:  Look, I think it's something that we

19    need to discuss because that's the note that I have that I was

20    going to eventually say this does not involve the loss of life.

21    But I wasn't sure to wait until we'd gotten all the questions

22    done --

23              MR. BROWN:  Yes, Your Honor.

24              THE COURT:  -- to try to see where -- because I

25    assume you were going to want to say something at some point.
```

02:42PM (line 5)
02:43PM (line 10)
02:43PM (line 15)
02:43PM (line 20)
02:43PM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1    So I wasn't sure if we should wait until now -- well, let me

 2    restate that.  My inclination was get all the questions --

 3              MR. BROWN:  Understood, Your Honor.

 4              THE COURT:  -- bring you all here, I assumed you

 5    were going to raise that.  And my thought was bring

 6    Mr. Ruvalcaba here --

 7              MR. BROWN:  Yes.

 8              THE COURT:  -- to have a semi-private conversation,

 9    be like, Does it matter to you?  You raised the issue about

10    life.  There's no allegation here of a loss of life.  How does

11    that impact you?  But if you want to try something differently,

12    I'm all ears.

13              MR. BROWN:  I would just ask that perhaps, if the

14    Court could clarify for the larger panel as well right now so

15    just that issue -- so it doesn't become a festering issue, I

16    guess, in people's minds.

17              THE COURT:  What's the Government's position, if at

18    all?

19              MR. PANG:  That the charges do not involve an

20    allegation that the distribution resulted in death, just

21    serious bodily injury.

22              THE COURT:  Right.

23              MR. PANG:  That's fine.

24              THE COURT:  I'll go back to Mr. Ruvalcaba.  And I'll

25    say, you know, you mentioned this.  I just want to make sure
```

02:43PM  (line 5)
02:44PM  (line 10)
02:44PM  (line 15)
02:44PM  (line 20)
02:44PM  (line 25)

**UNITED STATES DISTRICT COURT**

```
 1   you and the others are clear, there's no allegation that there

 2   was a loss of life --

 3              MR. BROWN:  Yes, Your Honor.

 4              THE COURT:  -- in this case.

 5              MR. BROWN:  Yes, Your Honor.

 6              THE COURT:  All right.

 7              MR. BROWN:  Thank you very much, Your Honor.  I'm

 8   sorry to interrupt.

 9              THE COURT:  No, no.  No need to apologize.

10              (In the presence of the prospective jurors:)

11              THE COURT:  All right.  And so, Mr. Ruvalcaba, if I

12   could jump back to you just for a moment because you made

13   reference about some of the concerns that you had about, you

14   know, fentanyl and the loss of life.

15         And I think it's probably a good time to just say to

16   you and to everyone so we're clear here.  There's no allegation

17   here that anyone lost their life in this case.

18         So does that change your views in any way, shape, or

19   form?

20              PROSPECTIVE JUROR RUVALCABA:  Yes.

21              THE COURT:  Okay.  And does it make it such that you

22   think that you would be able to be fair and impartial, taking

23   into account your religious beliefs?

24              PROSPECTIVE JUROR RUVALCABA:  Yes, I believe so.

25              THE COURT:  Okay.  All right.  Thank you.
```

02:44PM (line 5)
02:45PM (line 10)
02:45PM (line 15)
02:45PM (line 20)
02:45PM (line 25)

|     |     |
| --- | --- |
| | 1 | Appreciate that. |
| | 2 | Okay.  I think we had gotten to -- I'm sorry. |
| | 3 | Mr. Nguyen. |
| | 4 | PROSPECTIVE JUROR NGUYEN:  Yes, Your Honor.  I guess |
| 02:45PM | 5 | maybe a good time for me to bring up now, I do have some close |
| | 6 | friend that passed away from substance abuse. |
| | 7 | THE COURT:  We're going to get to that question in a |
| | 8 | moment, so if you wouldn't mind just holding tight.  We'll |
| | 9 | definitely come back to that.  Okay?  All right. |
| 02:46PM | 10 | I think we'd gotten to the question about anyone |
| | 11 | having any feelings regarding the criminal justice system |
| | 12 | generally that might affect their ability to consider the |
| | 13 | evidence in this case fairly and impartially and to base the |
| | 14 | verdict solely on the evidence presented in the case. |
| 02:46PM | 15 | We had a good conversation with Mr. Turner about |
| | 16 | that.  Anyone else -- of the 50, I should say? |
| | 17 | Okay.  Is there anything about the charges in this |
| | 18 | case that may make you unwilling or reluctant to serve as a |
| | 19 | juror? |
| 02:46PM | 20 | Mr. Nguyen, is this maybe an appropriate time? |
| | 21 | PROSPECTIVE JUROR NGUYEN:  No. |
| | 22 | THE COURT:  No?  Okay.  I thought you said -- |
| | 23 | PROSPECTIVE JUROR NGUYEN:  Well, I did mention, |
| | 24 | like, my close friend that I know that passed away from |
| 02:46PM | 25 | substance abuse, but I can go based on the evidence. |

```
 1              THE COURT:  Okay.  You think you can -- in spite of
 2    that.  And I'm sorry to hear that.
 3              PROSPECTIVE JUROR NGUYEN:  No worries.
 4              THE COURT:  Thank you.
 5              PROSPECTIVE JUROR NGUYEN:  You're welcome.
 6              THE COURT:  And I'm sorry.  Ms. Oropeza?  And with
 7    all the questions, I just -- I'm not trying to single you out.
 8    I just want to remind folks, if you need to talk at sidebar,
 9    let me know.  That's easy to do.
10              Go ahead, Ms. Oropeza.
11              PROSPECTIVE JUROR OROPEZA:  Yeah.  When I heard the
12    charges, it kind of reminded me of my personal experience with
13    my daughter and her drug addiction problem that she had.  So I
14    think that will interfere.
15              THE COURT:  Got it.
16              And you think it will be difficult for you to sit in
17    a case like this?
18              PROSPECTIVE JUROR OROPEZA:  (No audible response.)
19              THE COURT:  Okay.  All right.  Thank you.
20              Okay.  Anyone else?
21              I'm sorry.  Ms. Schwenke.
22              PROSPECTIVE JUROR SCHWENKE:  I feel I may be unduly
23    sympathetic in this situation because, as my position as a
24    tutor at a community college, I have come into contacts with
25    students that have confided in me about their addiction to
```

02:46PM  (line 5)
02:47PM  (line 10)
02:47PM  (line 15)
02:47PM  (line 20)
02:47PM  (line 25)

drugs and -- and also charges that they were imprisoned.  So --
and it's something that's new to me.  So I -- I don't know that
I am totally objective.

THE COURT:  Do you think -- again, sort of what I
02:48PM  was saying with Mr. Turner, look, we're shaped by our
experiences in life.  And as you point out, this is something
that's new to you.

PROSPECTIVE JUROR SCHWENKE:  Yes.

THE COURT:  And I guess it comes down to the
02:48PM  question of:  Do you think that you'd be able to just -- not
"just" -- be able to sit, listen to the evidence, listen to the
instructions that are given by the Court as to what the
elements are, and work with your fellow jurors to see if you
could come up with a verdict?  Or do you think that because of
02:48PM  the experiences that you've had recently in the community
college context, that you -- you don't think you can be fair to
either side?

PROSPECTIVE JUROR SCHWENKE:  Yes, I'm afraid I may
not be fair because I'm very sympathetic toward my students and
02:49PM  all the work that they're doing in overcoming things and --

THE COURT:  And you're worried that that might
influence --

PROSPECTIVE JUROR SCHWENKE:  Right.  At this point,
I think it might.  You know, a few years from now, it might
02:49PM  not.  But at this point, it might.

|   |   |
|---|---|
| | 1 |

```
 1              THE COURT:  Okay.  All right.  I appreciate your

 2    candor.  Thank you.

 3              All right.  Anyone else in the gallery?

 4              Okay.  Let's -- let's see.  Who -- I'm sorry.  Tough

02:49PM    5    for me to see.

 6              PROSPECTIVE JUROR VARGAS:  Juror 23, Dahlia.

 7              THE COURT:  Ms. Vargas.

 8              PROSPECTIVE JUROR VARGAS:  I'd like to do it in

 9    private.

02:49PM   10              THE COURT:  Yes.  Please come on up.

11                  (At sidebar in the presence of

12                   Prospective Juror No. 23:)

13              THE COURT:  Go ahead.  If you wouldn't mind, just so

14    everyone else can hear.

02:50PM   15              PROSPECTIVE JUROR VARGAS:  So I had an aunt who had

16    drug charges against her before in Federal Court.  And she was

17    found guilty.  And she ended up skipping town, and we never saw

18    her again after that.  So I -- when I hear, you know, what this

19    case is, like it brings that up --

02:50PM   20              THE COURT:  Got it.

21              PROSPECTIVE JUROR VARGAS:  -- in my mind.

22              THE COURT:  And I'm sorry about that experience.  If

23    I can just ask some follow-up questions.

24              How long ago was this?

02:50PM   25              PROSPECTIVE JUROR VARGAS:  She's been missing from
```

```
 1    us for over 15 years.
 2              THE COURT:  Okay.  So 15 years.
 3              And was it here in Los Angeles?
 4              PROSPECTIVE JUROR VARGAS:  It was.
 5              THE COURT:  Okay.
 6              PROSPECTIVE JUROR VARGAS:  I don't know if it was
 7    this court but --
 8              THE COURT:  I think you said -- you said it was
 9    federal charges?
10              PROSPECTIVE JUROR VARGAS:  Yes.
11              THE COURT:  You know that personally?
12              PROSPECTIVE JUROR VARGAS:  Yes.
13              THE COURT:  Okay.  All right.  And I have to ask, I
14    mean, you say it brings things up for you.  Is it -- does it --
15    naturally it would.  But I guess the question I have is:  Do
16    you think it would be difficult for you to sit and decide on
17    guilt or innocence based on the charges because of what
18    happened to your aunt?
19              PROSPECTIVE JUROR VARGAS:  I just feel like sitting
20    through and hearing it, like it just stirs up emotion in me.
21    And then, you know, when you're emotional, you're not always
22    clear.
23              THE COURT:  Clear, okay.
24              PROSPECTIVE JUROR VARGAS:  You're not listening.
25              THE COURT:  And you think, as a result -- I don't
```

02:50PM (line 5)
02:50PM (line 10)
02:50PM (line 15)
02:51PM (line 20)
02:51PM (line 25)

1   want to put words in your mouth.  You think this is not the

2   ideal case that you'd want to sit on?

3            PROSPECTIVE JUROR VARGAS:  Yeah.  Yes.

4            THE COURT:  Okay.  Couple other -- one other

02:51PM  5   question.  I can't remember if you said -- did your aunt, to

6   your knowledge, did she go to trial?

7            PROSPECTIVE JUROR VARGAS:  She did go to trial.

8            THE COURT:  Okay.

9            PROSPECTIVE JUROR VARGAS:  And when she was supposed

02:51PM  10  to show up for her --

11           THE COURT:  Sentencing.

12           PROSPECTIVE JUROR VARGAS:  -- sentence, she just

13  left without telling us.

14           THE COURT:  And I'm trying to think of -- did you

02:51PM  15  attend any of the trial?

16           PROSPECTIVE JUROR VARGAS:  No, but I was -- I had my

17  cousins.

18           THE COURT:  Okay.  And I'm assuming based -- you

19  were probably very young at this time.

02:51PM  20           PROSPECTIVE JUROR VARGAS:  I was in high school.

21           THE COURT:  High school.  Okay.  Got it.  Okay.  So

22  this happened in high school.

23           Let me ask, does the Government have any follow-up

24  questions?

02:52PM  25           MR. PANG:  Nothing, Your Honor.

| | |
|---|---|
| 1 | THE COURT:  Anything from the defense? |
| 2 | MR. BROWN:  No, Your Honor. |
| 3 | THE COURT:  All right.  Thank you very much. |
| 4 | Appreciate it. |
| 02:52PM  5 | (In the presence of the prospective jurors:) |
| 6 | THE COURT:  Okay.  All right.  Anyone else in the |
| 7 | back -- yes.  I'm sorry.  I can't see the number, but I know -- |
| 8 | Davis Polk, TikTok; right?  Tell me your -- |
| 9 | PROSPECTIVE JUROR GOTTESFELD:  You remember my |
| 02:52PM 10 | husband's achievements. |
| 11 | THE COURT:  Right. |
| 12 | PROSPECTIVE JUROR GOTTESFELD:  Terra, Juror |
| 13 | Number 34. |
| 14 | THE COURT:  34.  Okay. |
| 02:52PM 15 | PROSPECTIVE JUROR GOTTESFELD:  Unfortunately, I had |
| 16 | a cousin commit suicide about a month ago who had struggled |
| 17 | with addiction to painkillers.  And she committed suicide when |
| 18 | she basically got cut off by the person supplying them.  So |
| 19 | I've -- |
| 02:53PM 20 | THE COURT:  I'm sorry to hear that. |
| 21 | And I mean, I appreciate your candor.  Obviously -- |
| 22 | and this is probably -- something that's fresh.  Is it such |
| 23 | that you don't think that you could sit in a case -- we don't |
| 24 | have any allegations, as I said earlier, about -- about that. |
| 02:53PM 25 | Do you think that it would be difficult for you to |

1    sit as a juror in this case?

2            PROSPECTIVE JUROR GOTTESFELD:  I think it would be

3    difficult.  And I would try my best to be impartial, but it

4    would kind of depend upon what I was learning.  But, yeah,

02:53PM    5    having it happen so recently --

6            THE COURT:  Got it.  Okay.

7            PROSPECTIVE JUROR GOTTESFELD:  Yeah.

8            THE COURT:  It's interesting.  I don't mean to probe

9    because -- you do say I would try to be.  Do you think that the

02:54PM    10    mere fact that these -- this -- the case involves allegations

11    of the distribution of drugs, would it make it difficult for

12    you to sit and listen to the evidence fairly?

13            PROSPECTIVE JUROR GOTTESFELD:  Um, possibly.  I feel

14    like I would have to hear the evidence but, yeah, because it

02:54PM    15    happened in January so --

16            THE COURT:  Okay.  All right.

17            PROSPECTIVE JUROR GOTTESFELD:  Yeah.

18            THE COURT:  Thank you.  I appreciate that.  Okay.

19            And just for the record, just because the two firms

02:54PM    20    that you mentioned, I happen to know people that work at both

21    of those firms.  That's why it popped up.  I know you're joking

22    but --

23            PROSPECTIVE JUROR GOTTESFELD:  No, no.

24            THE COURT:  I know both of those firms quite well.

02:54PM    25            PROSPECTIVE JUROR GOTTESFELD:  No, no.  It's all

1  good, yeah.

2          THE COURT:  All right.  Anyone else?

3          Yeah.  Let's -- is it Ms. Sal- -- oh, we're going

4  the other way.  Wait.  Is it Ms. Szumski?

02:54PM  5          PROSPECTIVE JUROR SZUMSKI:  Yes, Your Honor.

6          I'm not sure if this relates more to this question

7  or some of the ones further down, but I do have personal

8  beliefs and opinions related to the laws and charges in this

9  case and the penal and justice systems as a whole and the way

02:55PM  10  they operate within this realm that I don't know that I would

11  be able to be impartial.  No offense.

12          THE COURT:  I appreciate that.

13          Do you think you'd have trouble following the law,

14  even if you disagreed with it?

02:55PM  15          PROSPECTIVE JUROR SZUMSKI:  Following it personally

16  for myself?  No.  But, like, placing that law onto other

17  people, yes.

18          THE COURT:  And when you say "placing that law onto

19  other people," meaning that if you were -- let's say you were

02:55PM  20  picked to serve as a juror on the case and I gave you the

21  instructions.  Okay?  And you have your views, and I respect

22  those views about our justice system and the -- the challenges

23  and perhaps inequities as you may find in that.

24          Are you saying, because of those views, you would

02:55PM  25  not be able to render a verdict and follow the law as I give it

1    to you?

2            PROSPECTIVE JUROR SZUMSKI:  I think I would find it

3    very difficult and I would look very -- I would try very hard

4    to make it go a certain way.

02:56PM  5            THE COURT:  Okay.  Okay.  Great.  Okay.  Thank you.

6    I appreciate it.

7            All right.  And then I think we had -- is it Ms. --

8    I want to make sure I get -- is it Ms. Vasquez or Ms. Salguero?

9            PROSPECTIVE JUROR SALGUERO:  Salguero.

02:56PM  10            THE COURT:  Got it.  Go ahead.

11            PROSPECTIVE JUROR SALGUERO:  Personally with this

12    case, I don't think I would have honestly, in my opinion, any

13    sympathy just because I have had an uncle who went through a

14    similar thing where he was given drugs but didn't know what it

02:56PM  15    was -- what was inside the drug.  And he went missing until

16    eventually the hospital called and said he was overdosed and

17    found on the street because he was taking things he shouldn't

18    be taking.  And --

19            THE COURT:  Go ahead.  I'm sorry.

02:56PM  20            PROSPECTIVE JUROR SALGUERO:  It makes me -- I don't

21    know.  It just makes me think, like, okay, what makes them --

22    what makes it -- like, how would I say it without being, like,

23    rude?

24            In my opinion, it would be like what makes me feel

02:57PM  25    like shit won't happen again to like somebody else?  Like, say,

```
 1    what if it happens again to other victims?  We don't know.

 2           THE COURT:  So as a result, you think this kind of

 3    case, because of the charges and the emotions that it brings

 4    out in you, it would be difficult for you to be fair to both

 5    sides in the case?

 6           PROSPECTIVE JUROR SALGUERO:  Yeah.

 7           THE COURT:  Okay.  All right.  Thank you.  I

 8    appreciate that.

 9           All right.  Anyone else -- we're going to -- I just

10    want to make sure while we're out there because our courtroom

11    deputy is going to get a lot of steps in today so --

12           Yes, sir.  We're going back -- Mr. -- oh --

13           PROSPECTIVE JUROR MCPHILAMY:  McPhilamy.

14           THE COURT:  McPhilamy.  Yes.

15           PROSPECTIVE JUROR MCPHILAMY:  I would actually like

16    to request a sidebar.

17           THE COURT:  Sidebar.  Okay.  Great.

18               (At sidebar in the presence of

19                Prospective Juror No. 9:)

20           THE COURT:  Take your time.

21           I just want to -- you're kind of in the center.  Go

22    ahead.

23           PROSPECTIVE JUROR MCPHILAMY:  I'm just worried that

24    my military background and the fact that I just buried way too

25    many brothers because of all this might affect my ability to be
```

02:57PM — lines 5, 10, 15
02:58PM — lines 20, 25

1   unbiased.

2          THE COURT:  If you wouldn't mind, talk to me a

3   little bit about that.  You said your military background and

4   you said you've had to bury many of your brothers.

02:58PM   5          PROSPECTIVE JUROR MCPHILAMY:  Correct.

6          THE COURT:  Due to what specifically?

7          PROSPECTIVE JUROR MCPHILAMY:  Opioids.

8          THE COURT:  Okay.  Were they all overdoses?

9          PROSPECTIVE JUROR MCPHILAMY:  Most of my brothers,

02:58PM   10  mixture of overdose.  We buried my aunt two months ago.

11         THE COURT:  I'm sorry, I may have misunderstood.

12  When you said "brothers," are you talking --

13         PROSPECTIVE JUROR MCPHILAMY:  Military.

14         THE COURT:  Military brothers.

02:58PM   15         PROSPECTIVE JUROR MCPHILAMY:  Yes, sir.

16         THE COURT:  Now you just --

17         PROSPECTIVE JUROR MCPHILAMY:  I said family as well.

18         THE COURT:  Got it.

19         Well, as indicated -- well, there's no allegation

02:59PM   20  that anyone --

21         PROSPECTIVE JUROR MCPHILAMY:  I know.  Absolutely.

22  It's more just the -- the morals of it.

23         THE COURT:  Right.  Okay.  Got it.

24         And so you think as a result, it might be difficult

02:59PM   25  for you to be fair --

```
  1            PROSPECTIVE JUROR MCPHILAMY:  Correct.

  2            THE COURT:  -- to either side here?

  3            PROSPECTIVE JUROR MCPHILAMY:  Particularly the

  4    defense.

  5            THE COURT:  The defense.  Great.  Okay.

  6            Any follow-up questions from the Government?

  7            MR. PANG:  No, Your Honor.

  8            THE COURT:  Anything from the defense, Mr. Brown?

  9            MR. BROWN:  What branch of the military and --

 10            PROSPECTIVE JUROR MCPHILAMY:  Marine Corps.

 11            THE COURT:  Thank you for your service.

 12            And were those intentional overdoses or just

 13    result --

 14            PROSPECTIVE JUROR MCPHILAMY:  There's no way to

 15    100 percent know.  But at the same time, it's just that

 16    boundary that I don't wish to cross, being around it mentally.

 17            THE COURT:  All right.  Thank you very much.

 18    Appreciate it.

 19            MR. BROWN:  Your Honor, I'm sorry.  I meant to

 20    direct the question to you.  I didn't mean to --

 21            THE COURT:  No, no.  That's fine.

 22            (In the presence of the prospective jurors:)

 23            THE COURT:  All right.  Anyone else in the first

 24    group of 50?

 25            I'm sorry.  Mr. -- is it Mr. -- Mr. Ken?
```

1          PROSPECTIVE JUROR KEN:  Yes.

2          THE COURT:  All right.

3          PROSPECTIVE JUROR KEN:  Can I talk to you --

4          THE COURT:  Sidebar?  Yeah.  Come on down.

03:00PM   5          (At sidebar in the presence of

6           Prospective Juror No. 5:)

7          THE COURT:  Do me a favor, just grab -- stand right

8     here so we can have everyone hear you.

9          PROSPECTIVE JUROR KEN:  My apologies.  I have a

03:00PM  10     situation where it's my roommate has been using some of those

11    drugs.  And this is before the New Year's, during, like,

12    New Year's Eve, before the new year.

13          THE COURT:  Before the new year.

14          PROSPECTIVE JUROR KEN:  And he's been using that and

03:01PM  15    he's been bringing a lady outside the street.  And they're

16    using in the room, master bedroom.  And then that night, I was

17    sitting outside -- outside.  And he had been hallucinating, so

18    he brought his gun.  And he showed me that if anybody in the

19    house or you see anything, you tell him -- I mean, you tell me,

03:01PM  20    I will blow his brain off.

21          And that's why I'm not very comfortable -- I can be

22    sitting and listen to the evidence, but I have fear.  I have

23    fear that every time I heard this kind of drug, it make me

24    scared.  That's why I'm nervous.

03:01PM  25          THE COURT:  Got it.  So I just want to make sure I

```
 1    understand.  You're saying that you have a roommate who's been

 2    recently using drugs --

 3              PROSPECTIVE JUROR KEN:  Yes.

 4              THE COURT:  -- as recently as this past new year?

 5              PROSPECTIVE JUROR KEN:  Yes.

 6              THE COURT:  He's bringing in --

 7              PROSPECTIVE JUROR KEN:  Guns.

 8              THE COURT:  Well, he brought in a woman from on the

 9    street.  One night he had an episode where he was

10    hallucinating?

11              PROSPECTIVE JUROR KEN:  Uh-huh.

12              THE COURT:  And he displayed a gun.

13              PROSPECTIVE JUROR KEN:  And then showed me.

14              THE COURT:  And showed it to you and said if anyone

15    comes to harm --

16              PROSPECTIVE JUROR KEN:  Yes.

17              THE COURT:  -- you or him, that he would blow their

18    head off?

19              PROSPECTIVE JUROR KEN:  Yes.

20              THE COURT:  And were the police ever called to your

21    apartment?

22              PROSPECTIVE JUROR KEN:  No, because it's just a

23    roommate.  It's, like, you know -- it's something that, you

24    know, I just don't want to get in a confrontation with him.

25              THE COURT:  Got it.  And so -- I'm sorry that you're
```

03:01PM (line 5)
03:02PM (line 10)
03:02PM (line 15)
03:02PM (line 20)
03:02PM (line 25)

1    having to deal with this.

2          But you're saying that these charges, it's just

3    bringing up all these emotions, makes you very nervous and

4    upset?

03:02PM    5          PROSPECTIVE JUROR KEN:  Yes.

6          THE COURT:  Okay.  Thank you.

7          Let me just ask, does the Government have any

8    follow-up questions?

9          MR. PANG:  No.

03:02PM    10          THE COURT:  Mr. Brown, any follow-up questions?

11          MR. BROWN:  No, Your Honor.

12          THE COURT:  Okay.  Thank you, Mr. Ken.  I appreciate

13    it.

14              (In the presence of the prospective jurors:)

03:03PM    15          THE COURT:  I want to make sure, anyone else that I

16    missed?

17          Okay.  I don't know if we got to this question but

18    just in an abundance of caution, regarding the law, you are to

19    take your instructions from the Court and you may not

03:03PM    20    substitute your beliefs as to what the law is or ought to be.

21          And do any of you feel you'll have trouble following

22    the Court's instructions?

23          Now, I know, Ms. Szumski, we talked a little bit

24    about that.  And is there anyone else that has some concerns at

03:03PM    25    all about that?

1          Yes.  Is it Mr. Frechette?

2          PROSPECTIVE JUROR FRECHETTE:  Yeah.

3          Um, yeah.  Your Honor, so I just sort of -- I'm in a

4    tough place with the -- just the court system at the moment.  I

03:04PM    5    just recently had a buddy who was murdered.  He was stabbed to

6    death by someone who was under the influence of drugs.  And the

7    Court ruled that she was to walk free, even after brutally --

8    brutally murdering my friend, like, stabbing him over 30 times,

9    Chad O'Melia.

03:04PM   10          So I just kind of really am not in a good place with

11    courts in general and kind of really aggravated.  And so I

12    think it would definitely impact my decision.

13          THE COURT:  And I'm sorry to pry and I appreciate

14    it.  If you want to talk at sidebar, we can.

03:04PM   15          PROSPECTIVE JUROR FRECHETTE:  It's all right.

16          THE COURT:  It's okay.

17          I'm sorry that you went through that.  Can I ask,

18    how long ago was this?

19          PROSPECTIVE JUROR FRECHETTE:  It was -- I think the

03:04PM   20    actual murder took place a few years ago, but the ruling didn't

21    come until, I believe, last year.

22          THE COURT:  And was that here in Los Angeles?

23          PROSPECTIVE JUROR FRECHETTE:  It was in Simi Valley,

24    yeah.

03:04PM   25          THE COURT:  Okay.  All right.  And because of

```
 1   that -- I don't want to put words in your mouth, but it sounds

 2   as if you have some sort of -- lost faith, if you will, in the

 3   justice system.  Is that it or --

 4               PROSPECTIVE JUROR FRECHETTE:  Yeah.  Yeah.  To an

 5   extent, for sure.  And I'm just gutted for him and his family

 6   that someone that -- could do something like that and never

 7   even spent one day behind bars.

 8               THE COURT:  Got it.

 9               Do you think as a result, you would not be able to

10   sit -- I mean, this case obviously is very different than what

11   your friend suffered.  Do you think it would be difficult for

12   you to sit as a juror in any criminal case because of that

13   experience?

14               PROSPECTIVE JUROR FRECHETTE:  Not necessarily.  I

15   mean, I always try to put my best foot forward and just do the

16   best I can.  I'm just letting you know kind of where I'm at

17   mentally.

18               THE COURT:  Got it.  And I appreciate that greatly.

19   Thank you, sir.  Appreciate it.

20               All right.  Anyone else?

21               Oh, yes.  Mr. -- I'm sorry.

22               PROSPECTIVE JUROR GASPAR:  Gaspar.

23               THE COURT:  Gaspar.

24               PROSPECTIVE JUROR GASPAR:  Is this a question about

25   having close relatives or --
```

1          THE COURT:  We haven't gotten there yet.

2          PROSPECTIVE JUROR GASPAR:  Okay.  Yeah.  I kind of

3   got confused.

4          THE COURT:  I'm sorry.

03:06PM   5          PROSPECTIVE JUROR GASPAR:  It's okay.

6          THE COURT:  Anyone else with respect to the --

7   having trouble following the Court's instructions?

8          All right.  And does anyone here have any problem

9   judging the credibility of all witnesses by the same standard,

03:06PM   10  regardless of their job?  The reason why I ask that question is

11  you're going to hear witnesses that are civilians, for lack of

12  a better term, some chemists, some doctors, police officers.

13         At the end of the day, they are witnesses.  They're

14  all to be judged the same.  They may have certain

03:06PM   15  qualifications or expertise that may give them an enhanced bit

16  of knowledge.  But at the end of the day, you are to judge them

17  as you would any other witness.

18         Does anyone have any problem doing that?

19         Yes, Mr. -- Mr. Turner.

03:06PM   20         PROSPECTIVE JUROR TURNER:  No, I don't have a

21  problem.  But, like -- like, can I -- can you clarify, like,

22  what do you mean?  Like, life -- the doctor was talking about,

23  like, drugs or something.

24         THE COURT:  That's a fair question.  I mean, there

03:07PM   25  are -- the concern that the Courts have is that, okay, you've

1    got two witnesses.  Okay?  One's a doctor and one's a streamer.

2    Okay?  And they're both testifying as to what they saw at the

3    corner of walk and don't walk.  All right?

4         There are some that might say, well, because she's a

03:07PM    5    doctor, they have more credibility versus a streamer.  But what

6    I'm trying to say is that they're both the same as far as they

7    witnessed things.

8         Now, if a doctor and a streamer come and testify and

9    the doctor comes up to testify about how many views that he

03:07PM    10   believes people get on the stream and how to play certain video

11   games, he doesn't have the expertise for that versus a streamer

12   or vice versa, a streamer trying to get up on the stand and say

13   I'm here to testify about, you know, compound fractures and

14   medical analysis.

03:07PM    15        My point is that there are witnesses that, because

16   of their experience, they may have insights.  But at the end of

17   the day, a witness is a witness and you're to judge their

18   credibility just like anyone else.

19        Does that make sense?

03:08PM    20        PROSPECTIVE JUROR TURNER:  Yeah.

21        THE COURT:  You sure?

22        PROSPECTIVE JUROR TURNER:  It's clarified, yeah.

23        THE COURT:  Okay.  Okay.  All right.  Any other

24   hands up?  I just want to make sure I didn't miss anyone.

03:08PM    25   Okay.

1              Have you or has anyone close to you ever worked in

2       law enforcement?

3              Okay.  Let's go -- let's see.  I'm sorry.

4              THE COURTROOM DEPUTY:  43.

03:08PM  5     THE COURT:  43.  Thank you.

6              Mr. Radanovich.

7              PROSPECTIVE JUROR RADANOVICH:  Thank you,

8       Your Honor.

9              Yes.  My uncle is in the internal division of the

03:08PM  10    San Francisco Police Department, has handled a couple of cases

11      with drugs, just based on stories he's told me, as well as my

12      great uncle who is one of the -- I'm not sure if he was the

13      head chief police officer but he was very high up there in the

14      San Francisco -- McNevin is his last name, Ed McNevin.

03:09PM  15    THE COURT:  San Francisco Police Department.  And

16      then --

17             PROSPECTIVE JUROR RADANOVICH:  I don't think he was

18      the chief of staff, but he was pretty close to that.

19             THE COURT:  And then you said an uncle who was

03:09PM  20    Internal Affairs or internal --

21             PROSPECTIVE JUROR RADANOVICH:  Internal Affairs

22      in -- he currently is.

23             THE COURT:  He's currently in --

24             PROSPECTIVE JUROR RADANOVICH:  He currently is,

03:09PM  25    yeah.  Michael Radanovich is his name.

|    |                                                                    |
|----|--------------------------------------------------------------------|
| 1  | THE COURT:  My understanding, Internal Affairs                     |
| 2  | generally deals with complaints lodged against police officers;    |
| 3  | correct?                                                            |
| 4  | PROSPECTIVE JUROR RADANOVICH:  Correct.                             |

03:09PM 5  THE COURT:  But in the course of his career, he has

6  worked narcotics cases.

7  PROSPECTIVE JUROR RADANOVICH:  Correct.  He didn't

8  do that -- he must have done it before, but currently he does

9  Internal Affairs.

03:09PM 10  THE COURT:  And is there anything about the stories

11  that either of them may have told you that would make it

12  difficult for you to sit as a fair and impartial juror in this

13  case?

14  PROSPECTIVE JUROR RADANOVICH:  I mean, I would do my

03:09PM 15  best to be impartial as I can be.  But as I've grown up, I've

16  always been around police officers and the stories that I've

17  been told.

18  THE COURT:  Okay.  Great.  Thank you.

19  Anyone else?

03:09PM 20  Let's see.  Hold on.  I think I --

21  PROSPECTIVE JUROR JENKINS:  It won't affect my --

22  THE COURT:  I'm sorry.  Give me your number again

23  because it's so hard for me to see from --

24  PROSPECTIVE JUROR JENKINS:  I'm 40.

03:10PM 25  THE COURT:  40.  Okay.  Ms. Jenkins.

1            PROSPECTIVE JUROR JENKINS:  Yeah.  I'm certain it

2    won't affect my judgment.  My uncle is a police officer.

3            THE COURT:  For what police department?

4            PROSPECTIVE JUROR JENKINS:  In Las Vegas, Nevada.

03:10PM    5            THE COURT:  Las Vegas.  Okay.

6        Anything about -- has your uncle shared any war

7    stories or anything like that with you about his experience at

8    Las Vegas Police?

9            PROSPECTIVE JUROR JENKINS:  No.

03:10PM   10            THE COURT:  And is there anything about that

11    relationship -- relationship that would make it difficult for

12    you to sit as a juror on this case?

13            PROSPECTIVE JUROR JENKINS:  No.

14            THE COURT:  Okay.  Great.  Thank you.

03:10PM   15        Anyone else?  In the back?  Okay.  No one in the

16    back.

17        Oh, I'm sorry.  Yes.

18            THE COURTROOM DEPUTY:  47.

19            THE COURT:  All right.  Ms. Horne, yes.

03:10PM   20            PROSPECTIVE JUROR HORNE:  Thank you.

21        My niece's husband in New Mexico was -- worked for

22    the sheriffs.  And you want to know about a story.  The only

23    story -- they come down about twice a year.  And the only story

24    was he got called out, somebody had tried to drive up a

03:11PM   25    telephone pole and it was his wife.  It was an accident, but

```
 1   she was okay.  Everybody was okay.  It was just crazy.
 2              THE COURT:  Got it.  Okay.  That's a story.  Okay.
 3              Is there anything about that relationship or that
 4   story, for that matter, that would make it difficult for you to
 5   sit as a fair and impartial juror?
 6              PROSPECTIVE JUROR HORNE:  No.
 7              THE COURT:  Okay.
 8              PROSPECTIVE JUROR HORNE:  I'm not done with you.
 9              THE COURT:  Oh, you have something else you want to
10   share with me?
11              PROSPECTIVE JUROR HORNE:  Sorry.  I have another
12   nephew.
13              THE COURT:  Oh.  Okay.  Go ahead.
14              PROSPECTIVE JUROR HORNE:  Highway Patrol.
15              THE COURT:  Got it.
16              PROSPECTIVE JUROR HORNE:  And we're pretty close.
17   And the only story -- I don't really like to talk about stuff.
18   But the only good story he told me, some guy was doing about
19   120 down the 405.  And when he finally got to him, he said he
20   was only doing 35.
21              THE COURT:  Well, on the 405, you can't do more than
22   10 miles an hour.  We all know that; right?
23              PROSPECTIVE JUROR HORNE:  I don't know how that
24   happened.
25              THE COURT:  Okay.
```

03:11PM (line 5)
03:11PM (line 10)
03:11PM (line 15)
03:11PM (line 20)
03:12PM (line 25)

1          PROSPECTIVE JUROR HORNE:  Now he works in

2     Sacramento.  Cushy job, I'm told.

3          THE COURT:  Got it.

4          Is there anything about that relationship that would

03:12PM  5     make it difficult for you to sit as a juror?

6          PROSPECTIVE JUROR HORNE:  No, nothing.

7          THE COURT:  Are you done with me now?

8          PROSPECTIVE JUROR HORNE:  Okay, honey.  I'm done.

9          THE COURT:  Okay.  All right.  Thank you.

03:12PM  10         Anyone else in the back in the gallery from the

11    first 50?

12         All right.  I thought -- Mr. Nguyen, did you have

13    your hand up?  Yes.

14         PROSPECTIVE JUROR NGUYEN:  Yes.  My best friend,

03:12PM  15    he's an L.A. detective.  He just retired.

16         THE COURT:  Okay.  Do you know how long -- how long

17    did he work -- I'm sorry.  What police agency?

18         PROSPECTIVE JUROR NGUYEN:  L.A. County.

19         THE COURT:  L.A. County sheriff?

03:12PM  20    PROSPECTIVE JUROR NGUYEN:  Sheriff and PD.

21         THE COURT:  Oh.  He did both the sheriffs and the

22    police department?

23         PROSPECTIVE JUROR NGUYEN:  Yes.

24         THE COURT:  I see.

03:12PM  25         And do you remember -- or do you know what

1    assignments that he had?  Where did he work?

2              PROSPECTIVE JUROR NGUYEN:  Um, he works different

3    department.

4              THE COURT:  Got it.

03:13PM  5              Is there anything about the relationship that you

6    have with him -- did he share any stories with you?  Anything

7    about that relationship that would make it difficult for you to

8    sit as a juror in this case?

9              PROSPECTIVE JUROR NGUYEN:  No.

03:13PM  10             THE COURT:  No.  Okay.  All right.  Thank you.

11             Anyone else in the front initial box here?

12             Okay.  The next question is:  Have you or any close

13   friends, relatives ever been accused, arrested, indicted,

14   charged, or convicted in a criminal case?  And, again, we can

03:13PM  15   talk at sidebar.  It's quite all right.

16             Let's -- we're going to start in the back because

17   he's closer there so --

18             THE COURTROOM DEPUTY:  45.

19             THE COURT:  All right.

03:13PM  20             PROSPECTIVE JUROR FONSECA:  Bernadette Fonseca.

21             I would like to sidebar.

22             THE COURT:  Okay.  Please come on down.  This is the

23   most exercise I get as a judge, so I'm happy to do it.

24                  (At sidebar in the presence of

03:14PM  25                  Prospective Juror No. 45:)

```
 1                THE COURT:  Go ahead, Ms. Fonseca.
 2                PROSPECTIVE JUROR FONSECA:  My dad has been charged
 3     through my whole life with drug convictions.
 4                THE COURT:  Got it.  Okay.  I'm sorry.  Sorry to
 5     hear that.  I have to ask a couple of follow-up questions.
 6                When you say throughout his life, I mean, when was
 7     the most recent conviction, if you know?
 8                PROSPECTIVE JUROR FONSECA:  He was released in 2020,
 9     the most recent time.
10                THE COURT:  2020.
11                And has he served state -- well, has he ever served
12     a prison sentence?
13                PROSPECTIVE JUROR FONSECA:  Yes.
14                THE COURT:  Okay.  Was it state prison or federal
15     prison or -- if you know?
16                PROSPECTIVE JUROR FONSECA:  I don't know.
17                THE COURT:  Okay.  And what was the last prison --
18     what was the last case in which he got a prison sentence, if
19     you know the charges?
20                PROSPECTIVE JUROR FONSECA:  I think it was
21     possession and then with -- when you're selling drugs.
22                THE COURT:  Possession with the intent to
23     distribute?
24                PROSPECTIVE JUROR FONSECA:  Uh-huh.
25                THE COURT:  Okay.  Got it.
```

03:14PM — line 5
03:14PM — line 10
03:15PM — line 15
03:15PM — line 20
03:15PM — line 25

```
 1            And did you ever -- do you know if he ever went to

 2    trial in any cases?

 3            PROSPECTIVE JUROR FONSECA:  Um, I don't think so.

 4            THE COURT:  Okay.  Did you ever go to court for any

 5    of his hearings?

 6            PROSPECTIVE JUROR FONSECA:  No.

 7            THE COURT:  Okay.  Now, I mean, I assume it was not

 8    a positive experience for you.  Right?

 9            PROSPECTIVE JUROR FONSECA:  No.

10            THE COURT:  Okay.  And you're talking about someone

11    who's charged with the distribution of drugs.  Do you think

12    because of your father's experience and how -- the interaction

13    with you, do you think it would be difficult for you to be fair

14    to either side in the case?

15            PROSPECTIVE JUROR FONSECA:  It would be hard for

16    both sides.

17            THE COURT:  Hard for both sides.

18            PROSPECTIVE JUROR FONSECA:  Uh-huh.

19            THE COURT:  Is that because you have --

20            PROSPECTIVE JUROR FONSECA:  Positive and negative,

21    yeah.

22            THE COURT:  Got it.

23            So let me ask -- if you don't mind me asking, in

24    some ways, that might make you the perfect juror because you've

25    had positive and negative --
```

1              PROSPECTIVE JUROR FONSECA:  I just thought I'd let

2      you know.

3              THE COURT:  No, no.  And I appreciate that.  And I'm

4      being somewhat serious.  You've seen the positive and negative.

03:16PM  5     You've seen -- I don't want to speak for you, but you've seen,

6      it sounds like, good and bad within our justice system.

7              But do you think, even with that good and bad, it

8      would make it tough for you to sit as a juror on the case?

9              PROSPECTIVE JUROR FONSECA:  Not necessarily.  I

03:16PM  10    might just be torn, in the middle.

11             THE COURT:  In the middle.  Okay.

12             Any follow-up questions from the Government?

13             MR. PANG:  No.

14             THE COURT:  Mr. Brown, any follow-up questions?

03:16PM  15    MR. BROWN:  No, Your Honor.

16             THE COURT:  Okay.  Thank you very much.  I

17     appreciate your honesty.

18                 (In the presence of the prospective jurors:)

19             THE COURT:  Okay.  Anyone else in the back gallery?

03:17PM  20    THE COURTROOM DEPUTY:  29.

21             THE COURT:  All right.  Ms. -- Ms. Manning.

22             PROSPECTIVE JUROR MANNING:  Yes.

23             My father was arrested.  It was over, like, 35 years

24     ago.  So it's not like it will make me biased in any way.  But

03:17PM  25    he was arrested, charged, but not convicted.

1           THE COURT:  Okay.  And do you know what he was

2    arrested for?

3           PROSPECTIVE JUROR MANNING:  Um, for trying to take

4    over an airplane.

03:17PM  5           THE COURT:  Okay.  Got it.

6           PROSPECTIVE JUROR MANNING:  This was pre-9/11.

7           THE COURT:  35 years ago.  Okay.

8           And there's nothing about that that would impact

9    your ability to be fair and impartial?

03:17PM  10          PROSPECTIVE JUROR MANNING:  No.  I was a kid when it

11   happened.

12          THE COURT:  Okay.  Great.  Thank you.

13          Anyone else in the back?

14          Oh, Ms. Young?

03:17PM  15          PROSPECTIVE JUROR YOUNG:  Yes.

16          THE COURT:  Go ahead.

17          PROSPECTIVE JUROR YOUNG:  I do have a relative who

18   was arrested and I also believe convicted, but I don't know all

19   the details.

03:18PM  20          THE COURT:  Do you know what the nature of the crime

21   was?

22          PROSPECTIVE JUROR YOUNG:  Not fully, no.

23          THE COURT:  Got it.

24          Anything about that experience that would make it

03:18PM  25   difficult for you to sit as a fair and impartial juror?

|        | 1  | PROSPECTIVE JUROR YOUNG:  No, Your Honor. |
|        | 2  | THE COURT:  Okay.  Thank you. |
|        | 3  | Then I think -- was it Mr. Turner? |
|        | 4  | PROSPECTIVE JUROR TURNER:  Yes. |
| 03:18PM | 5  | THE COURTROOM DEPUTY:  Yes.  41. |
|        | 6  | THE COURT:  Go ahead. |
|        | 7  | PROSPECTIVE JUROR TURNER:  Yeah, I have had friends |

1     PROSPECTIVE JUROR YOUNG:  No, Your Honor.

2     THE COURT:  Okay.  Thank you.

3     Then I think -- was it Mr. Turner?

4     PROSPECTIVE JUROR TURNER:  Yes.

5     THE COURTROOM DEPUTY:  Yes.  41.

6     THE COURT:  Go ahead.

7     PROSPECTIVE JUROR TURNER:  Yeah, I have had friends

8     and relatives -- I don't want to go into detail but just answer

9     yes.

10     THE COURT:  Okay.  Do you want to talk at sidebar?

11     PROSPECTIVE JUROR TURNER:  No.

12     THE COURT:  Is there anything about the experiences

13     that your friends or relatives have had that would make it

14     difficult for you to sit as a juror in this case?

15     PROSPECTIVE JUROR TURNER:  No.

16     THE COURT:  Okay.  All right.  Thank you.

17     Anyone else in the back?

18     Okay.  I thought I saw some hands in the front here

19     so -- all right.  We'll start with Mr. -- oh, I'm sorry.  No,

20     we'll start with Ms. Gritman.

21     PROSPECTIVE JUROR GRITMAN:  Hi.  A brother who is

22     now deceased.  I don't remember everything he did.  But he

23     robbed a bank, um, he had a DUI, burglary, a nephew who was

24     also arrested and convicted for burglary.  My brother's house

25     just got raided about two months ago.  And my 17-year-old

1    nephew is now going up on felony charges.

2              THE COURT:  Got it.  Okay.

3              Anything about any of those experiences that you've

4    relayed to us that would make it difficult for you to sit as a

03:19PM    5    fair and impartial juror in the case?  It sounds like none of

6    them have anything to do with the kinds of charges alleged

7    here.  So is there anything about that that would make it

8    difficult for you to sit as a juror?

9              PROSPECTIVE JUROR GRITMAN:  No.

03:19PM    10             THE COURT:  Okay.  All right.  Thank you.

11             I think we'll go down the road.

12             Mr. Gaspar?

13             PROSPECTIVE JUROR GASPAR:  Yes.

14             THE COURT:  Go ahead.

03:19PM    15             PROSPECTIVE JUROR GASPAR:  I have two nephews.  And

16   one of them was convicted in Washington state, I believe -- I'm

17   not sure what it was, but there was a gun involved.  It was

18   assault with a deadly weapon or something like that, you know.

19   And my other nephew -- and he went to prison.  He went to

03:20PM    20   prison.  He's not in prison anymore, but he -- he served time

21   there.

22             I have another nephew who served time.  I'm not

23   exactly sure what he was charged with, but I -- I think it was

24   drug related.  And he was caught within a group of -- I guess

03:20PM    25   it would be a conspiracy or collaborators or something like

```
 1    that, but he got caught.

 2            THE COURT:  Got it.

 3            PROSPECTIVE JUROR GASPAR:  And he went to court and

 4    he ended up going to prison too.  So I have two nephews who --

 5            THE COURT:  Anything about those unfortunate

 6    experiences that would make it difficult for you to sit as a

 7    juror in this case?

 8            PROSPECTIVE JUROR GASPAR:  No, I don't think so.  I

 9    just wanted to respond.

10            THE COURT:  Right.  I appreciate it.  Thank you.

11            All right.  Yes, Mr. Conrad.

12            PROSPECTIVE JUROR CONRAD:  Yes.  Um, full

13    disclosure, in my youth, I was accused and arrested for

14    stealing a car.  Um, the circumstances were taken care of

15    outside of court.  So there was no -- no permanent record or

16    fingerprints were expunged and that kind of thing.

17            THE COURT:  Anything about that experience that

18    would make it difficult for you to sit --

19            PROSPECTIVE JUROR CONRAD:  Not at all, no.

20            THE COURT:  Thank you.

21            Then, is it Ms. Provencio?

22            PROSPECTIVE JUROR PROVENCIO:  Yes.  14.

23            My cousin -- first cousin was convicted of a crime.

24    It was a gang rape.  And four of the young men along with him.

25    The question became whether the young woman was basically
```

03:20PM (line 5)
03:21PM (line 10)
03:21PM (line 15)
03:21PM (line 20)
03:21PM (line 25)

**UNITED STATES DISTRICT COURT**

1    forced into a van and given drugs and alcohol or whether she

2    voluntarily went into the van and was already -- already had

3    taken drugs and alcohol.

4              THE COURT:  Got it.

03:21PM  5              And as a result -- you said your cousin -- was he

6    convicted or --

7              PROSPECTIVE JUROR PROVENCIO:  He was convicted.

8              THE COURT:  Got it.  All right.

9              PROSPECTIVE JUROR PROVENCIO:  In California.

03:22PM  10             THE COURT:  How long ago was this?

11             PROSPECTIVE JUROR PROVENCIO:  Oh, gosh, it was about

12   20 years ago.

13             THE COURT:  Is there anything about that experience

14   that would make it difficult for you to sit as a juror in the

03:22PM  15   case?

16             PROSPECTIVE JUROR PROVENCIO:  I don't think so.  It

17   was just a drug-related issue.  Obviously the fact that they

18   had exposure to the drugs.  But, again, it was, you know -- I

19   think I could be okay with it.

03:22PM  20             THE COURT:  Okay.  All right.  Thank you.

21             PROSPECTIVE JUROR PROVENCIO:  Uh-huh.

22             THE COURT:  Anyone else in the front gallery?

23             Yes, Ms. Cham- -- Ms. Chambers?

24             PROSPECTIVE JUROR CHAMBERS:  My cousin was convicted

03:22PM  25   of arson, and there were some drug-related charges along with

```
 1    it.  I'm not sure.  I assume possession.
 2              THE COURT:  Okay.  How long ago was this?
 3              PROSPECTIVE JUROR CHAMBERS:  I want to say 2021.  It
 4    was a few years ago.
 5              THE COURT:  Got it.
 6              Did you attend any of the hearings or anything like
 7    that?
 8              PROSPECTIVE JUROR CHAMBERS:  No.
 9              THE COURT:  No.  Anything about that experience that
10    would make it difficult for you to sit as a juror in this case?
11              PROSPECTIVE JUROR CHAMBERS:  I don't think so.
12              THE COURT:  Okay.  All right.  Thank you.  Thank
13    you.
14              Then who else -- was there anyone else in the second
15    row?
16              We'll go back to Mr. Good- --
17              PROSPECTIVE JUROR GOODMAN:  Can I do sidebar?
18              THE COURT:  Sidebar?  Absolutely.
19                  (At sidebar in the presence of
20                   Prospective Juror No. 19:)
21              THE COURT:  Yes, Mr. Goodman.
22              PROSPECTIVE JUROR GOODMAN:  I apologize.
23              THE COURT:  No, no.  No need to apologize.
24              PROSPECTIVE JUROR GOODMAN:  And I somehow got
25    switched from the 10-day to the 14-day.  But as I listen and
```

03:22PM (line 5)
03:22PM (line 10)
03:23PM (line 15)
03:23PM (line 20)
03:23PM (line 25)

```
 1   think, all this I hear, I have a protégé that I've been over

 2   the years managing and being a stepfather -- not stepfather --

 3   a, whatever, surrogate father to.  He has been arrested so many

 4   times and had so many charges and drugs that I have put him in

 5   rehab so many times.

 6           It would take a lot -- a miracle to convince me that

 7   there's some sort of mistake in identity or conspiracy.  I just

 8   strongly believe drugs shouldn't be allowed, illegal drugs.

 9   And I believe it's an out-of-control problem.  And I don't know

10   that I can get past that.  I'm sorry to -- I won't take any

11   more --

12           THE COURT:  No, no.  You're not wasting anybody's

13   time.  It's important that we get people's candid thoughts

14   because both sides need to hear that in trying to assess who

15   should be on this jury.  So thank you for sharing that.

16           Any questions from the Government?

17           MS. BAHADUE:  No, Your Honor.

18           THE COURT:  From the defense?

19           MR. BROWN:  No, Your Honor.

20           THE COURT:  Thank you, sir.  Appreciate it.

21           (In the presence of the prospective jurors:)

22           THE COURT:  Okay.  Anyone else in the lower gallery?

23           Okay.  The next question:  Have you or anyone close

24   to you ever had an unpleasant experience with state or federal

25   law enforcement or with the Government?
```

03:23PM — line 5
03:24PM — line 10
03:24PM — line 15
03:24PM — line 20
03:25PM — line 25

1          Okay.  I want to make sure -- okay.

2          Do you have any opinions, positive or negative,

3    about the Drug Enforcement Administration or the Los Angeles

4    Police Department that would affect your ability to be fair and

03:25PM  5    impartial in this case?

6          Hold on.  Let's see.  That's --

7          THE COURTROOM DEPUTY:  38.

8          THE COURT:  38.

9          PROSPECTIVE JUROR ALEMAN:  Um, I do have some

03:25PM  10   opinions about the DEA and the Los Angeles Police Department.

11   They're kind of negative.  Sometimes I think, like, the DEA

12   partakes -- but these are personal opinions -- into the

13   supplying of drugs in the streets.

14         THE COURT:  And do you think that -- as a result of

03:26PM  15   those feelings, do you think it would be difficult for you to

16   sit in a case where there might -- where there would be DEA

17   agents testifying?

18         PROSPECTIVE JUROR ALEMAN:  I think so.  Yeah.

19         THE COURT:  All right.  Thank you, ma'am.  I

03:26PM  20   appreciate that.

21         And that's Ms. Aleman; right?

22         PROSPECTIVE JUROR ALEMAN:  Yeah.

23         THE COURT:  Okay.  All right.  Anyone else?  In the

24   back?  In the front?  No?  Okay.

03:26PM  25         Oh, I'm sorry.  Hold on.  I think Mr. --

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | THE COURTROOM DEPUTY:  31.                                    |
|        | 2  | PROSPECTIVE JUROR FRECHETTE:  Yeah.  I guess I'm              |
|        | 3  | just, like, slightly confused on whether -- like, I'm supposed |
|        | 4  | to address any of these if they apply to me or if I just think |
| 03:26PM| 5  | it will affect my opinion to hear, like, a fair trial?       |
|        | 6  | THE COURT:  It's both, actually.  I mean, if you             |
|        | 7  | have any opinions that are positive or negative about -- for |
|        | 8  | example, in this question, whether -- whether it's based on  |
|        | 9  | your own personal experience or things that you've heard or  |
| 03:26PM| 10 | read.                                                        |
|        | 11 | I mean, Ms. Aleman -- I don't know for certain where |
|        | 12 | her opinions come from, but she -- she's expressed those.    |
|        | 13 | That's her experience.                                       |
|        | 14 | And so if there are things that you have opinions |
| 03:27PM| 15 | on, we'd like to know.                                       |
|        | 16 | PROSPECTIVE JUROR FRECHETTE:  Okay.  Well, it was            |
|        | 17 | just for the last two, then.  I -- I have a cousin that works |
|        | 18 | in CHP, but I don't think it would affect my opinion to -- to a |
|        | 19 | fair trial.                                                  |
| 03:27PM| 20 | THE COURT:  Okay.                                            |
|        | 21 | PROSPECTIVE JUROR FRECHETTE:  And then I also was            |
|        | 22 | charged with possession of a controlled substance, but I did -- |
|        | 23 | I did, like, DOJ and everything I needed to do to have it    |
|        | 24 | expunged.                                                    |
| 03:27PM| 25 | THE COURT:  Got it.                                          |

1          If you don't mind me asking, how long ago was that?

2          PROSPECTIVE JUROR FRECHETTE:  I'd say -- I think

3    seven or eight years ago now.

4          THE COURT:  And you said -- you said it was DOJ.

03:27PM  5    Was it like a diversion program or --

6          PROSPECTIVE JUROR FRECHETTE:  Yeah.  It was, like,

7    I -- I wasn't -- I think it was my age and the amount that I

8    had was -- I was given kind of just like a -- a pass to just be

9    able to take care of what I needed to do, and then they would

03:27PM 10    wipe it from my record.

11          THE COURT:  Got it.

12          And is there anything from that experience that

13    would make it difficult for you to sit as a juror in this case?

14          PROSPECTIVE JUROR FRECHETTE:  No, I don't believe

03:28PM 15    so.

16          THE COURT:  Okay.  All right.  Thank you, sir.  I

17    appreciate it.

18          Anyone else in the back?

19          Oh, I'm sorry.  Yes, ma'am.  Hold on.  I know I can

03:28PM 20    see -- Ms. Jenkins; right?

21          PROSPECTIVE JUROR JENKINS:  Yes.

22          Um, I -- full disclosure, upon -- I just wanted to

23    say -- I don't think this will affect my view of the -- the

24    case itself.  But given his response to the question earlier,

03:28PM 25    um, I do -- I have had unpleasant experiences with state law

```
 1    enforcement but not of any, like, high caliber and very -- not

 2    very, like, strongly with the police department in general.

 3                   THE COURT:  Got it.

 4                   And if you don't mind me asking, how -- how long ago

 5    was your most recent negative experience?

 6                   PROSPECTIVE JUROR JENKINS:  Um, last year, at the

 7    airport.  The other ones were -- like, the one before was two

 8    years ago, and the other one was, like, a few years before

 9    but --

10                   THE COURT:  And is there anything about those

11    experiences -- did they involve either the Drug Enforcement

12    Administration or the LAPD?

13                   PROSPECTIVE JUROR JENKINS:  Um, LAPD.

14                   THE COURT:  Got it.  Okay.

15                   And is there anything about any of those

16    experiences, whether they involved LAPD or not, that would make

17    it difficult for you to sit as a juror in this case?

18                   PROSPECTIVE JUROR JENKINS:  I don't think so, no.

19                   THE COURT:  Okay.  All right.  Thank you.  Great.

20    Thank you, ma'am.  Appreciate it.

21                   Anyone else in the back?

22                   Anyone in the front half of the gallery?

23                   Okay.  Um, the investigation in this case involves

24    the use of cooperating defendants and/or cooperating witnesses.

25    Some of those witnesses engage in criminal conduct and/or have
```

Timestamps (left margin): 03:28PM (line 5), 03:29PM (line 10), 03:29PM (line 15), 03:29PM (line 20), 03:29PM (line 25)

criminal histories.

        Do any of you have any feelings or opinions about the use of these types of witnesses to investigate these crimes?  Anything that would make it difficult for you to sit as a juror in this case?

        Yes, Mr. Gaspar.

        PROSPECTIVE JUROR GASPAR:  Only that, um, there has to be something else besides their word.

        THE COURT:  So you would be looking for some kind of corroboration?

        PROSPECTIVE JUROR GASPAR:  Yeah.  It has to be something else just besides their word.

        THE COURT:  I really do appreciate your answer because it sounds like your -- and please, if I don't -- if I'm not getting this right, tell me.

        You would have some skepticism about a witness who was cooperating with the Government?

        PROSPECTIVE JUROR GASPAR:  Yeah.

        THE COURT:  And you'd want some other corroboration; right?  So you would be evaluating their testimony, but you may have some views about their testimony because of their status as a witness?

        PROSPECTIVE JUROR GASPAR:  Or their circumstances --

        THE COURT:  Right.

        PROSPECTIVE JUROR GASPAR:  -- in the case itself.

```
 1              THE COURT:  Okay.  And I don't think there's

 2   anything unreasonable with that but thank you.  Appreciate it.

 3              Anyone else?

 4              Okay.  All right.  Do you have any strong feelings

 5   or beliefs about the laws that regulate drug -- drug use that

 6   would affect your ability to be a fair and impartial juror in

 7   this case?

 8              Now, I know we've heard from Ms. Szumski earlier.

 9   Anything -- anyone else -- or, Ms. Szumski, if I missed

10   anything, is there anything else you wish to add?

11              PROSPECTIVE JUROR SZUMSKI:  No.

12              THE COURT:  Okay.  Anyone else?

13              Okay.  Do any of you have any specialized training

14   or experience using a cloud service for digital devices, such

15   as iCloud?  I thought we had some techies here.  No?

16              Hold on.  This is Juror Number 9, Mr. Mc -- oh, my

17   goodness.  McPhilamy.

18              PROSPECTIVE JUROR MCPHILAMY:  It's really Irish.

19              THE COURT:  McPhilamy.

20              PROSPECTIVE JUROR MCPHILAMY:  Just, like, with

21   storage and training that I had prior with, like, Internet

22   storage and facilities.

23              THE COURT:  Got it.  Okay.

24              And where did you get that training?

25              PROSPECTIVE JUROR MCPHILAMY:  Through work.
```

|  | 1 | THE COURT:  Work.  Okay. |

1          THE COURT:  Work.  Okay.

2          And do you hold any special certificates or anything

3   like that in that field?

4          PROSPECTIVE JUROR MCPHILAMY:  No certificates.

03:32PM   5          THE COURT:  Okay.  Great.  Appreciate it.  Thank

6   you.

7          Anyone else?  Hold on.  We've got someone who hasn't

8   spoken before.  Let's see what juror number in the back.

9          PROSPECTIVE JUROR NAVEJAS:  42.

03:32PM  10          THE COURT:  42.  Mr. Navejas, where have you been?

11          Yes, sir.

12          PROSPECTIVE JUROR NAVEJAS:  I am currently studying

13   for cloud services.  I do have a certificate for cloud

14   practitioner for AWS.

03:32PM  15          THE COURT:  And I'm sorry.  What's AWS?

16          PROSPECTIVE JUROR NAVEJAS:  Amazon Web Services.

17          THE COURT:  Okay.  Got it.

18          So you have a certificate for cloud practitioner

19   services from AWS.  Okay.

03:33PM  20          PROSPECTIVE JUROR NAVEJAS:  And currently still

21   studying for -- yeah, more -- more AWS services but --

22          THE COURT:  Got it.  Okay.

23          PROSPECTIVE JUROR NAVEJAS:  More certificates.

24          THE COURT:  There may be testimony with respect to

03:33PM  25   iCloud services or -- or cloud services generally.  Do you

        1    think, if you were to serve as a juror, that either side should

        2    be worried that you might be a juror and say, hey, that's not

        3    how I was trained at AWS.  What this witness is saying is not

        4    right?  Or would you listen to their testimony and evaluate it

03:33PM  5    in conjunction with everything else?

        6          PROSPECTIVE JUROR NAVEJAS:  Yeah, I would be able to

        7    listen and give -- evaluate.

        8          THE COURT:  Even if it may be inconsistent with what

        9    you were trained and your respective trainings for AWS?

03:33PM  10          PROSPECTIVE JUROR NAVEJAS:  Yes.

        11          THE COURT:  Okay.  Great.  Thank you.  Appreciate

        12    it.

        13          Okay.  Anyone else?

        14          Okay.  Have any of you -- I asked this earlier, but

03:34PM  15    I ask towards the end also.  Have any of you heard, read, seen

        16    any news reports about this case?

        17          Okay.  Have you or any close friends or relatives

        18    ever had a drug dependency or drug addiction problem?

        19          Now, I know I've heard from some of you, so I don't

03:34PM  20    want to have you speak again unnecessarily.  But anyone who

        21    hasn't of the first 50 not shared?  And if you wish to do so

        22    either sidebar, please raise your hand.

        23          Mr. -- I'm sorry.  Mr. Gaspar.

        24          PROSPECTIVE JUROR GASPAR:  I don't need a sidebar.

03:34PM  25          Um, my brother died of an opioid overdose.

```
 1              THE COURT:  Sorry to hear that.

 2              PROSPECTIVE JUROR GASPAR:  And I have a nephew who's

 3  addicted to -- I don't know what they call it.  Keta- --

 4              THE COURT:  Ketamine.

 5              PROSPECTIVE JUROR GASPAR:  Ketamine.  That's what it

 6  is.

 7              THE COURT:  I'm sorry.  Let me let you finish.

 8              PROSPECTIVE JUROR GASPAR:  And -- and those are the

 9  two cases that come to mind right now.  As a kid, I grew up in

10  a heroin-infested neighborhood.  So I had lots of friends at

11  that time, but that was when I was a kid.

12              Now, in my more recent life, it's my brother that

13  passed away and he was addicted to opioids.  And we didn't

14  really realize what was happening until it was too late.  And I

15  realized, okay, he's addicted to opioids.  And my nephew, he's

16  probably about 25 and he's already addicted to this other stuff

17  and --

18              THE COURT:  How long ago did your brother pass?

19              PROSPECTIVE JUROR GASPAR:  He passed -- must have

20  been ten years ago.

21              THE COURT:  Okay.

22              PROSPECTIVE JUROR GASPAR:  2015, around there.

23              THE COURT:  So, look, I just have to ask.  We're

24  going to be talking about a whole -- different kinds of

25  narcotics that are alleged here.
```

03:35PM (line 5)
03:35PM (line 10)
03:35PM (line 15)
03:35PM (line 20)
03:36PM (line 25)

1    Do you think, because of the -- you know,

2    circumstances that you're dealing -- that you dealt with with

3    your brother and your nephew, that it would be difficult for

4    you to sit as a fair and impartial juror in this case?

03:36PM  5    PROSPECTIVE JUROR GASPAR:  Well, it depends because

6    your mind starts to wander when you hear things that relate to

7    you in ways that you remember.  And, you know, you try but, you

8    know, those things are there and --

9    THE COURT:  Right.

03:36PM  10    And it's interesting because in our earlier

11    conversation, you touched upon some very important points

12    about -- look, we strive to do the right thing, right, and your

13    personal fear of an injustice.  But we are also formed and

14    shaped by our own personal experiences.  We all bring them to

03:36PM  15    the table; right?

16    PROSPECTIVE JUROR GASPAR:  Right.

17    THE COURT:  And the million-dollar question and

18    perhaps it's an unfair one but it's one that we endeavor to ask

19    is that:  Do you think with your experiences that you could sit

03:37PM  20    and fairly listen to the evidence, listen to the law that I

21    instruct you on, work with your fellow jurors to determine --

22    to come up with a verdict?  Or do you think there are some

23    folks that say, look, because of my experiences, I can't do it.

24    This is not the right case for me.  Are you in the former or

03:37PM  25    the latter?

1    PROSPECTIVE JUROR GASPAR:  I'm in the former, but

2  I -- you know, I'd like to think I could do it.

3    THE COURT:  Right.  Right.  Okay.  And that's all I

4  can ask.  Thank you.  I appreciate it.

03:37PM  5    Anyone else?  Yes.  Let's go back -- counsel.

6  Ms. Young.

7    PROSPECTIVE JUROR YOUNG:  Yes, Your Honor.  I do

8  know someone who has a drug dependency.

9    THE COURT:  Okay.  Anything about that relationship

03:37PM  10  that would make it difficult for you to sit as a fair and

11  impartial juror in a case like this?

12    PROSPECTIVE JUROR YOUNG:  I don't think so,

13  Your Honor.

14    THE COURT:  Okay.  All right.  Thank you.

03:37PM  15    Anyone else?

16    Yes, we're going to go -- oh, sorry.  Ms. -- I'm

17  sorry.  Let me --

18    PROSPECTIVE JUROR MANNING:  Manning.

19    THE COURT:  Ms. Manning.  Sorry.

03:37PM  20    PROSPECTIVE JUROR MANNING:  My brother-in-law was

21  addicted to cocaine for years and years, and that's one thing.

22  But, you know, it took my sister down with him, you know.  So

23  whereas I think I can be analytically impartial, I don't think

24  I'll be very patient for someone who's trafficking in

03:38PM  25  narcotics.

| | |
|---|---|
| 1 | THE COURT:  And you used the word "patient."  I'm |
| 2 | just curious, do you think it would be difficult for you to sit |
| 3 | as a fair and impartial juror -- I mean, I just want to make |
| 4 | sure that I'm not misinterpreting what you mean by "patient." |
| 03:38PM 5 | PROSPECTIVE JUROR MANNING:  I think that it would be |
| 6 | hard to hear the detail and be -- and remain objective for an |
| 7 | extended period of time. |
| 8 | THE COURT:  Got it.  Okay.  Thank you, ma'am.  I |
| 9 | appreciate it. |
| 03:38PM 10 | All right.  I thought there were some other hands in |
| 11 | the back. |
| 12 | THE COURTROOM DEPUTY:  48. |
| 13 | THE COURT:  All right.  Is it Ms. Johnson?  Oh, no. |
| 14 | Ms. Arredondo. |
| 03:38PM 15 | PROSPECTIVE JUROR ARREDONDO:  Yes. |
| 16 | THE COURT:  Yes. |
| 17 | PROSPECTIVE JUROR ARREDONDO:  Yeah.  My dad |
| 18 | currently has a drug addiction problem. |
| 19 | THE COURT:  Okay.  And I don't want to probe |
| 03:39PM 20 | unnecessarily.  But is there anything about that relationship |
| 21 | and the experiences that you've gone through -- I don't know |
| 22 | how long this has been going on -- that would make it difficult |
| 23 | for you to sit as a juror in this case? |
| 24 | PROSPECTIVE JUROR ARREDONDO:  It does, yeah.  I'm |
| 03:39PM 25 | getting feelings now about it so -- |

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 03:39PM | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 03:39PM | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 03:39PM | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 03:40PM | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 03:40PM | 25 |

1          THE COURT:  Okay.  Thank you.  Appreciate it.

2          All right.  Anyone else?

3          Okay.  Anyone in the front?

4          Okay.  You know, as I mentioned earlier, these are

5   challenging questions but they're important for all sides in

6   this case.

7          Have you had any close friends or relatives who

8   overdosed on drugs?

9          Okay.  Let me just -- your juror number again.  I'm

10  sorry.

11          PROSPECTIVE JUROR RADANOVICH:  43.

12          THE COURT:  40 --

13          PROSPECTIVE JUROR RADANOVICH:  43.

14          THE COURT:  Mr. Radanovich, yes.

15          PROSPECTIVE JUROR RADANOVICH:  Yes.  I've had two

16  friends pass away both from fentanyl overdoses.  One in 2016.

17  It was my brother's best friend from college passed away in his

18  sleep.  And then you may have heard it in the news, but

19  Chris Brown used to play at USC.  I grew up with him and went

20  to school with him a long time.  He was facedown in the pool.

21          THE COURT:  I'm sorry to hear that on both fronts.

22          You know, the question you heard me ask of everyone

23  is:  Do you think it would be difficult for you to sit as a

24  juror in a case like this?

25          PROSPECTIVE JUROR RADANOVICH:  I mean, yeah, I would

```
 1  be try to be as impartial as I can.  But I know -- I think the

 2  lady just spoke in front of me, it would be kind of hard to be

 3  patient just because it hits home a little harder just because

 4  I've had personal experiences from it and people trafficking --

 5  you know, it's very preventible.

 6          THE COURT:  Got it.  Thank you, sir.  Appreciate it.

 7          Who else?  I thought I saw -- no one in the back.

 8          So Ms. -- sorry.  Ms. Gritman?

 9          PROSPECTIVE JUROR GRITMAN:  Hi.

10          One of my best friends when we were in our 20s and

11  then my nephew four years ago.

12          THE COURT:  And, again, I have to ask, just, you

13  know, anything about those experiences that would make it

14  difficult for you to sit as a fair and impartial juror in this

15  case?

16          PROSPECTIVE JUROR GRITMAN:  No.

17          THE COURT:  No.  Okay.  Thank you.

18          Okay.  Anyone else?

19          Yes, Mr. Nguyen?

20          PROSPECTIVE JUROR NGUYEN:  Yes, I have brought up

21  before earlier, I did before the question come up that my close

22  friend passed away.

23          THE COURT:  That's right.  We talked about that,

24  yes.

25          Anything about that that would make it difficult for
```

03:40PM (line 5)
03:40PM (line 10)
03:41PM (line 15)
03:41PM (line 20)
03:41PM (line 25)

```
 1   you to sit in a case like this?
 2              PROSPECTIVE JUROR NGUYEN:  No.
 3              THE COURT:  No.  Okay.  Thank you.
 4              Anyone else?
 5              Yes.  Ms. -- I'm sorry because my handwriting is so
 6   bad.
 7              PROSPECTIVE JUROR TCHEKMEDYIAN:  Tchekmedyian.
 8              THE COURT:  Tchekmedyian.  Yes.  Sorry.
 9              PROSPECTIVE JUROR TCHEKMEDYIAN:  This is kind of
10   backtracking.  I just have a close friend who used to have a
11   drug dependency.  He's clean now.  I've only known him since
12   being clean.
13              THE COURT:  Since -- okay.
14              Anything about any stories that he may have
15   shared -- he or she may have shared in the past about his
16   addiction that would make it difficult for you to sit as a
17   juror?
18              PROSPECTIVE JUROR TCHEKMEDYIAN:  No.  No.
19              THE COURT:  Okay.  Great.  Thank you.
20              Anyone else?
21              Okay.  Is there anything that we haven't discussed
22   for the first 50 that might affect your ability to be fair to
23   both sides in this case?  Anything at all?
24              Okay.  So we're going to take another recess at this
25   time.  I'm going to ask you all to come back at 4:00 o'clock.
```

           1    I need to handle some matters with the lawyers.

           2            So please do not form or express any opinion about

           3    the case until the matter is finally submitted to you.  Don't

           4    talk with anyone about the case.  Don't allow anyone to talk to

03:42PM    5    you about the case.  And do not do any research, conduct any

           6    research of any kind on any subject connected with this case.

           7            We'll see you back at 4:00 o'clock.

           8            THE COURTROOM DEPUTY:  All rise for the jury.

           9            (In the presence of Prospective Juror No. 27:)

03:44PM   10            THE COURT:  Have a seat everyone.

          11            Ms. Romero, Juror Number 27, yes, there was

          12    something you wanted to share with us?

          13            PROSPECTIVE JUROR ROMERO:  Yes.  When I introduced

          14    myself, I said I was unemployed.  And I have been a previous

03:44PM   15    banker before.

          16            THE COURT:  Yes.

          17            PROSPECTIVE JUROR ROMERO:  This was, like, right

          18    when I came back after lunch.  But during lunch, I got a phone

          19    call for a job offer.  And I've been unemployed for six months,

03:44PM   20    and I just wanted to share that.

          21            THE COURT:  Okay.

          22            PROSPECTIVE JUROR ROMERO:  So you can have it in

          23    mind.

          24            THE COURT:  And what's the -- is it in banking?

03:44PM   25            PROSPECTIVE JUROR ROMERO:  It's a check cashing

1    place.

2              THE COURT:  Okay.  Great.  Well, congratulations.

3    You can always say that jury service brought you good luck.

4              PROSPECTIVE JUROR ROMERO:  Yes.

03:44PM   5              THE COURT:  Well, thank you.

6              PROSPECTIVE JUROR ROMERO:  Sorry about that.

7              THE COURT:  We'll see you back at 4:00 o'clock.

8    Okay?  Thank you.

9                   (Out of the presence of the prospective jurors:)

03:44PM  10              THE COURT:  Okay.  So we're outside the presence of

11   the jurors.

12              I guess what I'd like to do now is talk about

13   challenges for cause, see where we're at.  Depending where

14   we're at, we may just do our peremptories outside the presence

03:45PM  15   of the jury.

16              You know -- well, let's just see where we're at with

17   respect to challenges for cause first.

18              So let's start with the Government.  Do you have any

19   challenges for cause?

03:45PM  20              MR. PANG:  Your Honor, I think we have a couple that

21   we want to discuss.

22              Number 4, um --

23              THE COURT:  Number 4.  Okay.

24              MR. PANG:  I mean whether we believe it or not, she

03:45PM  25   says she would presume the guilt of the defendant.  So --

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 03:45PM | 5 |

1    THE COURT:  That's a bit of a problem.  Let's deal

2    with that one by one.

3         I mean, Mr. Brown, what are your views?

4         MR. BROWN:  Agreed, Your Honor.

5         THE COURT:  All right.  So I think she has to go for

6    cause.  But I appreciate her candor or -- well, yeah, let's

7    just leave it at that.

8         All right.  So for cause.  Okay.

9         Any other challenges -- your next challenge for

10   cause?

11        MR. PANG:  Your Honor, I believe Number -- Juror

12   Number 19 claimed that they would -- it would be hard to be

13   impartial.

14        THE COURT:  I'm sorry.  Hold on.  Let me -- Juror

15   Number 19 -- okay.  Now, just so you all know, Juror 19 -- 19,

16   20, 21, 22, they're the alternates.  So -- I mean --

17        MR. PANG:  Oh, are we only talking about the 12 in

18   the box?

19        THE COURT:  That's what I was focusing on right now.

20        MR. PANG:  Understood.

21        THE COURT:  I wasn't clear on that so --

22        MR. PANG:  Understood.

23        Your Honor, Number 19, that's the gentleman who had

24   the cane and he served in the military.

25        THE COURT:  No.  That was Number 9.

Timestamps in left margin: 03:45PM (line 5), 03:46PM (line 10), 03:46PM (line 15), 03:46PM (line 20), 03:47PM (line 25).

|   |   |
|---|---|
| | 1 |

MR. PANG:  I'm sorry.  Number 9.

Because of his military brothers who had opioid addictions, he said it would be difficult to be fair.  But I don't know how kind of -- how much the Court wanted to see if

03:47PM    it could resuscitate him before kind of deciding on that issue.

THE COURT:  Mr. Brown, what are your views?

MR. BROWN:  Your Honor, we agree with the Government.

THE COURT:  Do me a favor, Mr. Brown, I think

03:47PM    because -- for whatever reason, the microphone --

MR. BROWN:  My apologies, Your Honor.

THE COURT:  Go ahead.

MR. BROWN:  Your Honor, we're in agreement with Juror Number 9.  We were going to ask that he be stricken for

03:47PM    cause as well.

THE COURT:  It's interesting.  I may be overanalyzing.  I thought the fact that he asked to come up and speak to this, I thought it was more -- I don't think he was being -- I think he was being very direct about his views.  And

03:47PM    I don't think he would be fair to the defense, quite frankly.

So I'm going to excuse him for cause.  Okay.

MR. PANG:  While we're here and since we're outside the presence of the jury, there are the two potential jurors with the medical issues.  Juror Number 14 had the --

03:48PM    THE COURT:  Yes, yes.

**UNITED STATES DISTRICT COURT**

1          MR. PANG:  -- scan on March 5th.

2          THE COURT:  Right.  And who else?  There was --

3  oh --

4          MR. PANG:  Juror Number 19 had two medical issues.

03:48PM   5  He was taking heart pills.

6          THE COURT:  Right.

7          MR. PANG:  And he needed to stretch so often or he

8  needed to exercise his legs.

9          I think in our view, Juror Number 19 is -- that's

03:48PM   10  something that the Court can accommodate quite easily.  He can

11  take his pills.  He can stretch, if the Court is comfortable

12  with that.

13          Juror Number 14 -- I apologize, Your Honor.  One

14  moment.

03:48PM   15          THE COURT:  Ms. Provencio.

16          MR. PANG:  Correct.  The Court did tell the jury

17  that the case would take three weeks, and I think that's a

18  comfortable estimate.  It's our hope that we will have

19  submitted by then.

03:48PM   20          THE COURT:  Submitted by --

21          MR. PANG:  By the 5th.

22          THE COURT:  The Government submitted.

23          MR. PANG:  No.  The case.

24          THE COURT:  Okay.  Right.  But now keep in mind, we

03:49PM   25  should have picked the jury today; right?  I don't know if

1    we're going to get there.

2           MR. PANG:  I hear you.  Which is all to say, you

3    know, if the Court wants to be careful, we can always exclude

4    her.  But I think we could always just -- if the only kind of

03:49PM  5    impediment is her health issues, then we can just keep her on,

6    assuming that there isn't some sort of peremptory strike of her

7    or something.  And if it comes to pass that the trial runs

8    through March 5th, then if she needs to go or if the Court can

9    recess the day earlier or something like that, then we can

03:49PM  10   always bring in an alternate.

11          THE COURT:  Okay.  Mr. Brown, do you have any views

12   on that?  I mean, well -- do you have any views one way or the

13   other as -- with respect to Ms. Provencio?  I guess there's a

14   medical issue and I don't know if any -- either side has any

03:50PM  15   thoughts with respect to any of her responses and whether they

16   would raise any issues.

17          MR. BROWN:  Your Honor, we were actually going to

18   make a for-cause motion with respect to Ms. Provencio based on,

19   one, her medical issues; and, two, I believe she said that she

03:50PM  20   had a cousin who was convicted of a pretty -- pretty heinous

21   crime that involved drugs and alcohol as well, Your Honor.  I

22   think --

23          THE COURT:  It was a cousin who was convicted of

24   gang rape where there were drugs and alcohol involved, and I

03:50PM  25   think -- well, I think -- I think that's what I have -- that's

| | |
|---|---|
| 1 | what I have down. |
| 2 | MR. BROWN:  Yes, Your Honor.  So we were going to |
| 3 | ask that she be stricken for cause. |
| 4 | THE COURT:  Well, look, I think in an abundance of |
| 03:50PM  5 | caution, the combination of two, I'll just excuse her for |
| 6 | cause. |
| 7 | MR. BROWN:  Then with respect to Mr. Goodman, |
| 8 | Your Honor, we -- we also thought -- |
| 9 | THE COURT:  Let's come back to Mr. Goodman only |
| 03:50PM  10 | because he's an alternate.  He may be excused for cause for |
| 11 | other reasons, but let's come back to him, if we could. |
| 12 | MR. BROWN:  Yes, Your Honor. |
| 13 | THE COURT:  Mr. Pang, any other challenges for |
| 14 | cause? |
| 03:51PM  15 | MR. PANG:  One moment, Your Honor. |
| 16 | (Pause in the proceedings.) |
| 17 | MR. PANG:  No one else in the first 12, Your Honor. |
| 18 | THE COURT:  Okay.  What about in the remaining -- |
| 19 | out in the larger panel? |
| 03:51PM  20 | (Pause in the proceedings.) |
| 21 | MR. PANG:  Um, Your Honor, Juror Number 16, um -- |
| 22 | THE COURT:  Mr. Gaspar? |
| 23 | MR. PANG:  Yes.  He's the loquacious gentleman |
| 24 | behind me. |
| 03:52PM  25 | I think for the first couple of answers to some of |

1    the Court's questions about whether or not he can be fair and

2    impartial, I think you and he had a good discussion about what

3    it means to be a juror in the case and kind of the evaluation

4    of someone in judgment.

03:52PM    5         But when he talked about -- I don't know if the

6    Government's the one that should be raising this challenge.

7    But he mentioned that he had relatives who are addicted to

8    opioids and ketamine.  Those are the drugs at issue in this

9    case.  And when the Court inquired of him whether or not he

03:52PM    10    could be fair and impartial, he said it depends on the facts.

11    And by that, I intuited depends on the drugs at issue.

12         Unfortunately, here it's opioids; namely, fentanyl

13    and oxycodone and ketamine.  She possessed ketamine in her

14    apartment.  The text messages are rife with her selling

03:53PM    15    ketamine.

16         So I think for those reasons, it would only be fair

17    for him to go.

18         THE COURT:  Mr. Brown, do you have any views on

19    that?

03:53PM    20         MR. BROWN:  Your Honor, forgive me, I was -- are we

21    talking about Mr. Gaspar, Your Honor?

22         THE COURT:  Yes.  Mr. Gaspar, Number 19 -- I'm

23    sorry -- Number 16.

24         MR. BROWN:  Your Honor, we would object to a

03:53PM    25    for-cause challenge for him.  I believe even the Court

mentioned that he's in many ways the ideal juror because of his

struggles with both sides.  And we would agree with the Court's

assessment that he's a man who is deeply thoughtful and -- and

would do his best to be fair.

03:53PM    THE COURT:  Yeah, I have to tell you, I mean, his

loquaciousness was appealing in the sense that he's -- he's

putting it all on the table, good or bad.  And maybe I'm --

maybe I'm overly influenced by his comment about, look, he has

more fear of an injustice than -- and he was just saying, look,

03:54PM    this is who I am, here are my experiences.

MR. PANG:  Your Honor, just for the record, he said

he has an issue with ketamine and opioids.  If the defense does

not object, then we are fine with --

THE COURT:  I don't know if it's fair to say he has

03:54PM    an issue with ketamine or opioids.  He said family members that

were impacted --

MR. PANG:  And he also said, when the Court asked

him whether he could be fair and impartial given that family

history, he said, I don't know, it depends.

03:54PM    THE COURT:  It depends on the facts; right?

MR. PANG:  Right.  As long as it's all on the table,

if the defense does not object, we don't either.

THE COURT:  So any other challenges for cause from

the group of 50?  From the Government?

03:54PM    The reason why I'm asking is because, depending on

                1    how many challenges for cause, if there are still a number

                2    of -- ample number of jurors with peremptories, we can go right

                3    to the peremptories and you can pick out of the 50 and make the

                4    peremptories out of the whole group.  And whatever -- the first

    03:55PM     5    12 are left, that will be the jury.

                6                    (Pause in the proceedings.)

                7                THE COURT:  And obviously, defense, be thinking

                8    about challenges for cause out of the 50.  All right?

                9                    (Pause in the proceedings.)

    03:58PM    10                MR. PANG:  Three more.  I'm mindful that we are

               11    whittling through jurors.  But Juror Number 22 --

               12                THE COURT:  Hold on.  Let me just make sure because

               13    I don't have the number -- Juror 22.  Is that Ms. --

               14    Ms. Gritman.

    03:58PM    15                Wait.  I'm sorry.  Juror Number 22, that's an

               16    alternate, but I suppose we can deal with it.  I was focusing

               17    on -- I'm not being clear.  19, 20, 21, 22 are alternates.  And

               18    so -- but the problem is that they are still in the 50, so

               19    that's why -- I'll take responsibility for that.  So --

    03:58PM    20                MR. PANG:  Understood.

               21                THE COURT:  But what normally happens is that --

               22    what I'm hoping might happen is we -- the for-cause challenges

               23    for the group other than that four.

               24                MR. PANG:  Understood.  Okay.

    03:58PM    25                THE COURT:  And then depending on if there are

1    enough, we'll deal with peremptories.  And then if there are

2    still enough, we deal with the alternates.  And we can replace

3    the alternates with some of the remaining jurors, if there are

4    enough.

03:59PM    5         MR. PANG:  Very good, Your Honor.

6              Juror Number 32.

7         THE COURT:  32.  Ms. Szumski.

8         MR. PANG:  Yes.  She is the one who said I can't be

9    impartial because of my beliefs on drug laws and I will try and

03:59PM   10    make it go a certain way.  So the Government would move to

11    strike her for cause.

12         THE COURT:  Defense position?

13         MR. BROWN:  Your Honor, I think she's a juror who

14    could -- with some rehabilitation, could be fair and impartial,

03:59PM   15    Your Honor.

16         THE COURT:  Help me out here as far as

17    rehabilitation.  The reason why I say that is because she

18    seemed pretty sort of steadfast in her views.

19         MR. BROWN:  Indeed, Your Honor.  She just seemed to

03:59PM   20    be very thoughtful, Your Honor.  I would just submit on that.

21         THE COURT:  Okay.  Respectfully, I'm going to excuse

22    her for cause.  She seemed like she would have a difficulty --

23    what I'm more concerned with is following the law that the

24    Court instructs her on.  So 32 will be excused for cause.

04:00PM   25         MR. PANG:  Juror Number 38, Your Honor.

**UNITED STATES DISTRICT COURT**

THE COURT:  38.  Ms. Aleman, who indicated that she

thought the DEA might have some involvement with the -- with

drugs in the community.

MR. PANG:  Indeed, Your Honor.  She indicated she

04:00PM   didn't think she could be fair because she thought that the --

I don't know whether to call it a conspiracy theory or whatever

but --

THE COURT:  Her view is that she thinks that the DEA

might have --

04:00PM   MR. PANG:  A hand distributing drugs in the streets.

So for that reason, given her predisposition to not trusting

DEA, this is a DEA case, we would move to strike her for cause.

THE COURT:  Mr. Brown?

MR. BROWN:  Your Honor, for the record, we would

04:00PM   just argue that her skepticism of the DEA is not a basis --

it's not -- she didn't actually say she didn't think she could

be fair.

THE COURT:  Well, I actually think -- well, I

thought -- in response to her opinion of the DEA, I thought I

04:01PM   asked her something along the lines, Do you think it would be

difficult for you to sit as a juror in this case?  And I think

she said, Yes, I do.

MR. BROWN:  Submit it, then, Your Honor.

THE COURT:  Based on that, she'll be excused for

04:01PM   cause.

1          All right.  Next peremptory -- or next challenge for

2    cause.

3          MR. PANG:  Your Honor, if the defense is prepared,

4    maybe we can review our notes while Mr. Brown is --

04:01PM  5          THE COURT:  Translation, I need more time.

6          But go ahead, Mr. Brown.

7          MR. BROWN:  Your Honor, Prospective Juror Number 5,

8    I believe that was Eddie Ken.

9          THE COURT:  Eddie Ken.  Yes.  Yes.  Yes.

04:01PM 10          MR. BROWN:  We had the sidebar.

11          THE COURT:  Right.

12          MR. BROWN:  Very fearful because of what he's --

13          THE COURT:  What he's going through with his

14    roommate, right.

04:01PM 15          What's the Government's view with respect to

16    Mr. Ken?

17          MR. PANG:  Well, Your Honor, I believe Mr. Ken said

18    he would evaluate the evidence.  He was just fearful of his

19    roommate.  And I think, given that this case does not involve

04:02PM 20    his roommate --

21          THE COURT:  And maybe my notes are -- I thought he

22    was saying he was fearful but maybe -- I wasn't clear if it was

23    of the roommate or just the case itself was bringing about

24    fears and anxiety.  I may have misinterpreted that.

04:02PM 25          MR. PANG:  Perhaps I did as well, Your Honor.

**UNITED STATES DISTRICT COURT**

Perhaps this might be a situation where we bring him back to the sidebar.  But given that his fears seem to at least emanate from his roommate who had what seemed like a mental health related issue pertaining to drugs, this didn't seem like a situation where he couldn't evaluate the facts of this case using these facts unfairly.

THE COURT:  Mr. Brown?

MR. BROWN:  Your Honor, I think -- as the Court noted, he seemed to be incredibly anxious.  He was, I would say, visibly fearful and he was almost shaking, Your Honor. His eyes were trembling.  It didn't -- he didn't seem like the type of juror who would be able to sit through a trial like this and remain clear-minded and be fair to -- to our client, Your Honor.  I don't think he -- I think he should be stricken for cause.

THE COURT:  I tend to agree.  I mean, just his physical reaction -- and I thought the fear that he was expressing was just the fear -- the emotions and the anxiety that were building up as a result of the charges.  So I'm going to excuse him for cause.

Any other challenges for cause, Mr. Brown?

MR. BROWN:  Yes, Your Honor.  Prospective Juror Number 8, Mr. Nguyen.  I think he had a family member -- or best friend -- no.  Sorry.

THE COURT:  Well, no.

1          MR. BROWN:  Close friend who passed away from an

2     overdose, Your Honor.

3          THE COURT:  Right.

4          Now, it's interesting because Mr. Nguyen, you know,

04:03PM  5     he's got friends in the department, policing, overdose.  But

6     every time, he said I can be fair.  I could sit.  So at least I

7     didn't hear any.  Maybe my notes are off, but I -- each time, I

8     could be fair, I could be fair.

9          MR. BROWN:  Your Honor, from my perspective, it

04:04PM 10     appeared that he was putting on a good face.  But given the

11     allegations, Your Honor, the fact that someone so close to him

12     passed away as a result of an overdose, I think it's -- I don't

13     think he can be fair even though he said that he could,

14     Your Honor.

04:04PM 15          THE COURT:  Any response from the Government?

16          MR. PANG:  Your Honor, I think the Court has said it

17     right.  We also have it in our notes that he stood up several

18     times showing that he was being truthful and forthcoming with

19     the Court.  And each time, when the Court asked him whether he

04:04PM 20     could be fair and impartial, he responded affirmatively yes.

21          So for that reason, we oppose --

22          THE COURT:  I'm going to deny the challenge for

23     cause for Mr. Nguyen based on his responses.  And I don't think

24     he was acting.  But based on the responses, I don't think it's

04:04PM 25     a basis for a for-cause challenge.

1          Next challenge for cause.

2          MR. BROWN:  Your Honor, Prospective Juror Number 17,

3    that was Mr. Ruvalcaba.  We had --

4          THE COURT:  Yes.  Now, that's the one who -- who we

04:04PM 5    talked about at sidebar.  I thought when we explained to him

6    that this case -- there were not going to be allegations of a

7    death and I thought -- and I thought I asked him, you know, in

8    light of that, does that change your opinion with -- in

9    connection with his religious beliefs, admittedly I have here

04:05PM 10   no, but it's a bit of chicken scratch, I will admit.  I should

11   say not "no" but not "not."  And so I interpret that to mean it

12   would not impact him.

13          But I don't know if your notes reflect something

14   different.

04:05PM 15         MR. PANG:  I have -- I think this might be the

16   Court's quote and not his quote but "can be fair and

17   impartial," arrow "F/I," which I think is my notes for saying

18   he said yes, he can be fair and impartial, after the Court

19   advised him -- yeah, yeah, after the Court advised him that

04:05PM 20   there would be no -- there was no allegation of a death in this

21   case as opposed to just a serious bodily injury.

22          THE COURT:  I mean -- so, look, I can inquire -- I

23   can bring him back and inquire, but I thought -- in light of

24   the conversation we had at sidebar, I thought that him hearing

04:06PM 25   that fact changed the analysis.

1          MR. BROWN:  To a certain degree, Your Honor, but I

2    think Mr. Ruvalcaba was a person who, when he heard the word

3    "fentanyl," was especially alarmed by the nature of the

4    allegations related to fentanyl, in addition to his assumption

04:06PM    5    that, you know, the harms that flow from fentanyl.

6          So I think -- I think in general based on the

7    allegations, based on public perception, based on his really --

8          THE COURT:  How about this?  I'll bring him back and

9    we'll talk to him at sidebar.

04:06PM    10          MR. BROWN:  Thank you very much, Your Honor.

11          THE COURT:  Next challenge for cause.

12          MR. BROWN:  Yes.  Your Honor, did we discuss

13    Prospective Juror Number 29?

14          THE COURT:  29?  Oops.  Ms. Manning.

04:06PM    15          MR. BROWN:  Yes.  She -- I think she believed that

16    she didn't think she could even be patient when listening to

17    the evidence related to these charges.

18          THE COURT:  Yeah.  What's the Government's view?

19          MR. PANG:  Well, Your Honor, I think this is a juror

04:07PM    20    who, I think, also needs to come back and perhaps be discussed

21    on sidebar.  She indicated that -- she's clearly a very

22    thoughtful person.  She said she couldn't be patient.  But I

23    don't -- just like Mr. Brown was talking about the

24    thoughtfulness of witnesses, she clearly -- the Court did not

04:07PM    25    ask her, If I instruct you that you must follow the law and you

UNITED STATES DISTRICT COURT

must apply the facts of the law, can you do that?  I don't

think the Court ever asked that question.

THE COURT:  I didn't ask that question.  But when

she -- I think I followed up with a question with respect to

what does she mean by "patient," I thought she gave an

indication that there might be a problem with her sitting as a

juror, not followed up with Mr. Radanovich afterwards.

MR. PANG:  No, Your Honor.  So what she said she

wouldn't be patient with is someone who, in fact, distributed

drugs.  Here, the question at trial is not what would happen to

Ms. Todorova if she -- if she delivered drugs.  It's a question

of identity, whether or not the defendant, in fact, distributed

drugs.  That's the issue at trial.

MR. BROWN:  Your Honor, I believe the prospective

juror also used the word -- when the Court inquired further

that she didn't think she could be objective at all.

THE COURT:  And I have --

MR. BROWN:  That's what my notes say.

THE COURT:  Hard to remain objective is the note

that I have on the back of my Post-it pad afterwards.  So I

am -- I'm going to excuse her for cause.

All right.  Next challenge for cause.

MR. BROWN:  Yes, Your Honor.  Sadly, Prospective

Juror Number 31, Mr. Fre- --

THE COURT:  Frechette.

**UNITED STATES DISTRICT COURT**

1           MR. BROWN:  Frechette.

2           THE COURT:  I'm sorry.

3           MR. BROWN:  He said he had a friend who was murdered

4   by a purported drug user.

04:08PM   5           THE COURT:  Right.  Yeah.  And this was an

6   interesting one because he's had his own personal experiences.

7   Oddly enough, that didn't seem to bother him.  I think it was

8   more he was impacted by what I perceived to be perhaps a lack

9   of faith in the justice system by not holding someone

04:09PM  10   accountable but --

11           MR. BROWN:  Yes.

12           THE COURT:  I'm torn only because later on, when he

13   was discussing his own personal experience, I guess some

14   incident involving CHP and then him being charged with a

04:09PM  15   narcotics offense, he says that that wouldn't have an effect.

16           So I think he's someone I probably need to ask some

17   further questions at sidebar with you all there just because --

18   it's a bit of a wild card, in my view.  So --

19           MR. BROWN:  Yes, Your Honor.

04:09PM  20           THE COURT:  Next challenge for cause?

21           MR. BROWN:  Prospective Juror Number 34, Your Honor,

22   Ms. Gottesfeld.

23           THE COURT:  Ms. Gottesfeld.  Yes.

24           MR. BROWN:  She seemed to be visibly shaken by a

04:09PM  25   cousin's suicide from drug use one month ago.

1    THE COURT:  Right.  That was in the recent past.

2    What's the Government's view on that?

3    MR. PANG:  Yeah.  I mean, I -- Your Honor, I hear

4    the concerns, but she said she would try her best.  I think

04:10PM  5    this is perhaps a sidebar issue to kind of --

6    THE COURT:  We'll talk with her at sidebar.  Okay.

7    MR. BROWN:  Your Honor, we had -- I had notes for

8    Prospective Juror -- did we discuss 43 already, Your Honor?

9    THE COURT:  Well, that -- I -- I threw that name

04:10PM  10   out, Mr. Radanovich, because he said, like Ms. Manning, he

11   would also have difficulty being patient.

12   I think -- I mean, he's a -- wrong or right, I think

13   he's attempting to adopt -- or at least if we believe what

14   Ms. Manning said by being patient, which was hard to remain

04:11PM  15   objective, he had, you know, an individual who I guess was a

16   relatively well-known football player at SC and then another

17   friend -- brother's friend who OD'd.

18   MR. BROWN:  Specifically from fentanyl.

19   THE COURT:  Right.  I think I have to remove him for

04:11PM  20   cause.  So he'll be removed for cause.  Okay.

21   MR. BROWN:  Your Honor, I think the final

22   prospective juror that was on our list was Prospective Juror

23   Number 48, Ms. Arredondo, whose father she did mention was --

24   THE COURT:  Right.  Her father had been going

04:11PM  25   through some issues, I guess, throughout her -- well, for a

UNITED STATES DISTRICT COURT

```
 1    period of time.  But -- my memory may be fuzzy on this one.

 2    This is the one that she was saying, like, kind of on both

 3    ends, she had seen both the positive and negative.

 4             I'm torn on this one because, you know, I don't know

 5    how -- how to interpret that.  I mean -- well, I should say, I

 6    have my own thoughts on how to interpret that.  But -- she

 7    brought it up, but she did say, I've seen both the positive and

 8    negative of it.

 9             I don't know that statement in and of itself is

10    enough to remove her for cause.

11             MR. BROWN:  Your Honor, then, also, my notes of

12    Juror Number 37 --

13             THE COURT:  Hold on one second.

14             MR. BROWN:  -- Ms. Salguero.

15             THE COURT:  Ms. Salguero, yes.

16             MR. BROWN:  She said she didn't -- she lacked

17    sympathy and her uncle was a drug user.

18             THE COURT:  Right.  She did say that, yeah, she

19    didn't have a lot of sympathy for this kind -- I guess these

20    kinds of cases -- or I shouldn't say -- not related to this

21    case but sympathy for drugs.

22             What's the Government's position?

23             MR. PANG:  Your Honor, I think the Court will be

24    hard-pressed to find a fair juror who would be sympathetic to

25    drug distribution.
```

04:12PM (line 5)
04:12PM (line 10)
04:12PM (line 15)
04:12PM (line 20)
04:13PM (line 25)

**UNITED STATES DISTRICT COURT**

 1                    THE COURT:  But, look, out of 50 jurors, she's the

 2       only one that raised her hand and said --

 3                    MR. PANG:  I don't think so.  The Court has struck,

 4       like, five or six jurors who have said that they've had issues

04:13PM   5       with overdoses --

 6                    THE COURT:  No, but I think what Ms. Salguero said

 7       is somewhat different -- well, it's a variation of it that was

 8       pretty direct that -- you know, she's not sympathetic to it.  I

 9       mean --

04:13PM  10                    MR. PANG:  Whether she's sympathetic and she can be

11       fair and impartial and evaluate the facts of the case are two

12       different things.  I don't think we should expect jurors to be

13       sympathetic to drug distribution.

14                    THE COURT:  All right.  We'll inquire further.

04:13PM  15                    Any other challenges for cause?

16                    MR. BROWN:  Your Honor, just to be clear, with

17       respect to Prospective Juror Number 48, could the Court inquire

18       further as to Ms. Arredondo, if the Court is not inclined to

19       strike her for cause?

04:14PM  20                    THE COURT:  I will do that.  For you, Mr. Brown, I

21       will do that.

22                    MR. BROWN:  Thank you very much, Your Honor.

23                    THE COURT:  All right.  So any other challenges for

24       cause?

04:14PM  25                    MR. BROWN:  No, Your Honor.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Why don't we do this.  I'm going to ask

2     Mr. -- our courtroom deputy to bring in those jurors one by

3     one.  We'll do it right here in open court, and then we can ask

4     questions.  And hopefully we can get some clarity one way or

04:14PM  5     the other.  Then we can go from there to potentially the

6     peremptories.  Okay?

7          MR. PANG:  Very good, Your Honor.

8          THE COURT:  Okay.  So why don't we start with

9     Mr. Ruvalcaba.

04:15PM 10          (In the presence of Prospective Juror No. 17:)

11          THE COURT:  Mr. Ruvalcaba, if you wouldn't mind,

12     just step to the lectern.  We have some follow-up questions, if

13     that's okay with you.

14          You know, you were kind enough and candid enough to

04:15PM 15     let us know about some of the -- not conflict but sort of, you

16     know, juxtaposing your religious beliefs with the nature of the

17     case.  And you had some concerns about death, but you also had

18     some concerns about drugs.

19          And so what I'm trying to ascertain is -- like I

04:15PM 20     told you, there's no indication that you're going to hear any

21     testimony about a death in this case.

22          Do you think just the mere fact that this case deals

23     with drugs or allegations of drugs, would that be an issue with

24     respect to your ability to be fair and impartial to both sides?

04:16PM 25          PROSPECTIVE JUROR RUVALCABA:  I think I could try to

UNITED STATES DISTRICT COURT

be, um, impartial to both sides.

THE COURT:  Okay.  Even though it deals with a drug

case.  We're talking about -- they'll be talking about

different kinds of drugs that you heard about.  That's not

04:16PM  going to be a problem for you?

PROSPECTIVE JUROR RUVALCABA:  Correct.

THE COURT:  Okay.

PROSPECTIVE JUROR RUVALCABA:  And the reason why I

brought my religious beliefs up were because, just in general,

04:16PM  like -- like, there are certain ethical stances that I take and

they lean towards my religion in this case, Catholicism.

THE COURT:  Are there any other ethical stances that

you think might impact what goes on in this criminal trial,

just off the top of your head?  Just, I'm curious.

04:16PM  PROSPECTIVE JUROR RUVALCABA:  I mean, on, like --

sometimes on the news you hear about -- I've never heard about

this case or read about it or anything.  But sometimes you hear

about these cases and they kind of, like -- um, kind of, like,

spark something in the brain that -- and you kind of see this

04:17PM  over and over again play out and this -- I don't know.  I've,

like -- I've seen a lot of this play out, like, on the news,

not for this case but -- it just keeps coming up.

THE COURT:  Do you think you'd be able to listen to

the evidence, evaluate it with your fellow jurors, and

04:17PM  determine whether or not you could reach a verdict based on

```
  1    what you know right now?

  2                PROSPECTIVE JUROR RUVALCABA:  Yes.

  3                THE COURT:  Okay.  Any questions from the

  4    Government?

  5                MR. PANG:  No, Your Honor.

  6                THE COURT:  Any from the defense?

  7                MR. BROWN:  Yes, Your Honor.

  8                THE COURT:  Please, go ahead.  You may inquire, yes.

  9                MR. BROWN:  Mr. Ruvalcaba, thank you.

 10                One of the allegations in this case is that one of

 11    the specific drugs alleged to have been involved is fentanyl.

 12    And I noted from your comments that that seemed to trigger some

 13    concerns for you.

 14                Does the nature of that particular drug being

 15    involved in these allegations cause you concern about your

 16    ability to be fair to my client?

 17                PROSPECTIVE JUROR RUVALCABA:  Um, I think I can try

 18    to be impartial and fair.  Um, again, the -- when the word

 19    "fentanyl" comes up, it's usually associated with death or

 20    overdose.  So that's just something that's, like, kind of

 21    engrained in my mind.

 22                MR. BROWN:  Does that concern about the broader

 23    implications of what may or may not have happened with fentanyl

 24    cause you any additional concerns?  I guess my question is:  If

 25    you hear the word "fentanyl," are you assuming that someone
```

1    died?

2              PROSPECTIVE JUROR RUVALCABA:  No, I don't assume

3    that someone died.  It just so happens to be that, when --

4    there are a lot of people that die from it, just kind of, like,

04:18PM  5    logically thinking through it.

6              THE COURT:  Anything further, Mr. Brown?

7              MR. BROWN:  No, Your Honor.  Thank you.

8              THE COURT:  Anything further from the Government?

9              MR. PANG:  Just briefly, Your Honor.

04:19PM 10              Um, you understand that if you are sworn in as a

11    juror in this case, that it is your duty only to evaluate the

12    evidence in this case?

13              PROSPECTIVE JUROR RUVALCABA:  Yes.

14              MR. PANG:  And that anything you watch on TV or read

04:19PM 15    in the news, that's not something that's proper to consider if

16    you were a juror in this case.  Would you understand and be

17    able to do that?

18              PROSPECTIVE JUROR RUVALCABA:  Yes.

19              MR. PANG:  So based on your understanding that your

04:19PM 20    job as a juror would be to take the facts of the case and apply

21    it to the laws as the judge instructs you and only that

22    function, is that something you can do fairly and impartially

23    in this case?

24              PROSPECTIVE JUROR RUVALCABA:  Yes.  I believe so.

04:19PM 25              MR. PANG:  Thank you so much.

1          THE COURT:  Anything further, Mr. Brown?

2          MR. BROWN:  No, Your Honor.  Thank you.

3          THE COURT:  Thank you, sir.  Just have a moment

4     outside, please.  We'll be with you shortly.

04:19PM  5          You can bring in Mr. Frechette.

6              (In the presence of Prospective Juror No. 31:)

7          THE COURT:  Hey, Mr. Frechette.  Appreciate you

8     coming back.

9          Just wanted to follow up with some questions.  And I

04:20PM 10     want to start off by saying I really do appreciate your candor.

11     You've experienced a lot; right?  And I guess what -- we're all

12     just trying to ascertain, look, you've had your own personal

13     experiences.  And I thought you said in response to your

14     personal experiences, you think you could sit as a juror in the

04:20PM 15     case.

16          But I think we're troubled -- what I was hearing

17     troubled you more was the unfortunate experience regarding your

18     friend.

19          PROSPECTIVE JUROR FRECHETTE:  Yeah.

04:20PM 20          THE COURT:  And I guess my question to you is:  That

21     unfortunate experience, did that make you lose faith in the

22     system such that you couldn't sit as a juror or -- they seem to

23     be conflicting to me.  But I wanted to just hear it from you

24     directly.

04:21PM 25          PROSPECTIVE JUROR FRECHETTE:  Right.  Yeah.  I mean,

1    I think that it -- it's hard to definitively, I guess, say one

2    way or the other.  It just definitely left like a sour taste in

3    my mouth.  And it's just an upsetting situation, you know.  But

4    I understand that's how -- that's how the system works, you

04:21PM  5    know.  It's --

6              THE COURT:  Good or bad.

7              PROSPECTIVE JUROR FRECHETTE:  Right.  Yeah.  And

8    that's kind of how it goes.  And I don't know, I was just

9    raised to -- to just do the best I can.  And so, like, if I

04:21PM 10    were to be chosen, that's what I would try to do, you know.

11              THE COURT:  So you read my mind.  If you were

12    selected as a juror in this case, in light of all your

13    experiences, do you think you'd be able to listen to the

14    evidence, consider the evidence, work with your fellow jurors,

04:21PM 15    and determine whether or not you could come up with a verdict?

16              PROSPECTIVE JUROR FRECHETTE:  Yeah.  I think I would

17    be capable of doing it, yeah.

18              THE COURT:  Okay.  All right.  Any questions from

19    the Government?

04:22PM 20              MR. PANG:  Just very briefly, Your Honor.

21              Mr. Frechette -- is that how you pronounce your

22    name?

23              PROSPECTIVE JUROR FRECHETTE:  Yes.

24              MR. PANG:  You mentioned that you had concerns about

04:22PM 25    a case involving your friend who was stabbed.  You understand

```
 1    that these are two different cases; right?

 2              PROSPECTIVE JUROR FRECHETTE:  I do.

 3              MR. PANG:  That this isn't a case involving a

 4    defendant who stabbed your friend.  You understand that; right?

 5              PROSPECTIVE JUROR FRECHETTE:  Oh, absolutely.

 6              MR. PANG:  And that these are two different cases,

 7    two different sets of facts, that there's no stabbing involved

 8    in this case.

 9              PROSPECTIVE JUROR FRECHETTE:  Yes.

10              MR. PANG:  You can appreciate that; right?  And you

11    would understand that, if you were selected as a juror in the

12    case, you would only take the facts that were introduced at

13    trial; right?

14              PROSPECTIVE JUROR FRECHETTE:  Absolutely.

15              MR. PANG:  You would not bring into the jury room

16    facts you had involving your friend or anything else -- the

17    news, the media -- just the evidence in trial; right?

18              PROSPECTIVE JUROR FRECHETTE:  No.  And I wasn't

19    involved with that case whatsoever.  You know, it was just

20    watching from the sidelines.  And so, like, the details and

21    stuff, I -- it's -- it wasn't for me to decide.

22              MR. PANG:  And you would be able to apply all of the

23    law that Judge Birotte would instruct you at the end of the

24    trial and apply it only to the facts of this case; right?

25              PROSPECTIVE JUROR FRECHETTE:  Yeah.  He seems like a
```

04:22PM (line 5)
04:22PM (line 10)
04:22PM (line 15)
04:22PM (line 20)
04:23PM (line 25)

1    great guy.

2                 MR. PANG:  Indeed.

3                 THE COURT:  Clearly my relatives got my check.

4                 MR. PANG:  Thank you, Your Honor.

04:23PM    5    THE COURT:  Mr. Brown, any follow-up questions?

6                 MR. BROWN:  Yes, Your Honor.

7                 THE COURT:  Go ahead.

8                 MR. BROWN:  Mr. Frechette, thank you.

9                 When the Court first inquired, you used the word --

04:23PM    10   I lost faith in the criminal justice system or I lost faith in

11   the system.  Do you remember saying that?

12                PROSPECTIVE JUROR FRECHETTE:  Yes.

13                MR. BROWN:  What did you mean by that?

14                PROSPECTIVE JUROR FRECHETTE:  I think in just that

04:23PM    15   particular instance, I think everything is kind of its own

16   situation.  And that definitely made me lose a little bit of

17   faith because I wanted it to go a certain way obviously.

18                MR. BROWN:  And the concern was that the person you

19   thought was guilty was -- was found not guilty or released.

04:23PM    20   PROSPECTIVE JUROR FRECHETTE:  Correct.  Yes.

21                MR. BROWN:  And you said you lost faith.  Is that

22   because you feel that people who are accused of crimes may have

23   too many rights or that somehow it's a game?  What do you mean?

24   Could you expand on that?

04:24PM    25   PROSPECTIVE JUROR FRECHETTE:  No, I don't think it's

1    a game, especially when it's talking about potentially putting

2    someone -- you know, taking away their freedom.  I think it's

3    something you have to take very seriously.

4         And I just wanted to be -- I was just trying to be

04:24PM    5    honest with the questions and just how I was feeling about

6    them.  But I -- I wouldn't say that I think that the whole

7    system is -- you know, needs to be torn down or anything like

8    that.  I just felt that particular instance was just something

9    I would have liked to see something else happen.

04:24PM    10         MR. BROWN:  Understood.

11         Thank you, Mr. Frechette.

12         PROSPECTIVE JUROR FRECHETTE:  You're welcome.

13         THE COURT:  Thank you, Mr. Frechette.  Just step

14    outside.  We're working here.  All right?  Thank you.

04:24PM    15         If we can bring Ms. Gottesfeld back, I think it's

16    Juror 34.

17         (In the presence of Prospective Juror No. 34:)

18         THE COURT:  Ms. Gottesfeld, why don't you step to

19    the lectern.  And then you can tell your husband that you've

04:25PM    20    been at a court lectern probably more times than he has.

21         PROSPECTIVE JUROR GOTTESFELD:  Yes, if he does his

22    job right.

23         THE COURT:  Right.  Exactly.

24         So, look, I wanted to follow up and wanted to do it

04:25PM    25    in more of a semi-private setting.  You know, you seem like,

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 04:25PM | 5 |

1   you know, a reasonable person, wants to, you know, do the right

2   thing.  But this incident that happened recently with your

3   friend -- I guess I'm trying to make sure I understand, you

4   know.

5          Is that just too much for you in connection with

6   hearing a case like this?

7          PROSPECTIVE JUROR GOTTESFELD:  Yeah.  It was a

8   family member.  So --

9          THE COURT:  Okay.

04:26PM  10          PROSPECTIVE JUROR GOTTESFELD:  Yeah.  I mean --

11   yeah, I mean, it was because it was oxy and she basically

12   killed herself because she couldn't get more of it so --

13          THE COURT:  Okay.  Mr. Pang, any follow-up

14   questions?

04:26PM  15          MR. PANG:  Hello, Ms. Gottesfeld.  I'm sorry to hear

16   about your loss.

17          PROSPECTIVE JUROR GOTTESFELD:  Thank you.

18          MR. PANG:  Do you understand that if you were

19   selected to be a juror in this case, that, um, what's important

04:26PM  20   are the facts and the law and not your emotions?  And that's

21   true of every juror that kind of goes through this very

22   unpleasant process.

23          PROSPECTIVE JUROR GOTTESFELD:  Yeah.

24          MR. PANG:  Do you understand that?

04:26PM  25          PROSPECTIVE JUROR GOTTESFELD:  Yeah.

1          MR. PANG:  And would you be able to set aside your

2     emotions, even strong emotions, in service of being a juror and

3     evaluate only the facts that are presented in trial, not

4     involving your family, not involving the media, not involving

04:27PM  5     anything else outside of the four walls of this courtroom, and

6     applying those facts strictly to the elements of the law that

7     Judge Birotte will give you at the end of this trial?

8          PROSPECTIVE JUROR GOTTESFELD:  Yes.  I think so.

9          MR. PANG:  Based on your information that you could

04:27PM 10     put aside your strong emotions, however strong they could be,

11     could you be a fair and impartial juror just as to the facts of

12     this case, not involving your cousin and not involving anyone

13     else outside of the four walls of this courtroom?

14          PROSPECTIVE JUROR GOTTESFELD:  I think so.

04:27PM 15          MR. PANG:  Thank you.

16          THE COURT:  Mr. Brown.

17          MR. BROWN:  Good afternoon, Ms. Gottesfeld.  I'm

18     sorry -- again, sorry for your loss.

19          PROSPECTIVE JUROR GOTTESFELD:  Thank you.

04:27PM 20          MR. BROWN:  You seem really upset by what you've

21     just described, the loss of a close family member.  Is that

22     fair to say?

23          PROSPECTIVE JUROR GOTTESFELD:  Yeah.  It was like my

24     mother-in-law's basically sister growing up and I saw her get

04:27PM 25     the phone call that she killed herself.  Like, it was about two

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 04:28PM | 5 |

weeks ago, so it's just very fresh.

MR. BROWN:  Sounds incredibly fresh.

Your Honor, does the Court need me to inquire further?

THE COURT:  It's up to you.  It's up to you.

MR. BROWN:  We represent Ms. Todorova.  She's accused of selling oxys that contained fentanyl.  The charges are incredibly serious.

Do you think based on what you've experienced in the last two weeks would affect your ability to look at the facts and the allegations in this case with clear eyes?

PROSPECTIVE JUROR GOTTESFELD:  Um, I think I would try my best.  That's obviously -- you know --

MR. BROWN:  You seem a little reluctant, though.  I mean, is that fair to say?

PROSPECTIVE JUROR GOTTESFELD:  Yeah.  I think given the recency of, you know -- I mean --

MR. BROWN:  I'm sorry to inquire in such a way.

PROSPECTIVE JUROR GOTTESFELD:  No, no.  I appreciate it.  But, yes, I would do my best and I understand that it's a different person in the situation.

MR. BROWN:  Thank you.

PROSPECTIVE JUROR GOTTESFELD:  Yeah.

MR. BROWN:  Thank you very much, Your Honor.

THE COURT:  Anything further, Mr. Pang?

**UNITED STATES DISTRICT COURT**

1                  MR. PANG:  No, Your Honor.

2                  THE COURT:  All right.  Thank you, Ms. Gottesfeld.

3     Appreciate it.

4                  PROSPECTIVE JUROR GOTTESFELD:  Thank you,

04:29PM  5     Your Honor.

6                  THE COURT:  All right.  Ms. Salguero.

7                      (In the presence of Prospective Juror No. 37:)

8                  THE COURT:  I'm sorry.  Ms. -- oh, okay.

9                  Ms. Salguero, thank you.  Just wanted some follow-up

04:29PM 10     questions here.

11                 You had some experiences, negative experiences

12     dealing with -- at least according to my notes, you have drug

13     overdoses.

14                 Do you think that you could sit as a -- set aside

04:30PM 15     those experiences, listen to the evidence in this case, and be

16     fair to both sides?

17                 PROSPECTIVE JUROR SALGUERO:  Um, I don't know just

18     because with my uncle's situation, like, it just never got

19     resolved.  So I don't know if the people that did that to him

04:30PM 20     are still out there doing the same thing.

21                 THE COURT:  Got it.  Okay.

22                 So you think it would be difficult, then, to try to

23     be fair to either side in the case?

24                 PROSPECTIVE JUROR SALGUERO:  Probably.

04:30PM 25                 THE COURT:  Okay.  Okay.  Mr. Pang?

1          MR. PANG:  Um, hello.

2          PROSPECTIVE JUROR SALGUERO:  Hi.

3          MR. PANG:  You mentioned that you wouldn't be sure

4 whether you could be fair to either side; right?

04:30PM   5          I want to kind of mention some of the points you

6 made kind of before in front of the other jurors.  I believe

7 you said that it would be difficult for you to have sympathy

8 because of your uncle's situation.

9          PROSPECTIVE JUROR SALGUERO:  Uh-huh.

04:31PM  10          MR. PANG:  I know we're in a weird situation here

11 because it's -- you haven't heard any of the facts or the

12 evidence, but I think that's the point, you haven't heard any

13 of the facts or the evidence.

14          One of the instructions I expect the judge will give

04:31PM  15 you at the end of this trial is that you are not to consider

16 sympathy, malice, anger, kind of those visceral emotional

17 feelings when rendering a judgment in this case.

18          Is that something that you would be able to do, to

19 set aside your feelings and only look at the evidence -- and

04:31PM  20 that would be witness testimony, documents, any agreements by

21 the parties -- and apply them only to the law as Judge Birotte

22 will give you and not bring in other things like sympathy or

23 emotions in rendering a judgment if you were to be selected in

24 this case?

04:31PM  25          PROSPECTIVE JUROR SALGUERO:  Possibly, but I -- I

        1    feel like in the back of my mind, I would still have that

        2    iffiness.

        3            MR. PANG:  And that would be true even if the Court

        4    instructed you that -- because the Court is the arbiter of law,

04:32PM  5    he's responsible for the law, you're just responsible for the

        6    facts.

        7            So if the Court instructed you that you're only to

        8    consider the facts and decide kind of the factual disputes in

        9    the case and apply only the facts as the Court admits into

04:32PM 10    court, is that something you think you could do fairly and

       11    impartially?

       12            PROSPECTIVE JUROR SALGUERO:  Yes.

       13            MR. PANG:  Okay.  Thank you.

       14            THE COURT:  Mr. Brown?

04:32PM 15            MR. BROWN:  Thank you very much, Your Honor.

       16            And good afternoon, Ms. Salguero.

       17            PROSPECTIVE JUROR SALGUERO:  Good afternoon.

       18            MR. BROWN:  I don't want to, like, loom over you.

       19    Is it okay if I sit?

04:32PM 20            PROSPECTIVE JUROR SALGUERO:  Yeah.

       21            MR. BROWN:  Okay.  You said that -- when the Court

       22    first inquired, that you did not know if you could be fair

       23    because of what happened with unresolved issues with your uncle

       24    and his drug use.  Do you recall that?

04:32PM 25            PROSPECTIVE JUROR SALGUERO:  Yes.

```
 1              MR. BROWN:  What did you mean by that?  What issues

 2    were unresolved?  And why did you feel that you couldn't be

 3    fair?

 4              PROSPECTIVE JUROR SALGUERO:  Just because the --

 5    with his whole situation, nobody was caught, nobody was charged

 6    with anything.  So it just makes me think, like, okay, if

 7    someone is charged and not guilty, what if they do it again?

 8              MR. BROWN:  Uh-huh.  And you feel that -- because of

 9    your uncle's situation, that you feel that somebody should have

10    been brought to -- brought to answer to that?

11              PROSPECTIVE JUROR SALGUERO:  Someone should have

12    admitted to what they did.

13              MR. BROWN:  Okay.  What if the facts told a

14    different picture of what you thought that they were?  Do you

15    think that you could look at those facts clearly?  Or you

16    mentioned something -- this inkling in the back of your mind.

17    What is that thought in the back of your mind, that reservation

18    that you have about being fair?

19              PROSPECTIVE JUROR SALGUERO:  Um, I don't know how to

20    describe it.

21              MR. BROWN:  Try, if you don't --

22              PROSPECTIVE JUROR SALGUERO:  Um, just I guess my

23    main concern is what if, like, people are lying just to get

24    away with it or things like that?

25              MR. BROWN:  Uh-huh.  So do you think if someone is
```

**UNITED STATES DISTRICT COURT**

```
 1   accused of a crime and they are -- have -- insisted on pleading

 2   not guilty, that perhaps they could be making up a story to

 3   avoid having to answer for what they've been accused of?

 4           PROSPECTIVE JUROR SALGUERO:  Yes.  Just because in

 5   school when I was -- because I majored in criminal justice.  So

 6   when we learned about it, it seems that what -- from what I've

 7   learned, some people plead guilty just so they can be let off

 8   with a less case or some people plead not guilty just to see if

 9   they can get other people to back them up.

10           MR. BROWN:  And --

11           THE COURT:  I'm sorry.  Anything further, Mr. Brown?

12           MR. BROWN:  I don't think so, Your Honor.  No.

13   Thank you.

14           THE COURT:  Mr. Pang, anything further?

15           MR. PANG:  No, Your Honor.

16           THE COURT:  Thank you, ma'am.  Appreciate it.  We'll

17   be back with you shortly.

18           PROSPECTIVE JUROR SALGUERO:  Thank you.

19           THE COURT:  And then I think last but not least, was

20   it Ms. Arredondo?

21           Mr. Brown, I think you wanted me to inquire of

22   Ms. Arredondo, Juror Number 48?

23           MR. BROWN:  Yes, Your Honor.  Thank you, Your Honor.

24               (In the presence of Prospective Juror No. 48:)

25           THE COURT:  Hi, Ms. Arredondo.
```

04:34PM (line 5)
04:34PM (line 10)
04:34PM (line 15)
04:34PM (line 20)
04:35PM (line 25)

1          PROSPECTIVE JUROR ARREDONDO:  Yeah.

2          THE COURT:  I wanted to follow up a little bit, if I

3    could.

4          You had indicated that you -- that there have been

04:36PM  5    some drugs involving your father; correct?

6          PROSPECTIVE JUROR ARREDONDO:  Yeah.

7          THE COURT:  And the question that we have -- the

8    ultimate question that I have for you is that -- do you think

9    that the experience that you had to deal with with your dad,

04:36PM  10   would you be able to set those aside, listen to the evidence in

11   this case, and decide with your fellow jurors whether or not

12   the Government has proved its case?

13         PROSPECTIVE JUROR ARREDONDO:  I do think it will be

14   a bit difficult just because I'm currently dealing with it.

04:36PM  15         THE COURT:  Got it.

16         PROSPECTIVE JUROR ARREDONDO:  I'm recently estranged

17   from my dad.

18         THE COURT:  Go ahead.  I'm sorry.  I didn't mean to

19   interrupt you.

04:36PM  20         PROSPECTIVE JUROR ARREDONDO:  No, no, that's okay.

21         So, yeah, like hearing some of the things that were

22   talked about does bring up some feelings for me.

23         THE COURT:  And do you think it would be

24   difficult -- would you make assumptions of guilt or innocence

04:36PM  25   because of what -- what's going on with your father?

**UNITED STATES DISTRICT COURT**

1          PROSPECTIVE JUROR ARREDONDO:  Yeah.  Exactly.  I

2    think I'm already making assumptions based on my own

3    experiences.

4          THE COURT:  Okay.  Okay.  Mr. Pang?

04:37PM    5          MR. PANG:  No questions, Your Honor.

6          THE COURT:  All right.  Mr. Brown?

7          MR. BROWN:  Good afternoon.

8          What assumptions are you making?

9          PROSPECTIVE JUROR ARREDONDO:  Um, if I'm being

04:37PM    10   honest, um, it's -- I'm thinking that -- that she's probably

11   guilty.  Um, and I know that's -- I don't know anything about

12   the case.  I think it's just based off the situation with me

13   and my dad.

14         MR. BROWN:  Understood.  Thank you.

04:37PM    15         THE COURT:  All right.

16         MR. BROWN:  Thank you, Your Honor.

17         THE COURT:  All right.  Anything further, Mr. Pang?

18         MR. PANG:  No, Your Honor.

19         THE COURT:  All right.  Thank you, ma'am.  You can

04:37PM    20   step outside.  We'll be back with you shortly.  Okay?

21         PROSPECTIVE JUROR ARREDONDO:  Thank you.

22         THE COURT:  Thank you.

23         (Out of the presence of the prospective jurors:)

24         THE COURT:  Okay.  Look, based on what we've heard,

04:37PM    25   I don't think there's enough for a cause challenge for

|  | 1 | Mr. Ruvalcaba, for Mr. Frechette.  I'm torn on Ms. Gottesfeld, |

Mr. Ruvalcaba, for Mr. Frechette.  I'm torn on Ms. Gottesfeld,

but I'm sure the Government feels very strongly the other way.

MR. PANG:  Yes, Your Honor.

THE COURT:  Ms. Salguero -- I'm inclined to grant

the for-cause challenge for her as well as Ms. Arredondo.

So, Mr. Pang, you can wax poetic and try to be less

loquacious than Mr. Gaspar about why Ms. Gottesfeld should

remain as a juror -- and, look, maybe this doesn't matter in

the end.  She said the right things.  You led her right down

the path.  And I'm not criticizing you for it.  You did what

you needed to do.

But that woman -- her body reaction showed something

different to the Court.  But don't get me wrong, she answered

the questions and I'm acknowledging that.  I have some

concerns.  And I'm not suggesting you're doing anything

untoward; I want to be clear on that.  Her body language

suggested something different.  A woman who's -- I'm not sure

exactly who this person is, but she was described as either

like a sister or sister to her mother-in-law.

MR. PANG:  I think like a sister to her mother -- or

like her mother --

THE COURT:  So like a sister to her mother-in-law is

like an aunt who got the call two weeks ago.  She said she

would try.

MR. PANG:  She would try.

                    THE COURT:  And maybe, you know -- and I don't -- I

don't dispute the fact that she will try, but I thought her

body language suggested something very different.  But --

                    MR. PANG:  Your Honor, you know, this is not to

04:39PM    suggest that people of a certain education are, like, smarter

or less smart or whatever.  But she's obviously a very

conscientious, smart, like, thoughtful person.  And she also

doesn't strike me as someone who would lie just to -- she

clearly does not want to be here -- right? -- just like most of

04:39PM    the jurors don't want to be here.

                    THE COURT:  But I think the difference is why.  I

mean, look, most jurors don't want to be here.

                    MR. PANG:  But, Your Honor, I think if I asked her,

Could you put aside your strong emotions and be fair and

04:40PM    impartial, I think if she truly believed she could not be fair

and impartial, she would have said no.  She clearly has no

hesitation.

                    THE COURT:  She said, I would try.

                    MR. PANG:  She said, I would try.  She said, I would

04:40PM    try.  But that was with regards to when Mr. Brown was kind of

discussing with her.  When I was talking with her and I

explained to her, it's your duty to put aside your emotions and

it's your duty to follow the law as Judge Birotte instructed,

she unequivocally said yes.

04:40PM                    So I think, once --

THE COURT:  But she also said in response to Mr. Brown's question about whether she can be impartial, she said, it would be hard but I would try.

MR. PANG:  I would try.

THE COURT:  So -- well, I mean, look --

MR. PANG:  I will submit on the latter two, Your Honor.  But as to Ms. -- as to her, Juror Number 34, I think she -- she said, as the Court said the magic words, that she can be fair and impartial.  I think she would not lie to us if she could not actually be fair and impartial.  And for those reasons, I would submit on that.

THE COURT:  All right.  Mr. Brown.

MR. BROWN:  Your Honor, I think here was a juror who was clearly distraught by the loss of a close family member.  The loss was fresh.  It was two weeks ago.  And I think the loss involved oxy -- oxycodone, Your Honor.

I think it's -- I don't think she is of the mental -- I don't think she's in a position to be fair and impartial, Your Honor, despite the Government's very leading questions and her, you know, one-word responses to that.  When probed further, Your Honor, it's clearly -- again, her physical reaction, she was near tears, her face appeared to be distraught from where I was sitting.

I don't think she can be a fair and impartial juror, given the nature of this case, the allegations in this case,

and her -- her recent tragedy, Your Honor, the recent pain.  I

think it's too close to home, Your Honor.

THE COURT:  All right.  Look, reasonable minds or

unreasonable minds could differ.  I'm going to remove

04:42PM  Ms. Gottesfeld for cause for the reasons that I articulated

earlier.

So Ms. Gottesfeld will be removed for cause.  Ms. --

of the new group, Ms. Arredondo will be removed for cause, and

Ms. Salguero will be removed for cause.

04:42PM  If my math is right, we have 39 jurors left, if my

math is right, because we've excused 11.

MR. PANG:  Your Honor, I believe we maybe have

struck 12.  Oh, Juror Number 75, that was the one who had the

drug addiction.

04:43PM  THE COURT:  Oh, right.  But I'm not -- yeah, so --

MR. PANG:  I think we're squared.

THE COURT:  So 39; right?  We excused 11.  39 left.

MR. PANG:  Correct.  I believe she's outside of the

first 50.  So 39 left.

04:43PM  THE COURT:  And if you were to use all -- what is

it? -- 16 peremptories between the two of you?

MR. PANG:  We'll have a jury.

THE COURT:  We could -- right.

MR. PANG:  Yes.

04:43PM  THE COURT:  We'd still be a number -- so let's go

|      | 1  | through the peremptories now.  You can pick them out of the |
|      | 2  | remaining 40, and the first 12 will be our jurors. |
|      | 3  | So the Government gets the first peremptory. |
|      | 4  | So just so we're clear, you can pick -- you can do a |
| 04:43PM | 5  | peremptory out of anyone from the 1 through 50.  However -- |
|      | 6  | MR. PANG:  Outside of 13 to 18 because those are the |
|      | 7  | alternates. |
|      | 8  | THE COURT:  19 through 22. |
|      | 9  | MR. PANG:  19 to 22. |
| 04:43PM | 10 | THE COURT:  Right.  19, 20, 21, 22 are the |
|      | 11 | alternates.  Okay? |
|      | 12 | You can do a peremptory out of any of the remainder |
|      | 13 | of the group.  But after all the peremptories are done, I will |
|      | 14 | pick the first 12.  And then we'll go to the alternates.  And |
| 04:44PM | 15 | each side gets one strike of the alternate, and I'll replace |
|      | 16 | them with the remaining pool of jurors.  Okay?  Does that make |
|      | 17 | sense? |
|      | 18 | MR. PANG:  Yes. |
|      | 19 | THE COURT:  Does that make sense, Mr. Brown? |
| 04:44PM | 20 | MR. BROWN:  Yes, Your Honor. |
|      | 21 | THE COURT:  Okay.  So with that, the first |
|      | 22 | peremptory -- I'd like to do this now only because it's a |
|      | 23 | quarter to 5:00 and I'd like to not ask this jury to come back |
|      | 24 | tomorrow because I suspect there will be at least 70 people |
| 04:44PM | 25 | that will be very upset with all of us. |

UNITED STATES DISTRICT COURT

1          MR. PANG:  Indeed.

2          THE COURT:  So first peremptory with the Government.

3          MR. PANG:  We would ask the Court -- well, they're

4     not here.  Juror Number 13, Your Honor.

04:44PM   5          THE COURT:  Juror Number 13 is -- help me with

6     the -- I'm sorry.  Is that Ms. Petrina Haghverdian?

7          MR. PANG:  Yes, Your Honor.

8          THE COURT:  Okay.  So that's the first peremptory.

9          Next two peremptories are with the defense.

04:45PM   10         MR. BROWN:  Your Honor, we would respectfully ask

11    the Court to thank and excuse Juror Number 8 and Juror

12    Number 17.

13         THE COURT:  Juror Number 8, Mr. Nguyen; Juror

14    Number 17, Mr. Ruvalcaba.

04:45PM   15         And if both sides pass, I'll stop then.

16         So next peremptory with the Government.

17             (Pause in the proceedings.)

18         MR. PANG:  Your Honor, the Government would move to

19    strike Juror Number 16.

04:46PM   20         THE COURT:  Juror Number 16, Mr. Gaspar.

21         Next two peremptories are with the defense.

22         MR. BROWN:  Your Honor, we would respectfully

23    request that the Court thank and excuse Juror Numbers --

24    Number 7.

04:46PM   25         THE COURT:  Number 7, Mr. Lo.

|    |    |
|----|----|
| 1  | MR. BROWN:  Yes, Your Honor.  And Juror Number 30 -- |
| 2  | THE COURT:  Mr. Frechette? |
| 3  | MR. BROWN:  Yes, Your Honor. |
| 4  | THE COURT:  That's Juror Number 31. |
| 04:46PM 5 | MR. BROWN:  Yes, Your Honor.  Thank you. |
| 6  | THE COURT:  All right.  Next peremptory with the |
| 7  | Government. |
| 8  | MR. PANG:  I'm sorry, Your Honor.  That was Mr. Lo |
| 9  | and -- |
| 04:47PM 10 | THE COURT:  Mr. Lo.  I think he was Number 7. |
| 11 | MR. PANG:  Yes, Your Honor. |
| 12 | THE COURT:  And Mr. Frechette was Number 31. |
| 13 | MR. PANG:  Mr. -- 31.  Understood.  Thank you. |
| 14 | THE COURT:  The one who thought I was a great guy, |
| 04:47PM 15 | just so the record is clear. |
| 16 | MR. PANG:  Um, Your Honor, we would move to excuse |
| 17 | Juror Number 28. |
| 18 | THE COURT:  Juror Number 28, Ms. Young. |
| 19 | MR. PANG:  Yes, Your Honor. |
| 04:47PM 20 | THE COURT:  All right.  Juror Number 28.  Okay. |
| 21 | Next two with the defense. |
| 22 | MR. BROWN:  Yes, Your Honor.  The defense would |
| 23 | respectfully request that the Court thank and excuse Juror |
| 24 | Number 11. |
| 04:47PM 25 | THE COURT:  Juror Number 11, Ms. Chambers. |

|   |   |
|---|---|
| 1 | MR. BROWN:  Yes, Your Honor. |
| 2 | And may I have one moment, Your Honor? |
| 3 | THE COURT:  Yes. |
| 4 | (Pause in the proceedings.) |

04:49PM  5    THE COURT:  Just so that everyone is clear, just --
6    I want to make sure.  By my count currently, the last -- if
7    both sides were to stop, we're at -- the last juror would be
8    Juror 26.  I just want to make sure we're all on the same page.
9    MR. PANG:  Yes, Your Honor.
04:49PM  10    THE COURT:  Okay.
11    MR. BROWN:  And, Your Honor, did we already strike
12    Mr. Goodman?
13    THE COURT:  No.  We haven't dealt with the
14    alternates yet.
04:49PM  15    MR. BROWN:  Understood.
16    And if I -- just to be clear on the Court's rulings,
17    if I pass, am I done with strikes?
18    THE COURT:  Well, if you pass -- I mean, if you pass
19    this time, fine.  You lose that challenge.  You can't hold --
04:49PM  20    and if the Government passed, then we're done.  If both sides
21    pass, then we're done.
22    MR. BROWN:  Understood.
23    THE COURT:  But if the Government strikes someone
24    next, then you'd go on to your next peremptory.  But you
04:49PM  25    can't -- you lose the one that you just -- if you pass now.

```
 1              MR. BROWN:  Understood, Your Honor.

 2              We would accept the jury as currently impaneled.

 3              THE COURT:  So there's a pass, okay, on that.

 4              The Government now has its fourth peremptory.

 5                  (Pause in the proceedings.)

 6              MR. PANG:  Your Honor, the Government would move to

 7      excuse Juror Number 25.

 8              THE COURT:  Juror Number 25, Ms. Kelly.

 9              MR. PANG:  Yes, Your Honor.

10              THE COURT:  Okay.  Next peremptory -- next two

11      peremptories with the defense.

12              MR. BROWN:  Your Honor, we would accept the jury as

13      impaneled.

14              THE COURT:  Okay.

15              MR. PANG:  The Government also accepts the jury as

16      impaneled, Your Honor.

17              THE COURT:  Okay.  Just so we're clear, the last of

18      the 12 jurors would be Ms. Romero.  Is that -- is everyone on

19      the same page?

20              MR. PANG:  Yes.

21              THE COURT:  And I can read the names 1 through 12.

22              MR. BROWN:  It's okay, Your Honor.

23              THE COURT:  Just in an abundance of caution --

24              MR. PANG:  Your Honor, can we have one more minute

25      to deliberate?
```

04:50PM (line 5)
04:51PM (line 10)
04:51PM (line 15)
04:52PM (line 20)
04:52PM (line 25)

```
1          THE COURT:  Before you accept, even though you just

2    did?

3          MR. PANG:  I apologize.

4          MR. BROWN:  Is this some --

5          THE COURT:  Is this a mulligan or --

6          MR. PANG:  Yes, I apologize.  I misunderstood.

7          THE COURT:  Okay.

8              (Pause in the proceedings.)

9          MR. PANG:  I apologize, Your Honor.  I misunderstood

10   my colleagues.

11         We would move to -- I think we're still okay; right?

12   We would move to dismiss Juror Number 23.

13         THE COURT:  Number 23, Ms. Vargas.

14         MR. PANG:  Yes, Your Honor.

15         THE COURT:  Okay.  So the next -- the defense has

16   one -- the defense has -- the defense has the next peremptory.

17   It's just one.

18         MR. BROWN:  Your Honor, the defense accepts the jury

19   as impaneled.

20         THE COURT:  Okay.  All right.  The Government, you

21   have your last peremptory.

22         MR. PANG:  We accept -- I apologize.  We accept the

23   jury as impaneled, Your Honor.

24         THE COURT:  Should I ask you who you think the last

25   juror is, to make sure?
```

04:52PM (line 5)
04:52PM (line 10)
04:53PM (line 15)
04:53PM (line 20)
04:53PM (line 25)

1          MR. PANG:  Juror Number 30?

2          THE COURT:  You get the gold star.  Yes.

3    Ms. Ramirez; right?  Do you have Ms. Ramirez as your last

4    juror?

04:53PM    5          MR. BROWN:  Yes, Your Honor.  My distinguished

6    colleagues are --

7          THE COURT:  Yeah.  That's why I was looking at

8    Ms. Veral because I know she got it right.

9          Just so the record is clear, Juror Number 1,

04:54PM   10    Mr. Arana; Juror Number 2, Mr. Rivera; Juror Number 3,

11    Mr. Reeves; Juror Number 4 is Ms. Escobar; Juror Number 5 is

12    Ms. Tchekmedyian; Juror Number 6 is Ms. Sanchez; Juror Number 7

13    is Mr. Conrad; Juror Number 8 is Ms. Gritman; Juror Number 9 is

14    Mr. Alvarado; Juror Number 10 is Ms. Palencia; Juror Number 11

04:54PM   15    is Ms. Romero; Juror Number 12 is Ms. Ramirez.  Okay?  So that

16    will be the 12.

17          Now, each side gets one peremptory -- let's hear

18    for-cause challenges first with respect to our alternates.  And

19    just so you know, the alternates will be backfilled by the

04:55PM   20    remaining jurors on the list.

21          So any challenges for cause from the Government with

22    respect to the alternates?

23          MR. PANG:  Um, Your Honor, the Government would move

24    to dismiss for cause Juror Number 22.  I believe that's

04:55PM   25    Ms. Schwenke.

|  |  |  |
|---|---|---|
|  | 1 | THE COURT: Ms. Schwenke. |
|  | 2 | MR. PANG: She indicated that she could not be fair |
|  | 3 | because she's currently a school counselor and she has students |
|  | 4 | who have both been addicted to drugs and charged with crimes |
| 04:55PM | 5 | and, therefore, would have too much sympathy towards them. |
|  | 6 | And -- |
|  | 7 | THE COURT: And I think she said may not be fair. |
|  | 8 | MR. PANG: Yes. Quote, "could not be fair." |
|  | 9 | THE COURT: Mr. Brown. |
| 04:56PM | 10 | MR. BROWN: Your Honor, I -- I did not get that |
|  | 11 | impression from this prospective juror. I know it's late in |
|  | 12 | the hour, but perhaps a short further inquiry, attempt to |
|  | 13 | rehabilitate her with respect to that, your Honor. |
|  | 14 | THE COURT: Okay. I'll consider that. |
| 04:56PM | 15 | Any other challenges for cause from the -- for the |
|  | 16 | alternates, from the Government's perspective? |
|  | 17 | MR. PANG: No. Just Ms. Schwenke for the |
|  | 18 | Government, Your Honor. |
|  | 19 | THE COURT: From the defense, any challenges for |
| 04:56PM | 20 | cause? |
|  | 21 | MR. BROWN: Yes, Your Honor. Prospective Juror |
|  | 22 | Number -- Alternate Number 19, Mr. Goodman. |
|  | 23 | THE COURT: Okay. |
|  | 24 | MR. BROWN: I believe he's got some serious health |
| 04:56PM | 25 | issues. He says he's suffering from angina, can't sit for long |

**UNITED STATES DISTRICT COURT**

1    periods of time, and indicated that he didn't think he could be

2    fair with respect to the nature of the charges in this case,

3    Your Honor.

4            THE COURT:  Right.  What's the Government's

5    position?

6            I'm less concerned about -- well, I shouldn't say

7    I'm less concerned.  I am concerned about his health

8    conditions, but I think those might be remedied with breaks,

9    et cetera.  But he did make some statements that seemed if he

10   might -- that he might have some difficulty being fair and

11   impartial.

12           But, Mr. Pang, I'm sure you can lead him right back

13   to the promised land if --

14           MR. PANG:  Well, Your Honor, you know, Ms. Schwenke

15   said, quote, "I'm afraid I cannot be fair."  But it seems like

16   we should be applying the rules fairly.

17           But I would submit on Mr. Goodman.  I think we can

18   dismiss him.

19           THE COURT:  All right.  So Mr. Goodman will be

20   excused for cause.

21           All right.  Any other challenges for cause with

22   respect to the alternates?

23           MR. BROWN:  Not from the defense, Your Honor.

24           MR. PANG:  No, Your Honor.  I think -- assuming

25   Mr. Goodman -- is that who's the next one?

04:57PM (lines 5, 10, 15, 20, 25)

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  The next person would be Mr. Scott.

 2    Let's -- I'm going to bring in Ms. Schwenke very quickly just

 3    to -- and then we'll with --

 4              MR. PANG:  No one else from the Government,

 5    Your Honor.

 6              THE COURT:  Okay.  Let's bring in Ms. Schwenke.

 7                   (In the presence of Prospective Juror No. 22:)

 8              THE COURT:  Come on down, Ms. Schwenke.  If you can

 9    step to the lectern.

10              PROSPECTIVE JUROR SCHWENKE:  Okay.

11              THE COURT:  I know it's late and I apologize, but I

12    wanted to just follow up.

13              You know, look, it's a new day, right, as you've

14    been experiencing.  And the question I have is:  Do you think

15    you would be able to set aside the experiences that you've been

16    having or have had with your students and the issues that

17    they're going through and be able to listen to a case like this

18    that does involve the allegations of drugs?  Do you think you'd

19    be able to set that aside and listen to the evidence and decide

20    the case fairly and impartially or not?  Just an honest

21    question.

22              PROSPECTIVE JUROR SCHWENKE:  Right.  I understand.

23    I was kind of trying to talk myself into it that I could.  But

24    as the defendant kind of introduced herself to us as the

25    defendant and when I see her, I see my students.
```

|  |  |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 04:59PM | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 05:00PM | 10 |

1    THE COURT:  Got it.  Okay.

2    PROSPECTIVE JUROR SCHWENKE:  And at this point, I

3  think I'm probably unduly sympathetic.

4    THE COURT:  Got it.

5    PROSPECTIVE JUROR SCHWENKE:  It's not -- it's not

6  probably the correct way of thinking.

7    THE COURT:  It's not a function of correctness or

8  not.  It's honest.  And honesty is all I ask.  So as far as I'm

9  concerned, that is the -- that is the answer that we need.  We

10  need a correct -- we need an honest answer from you, and that's

11  all I can ask.

12    Let me ask the Government, do you have any follow-up

13  questions?

14    MR. PANG:  Very briefly, Your Honor.

15    Hello.  Thank you for your honesty.  I appreciate

16  it.

17    You mentioned that when you see the defendant, you

18  see your students.  And how long have you been teaching, if you

19  can remind us -- or a counselor?

20    PROSPECTIVE JUROR SCHWENKE:  Well, I'm a tutor.  I

21  was teaching for many years.  I'm retired at the -- I was

22  teaching at the college level.  Now I've been a tutor for eight

23  years at Cypress College.

24    MR. PANG:  Eight years at Cypress College.  And

25  you've been a tutor.

1    And you mentioned, I believe, when you were speaking

2  with Judge Birotte earlier about how -- when you speak with

3  your tutored students, that they've kind of disclosed to you

4  how they've been suffering from drug addiction and even some

05:01PM  5  criminal charges; is that right?

6    PROSPECTIVE JUROR SCHWENKE:  Yes.

7    MR. PANG:  And I think I have this right, I wrote

8  down from you -- when he asked whether you could be fair, you

9  said, I'm afraid I cannot be fair.

05:01PM  10    PROSPECTIVE JUROR SCHWENKE:  Oh, I -- I'm not sure

11  if I said "fair," but I -- I'm --

12    MR. PANG:  What did you mean?

13    PROSPECTIVE JUROR SCHWENKE:  Maybe that I'm not -- I

14  don't have an objective balance.

05:01PM  15    MR. PANG:  You can't be objective in this case.

16    PROSPECTIVE JUROR SCHWENKE:  Because I'm very

17  sympathetic towards my students, and I see how hard they have

18  been working to overcome and to correct their situation.

19    MR. PANG:  And is that sympathy a strongly held

05:01PM  20  feeling?

21    PROSPECTIVE JUROR SCHWENKE:  At this point, it is.

22  Right.

23    MR. PANG:  And when you --

24    PROSPECTIVE JUROR SCHWENKE:  Because, again, this is

05:01PM  25  kind of new to me.  So, you know, their experiences are new to

1    me.  So I feel very sympathetic for their situations.

2          MR. PANG:  And when you see the defendant, you feel

3    that same sympathy, don't you?

4          PROSPECTIVE JUROR SCHWENKE:  Yeah.  She looks like

05:01PM    5    my students.

6          MR. PANG:  That's hard to give up for you, is it?

7          PROSPECTIVE JUROR SCHWENKE:  Yes.  It's hard to --

8    at this point, it is hard to be -- I would want to be

9    objective.  And as I was sitting there, I kept trying to

05:02PM   10    balance, but I -- I'm not quite balanced.

11          MR. PANG:  You're not quite balanced.

12          You also -- I think you started your conversation in

13    this little setting with us saying that you tried to talk

14    yourself into it.  And by that, I understood to mean that you

05:02PM   15    were starting with the presumption of sympathy for the

16    client -- for the defendant; right?

17          PROSPECTIVE JUROR SCHWENKE:  Um, right.  I think

18    when I came into the jury, I was objective.  But then when I

19    saw the defendant, I had these feelings of identifying with a

05:02PM   20    student.

21          MR. PANG:  And do you think that's going to kind of

22    be in the back of your mind?

23          PROSPECTIVE JUROR SCHWENKE:  Right.  I -- it's

24    really -- I'm so sorry.  But it's really hard -- I feel like,

05:03PM   25    you know, yes, I could listen to evidence, but I -- I may

|     |     |
| --- | --- |
| | 1 |

1    unduly give extra benefit of the doubt.  Does that --

2                   MR. PANG:  I understand.

3                   PROSPECTIVE JUROR SCHWENKE:  That's what I mean,

4    unduly sympathetic.

05:03PM  5         MR. PANG:  I understand.  Thank you.

6                   THE COURT:  Mr. Brown.

7                   MR. BROWN:  Thank you very much, Your Honor.

8                   Good afternoon.

9                   Do you recall when the -- the judge gave the

05:03PM  10   PowerPoint presentation about the presumption of innocence and

11   the burden of proof that the Government has to be held to?

12                  PROSPECTIVE JUROR SCHWENKE:  Uh-huh.

13                  MR. BROWN:  Is it fair to say that, when you look at

14   my -- our client, Ms. Todorova, you presume her to be innocent

05:03PM  15   in the eyes of the law?

16                  PROSPECTIVE JUROR SCHWENKE:  Yes.  That's the --

17                  MR. BROWN:  And is it fair to say that when you say

18   you're worried about the burden -- you know that the Government

19   has to prove her guilt beyond a reasonable doubt; correct?

05:04PM  20   PROSPECTIVE JUROR SCHWENKE:  Uh-huh.

21                  MR. BROWN:  And you're able to follow the law with

22   respect to the high burden that the Government has.  Is that

23   fair to say?  You can apply the law to the facts of this case?

24                  PROSPECTIVE JUROR SCHWENKE:  And I guess that's

05:04PM  25   where, um -- yes, I believe I would understand that.  But at

                1    this point --

                2              MR. BROWN:  At this point, you can't conclude that

                3    Ms. Todorova is guilty until you hear all of the evidence.

                4              PROSPECTIVE JUROR SCHWENKE:  Right.  And I would

05:04PM         5    want to -- let's see.  I'm very sorry.

                6              THE COURT:  You don't need to apologize at all.

                7              PROSPECTIVE JUROR SCHWENKE:  My feelings, it's kind

                8    of hard sometimes.  But I -- I just feel like my sympathy may

                9    outweigh my objectivity.

05:04PM        10              MR. BROWN:  Okay.  Well, if the judge instructs you

               11    that you're only to consider the facts of this case and the law

               12    of this case, would you be willing to put aside your -- your

               13    big heart and your sympathy for Ms. Todorova and look at this

               14    case with clear and objective eyes?

05:05PM        15              PROSPECTIVE JUROR SCHWENKE:  Those are good

               16    instructions.  And, yes, I would -- I would like to do that.

               17              MR. BROWN:  Thank you.

               18              PROSPECTIVE JUROR SCHWENKE:  But --

               19              THE COURT:  All right.  Anything further, Mr. Pang?

05:05PM        20              MR. PANG:  No, Your Honor.

               21              THE COURT:  All right.  Thank you, Ms. Schwenke.  We

               22    really appreciate it.  We'll be with you momentarily.  Let the

               23    jurors know we haven't forgotten about them.

               24              (Out of the presence of the prospective jurors:)

05:05PM        25              THE COURT:  Mr. Brown, this is your -- your turn to

wax poetically about why you think Ms. Schwenke should remain

on this jury.

MR. BROWN:  Your Honor, I think -- I think

Ms. Schwenke is a very kind person.  I think she appears to be

a very fair-minded person.  She indicated that she would do her

best to follow the law with respect to the facts and the law.

And I think the fact that she wants to hold the Government to

its burden and looks at my client with -- with -- through the

lens of the presumption of innocence, I think is a rare and

noble thing.  And she's precisely the kind of person who should

be on the jury and not be stricken for cause.

The fact that she expressed some sympathy should not

be a reason to exclude her from the jury, Your Honor.  And I

think --

THE COURT:  I guess where I have a slight

disagreement is when the sympathy, as she puts, outweighs her

objectivity.  I think that, to me, is a problem.  And, look, if

I'm doing my job right, both sides get upset at me.  So I think

on this one, I'm going to have to excuse her for cause.

I do think she's trying, but she's also being

honest, which is all we can ask.  And I think her statement

sympathy outweighing her objectivity would be problematic.  So

she'll be excused for cause.

MR. BROWN:  Thank you, Your Honor.

THE COURT:  So then if we excuse both her and

**UNITED STATES DISTRICT COURT**

1    Mr. Goodman for cause, then Mr. -- well, Mr. -- I want to go

2    with -- I'd like to go with four alternates for this trial.

3    Mr. Scott and Mr. Ornelas replace them.  So if there are no

4    other challenges for cause, each side gets one peremptory.

05:07PM    5         So first peremptory with the Government.

6         MR. PANG:  One moment, Your Honor.

7         THE COURT:  All right.  So the four alternates, so

8    that we're clear right now, are Mr. Scott, Mr. -- Ms. Oropeza,

9    Mr. Cerda, and Mr. Ornelas.

05:07PM    10        MR. PANG:  Your Honor, the Government would accept

11   the four alternates.

12        THE COURT:  Okay.  Defense, is there a challenge --

13   peremptory challenge?

14        MR. BROWN:  Yes, Your Honor, with respect to

05:08PM    15   alternate -- with the -- Number 20, Your Honor, Ms. Oropeza.

16        THE COURT:  Ms. Oropeza for the defense.  All right.

17        So then that person would be replaced -- Mr. Oropeza

18   would be replaced with Ms. Ashley Vasquez.  So the alternates

19   would be Mr. Raymond Scott, Ms. Ashley Vasquez,

05:08PM    20   Mr. Jaime Cerda, and Mr. Ornelas.  Does that comport with each

21   side's understanding?

22        MR. PANG:  Yes, Your Honor.

23        MR. BROWN:  Yes, Your Honor.

24        THE COURT:  Okay.  All right.  So what we're going

05:08PM    25   to do now is we're going to bring the jurors back.  I'm going

|      |   |
|------|---|
| 1    | to read the -- I guess the 16 names, have them stand, have them |
| 2    | be sworn, and then I'll excuse the rest of the panel.  All |
| 3    | right? |
| 4    | So let's bring in the jury, please. |
| 05:08PM 5 | (In the presence of the prospective jurors:) |
| 6    | THE COURT:  All right.  Well, I want to thank you |
| 7    | for your patience.  We were working here.  And hopefully this |
| 8    | will make sense at the end of all of this. |
| 9    | I'm going to read off certain names.  And if I read |
| 05:12PM 10 | your name, if you wouldn't mind, please stand up. |
| 11   | Mr. Arana, Mr. Rivera, Mr. Reeves, Ms. Escobar, |
| 12   | Ms. Tchekmedyian, Ms. Sanchez, Mr. Conrad, Ms. Gritman, |
| 13   | Mr. Alvarado, Ms. Palencia, Ms. Romero, Ms. Ramirez, Mr. Scott, |
| 14   | Ms. Vasquez, Mr. Cerda, and Mr. Ornelas.  Okay. |
| 05:13PM 15 | All right.  For those that have stood up, if you're |
| 16   | familiar with the movie *Willie Wonka and the Chocolate Factory*, |
| 17   | you received the golden ticket, you are going to be the jurors |
| 18   | in our case.  So we're going to have you sworn in at this time. |
| 19   | So if you'd please raise your right hand so you can be sworn. |
| 05:14PM 20 | THE COURTROOM DEPUTY:  Your response will be "I do." |
| 21   | Ladies and gentlemen of the jury, do you solemnly |
| 22   | swear that you will well and truly try the cause now before |
| 23   | this Court and a true verdict therein render according to the |
| 24   | evidence and instructions of the Court, so help you God? |
| 05:14PM 25 | THE JURORS:  (Collectively) I do. |

```
 1                THE COURTROOM DEPUTY:  Thank you.

 2                THE COURT:  All right.  So I want you guys to just

 3       remain standing just so we can get this organized.

 4                For those of you that were not called, not called,

 5       you need to come back tomorrow at 9:00 AM.  I'm just kidding.

 6       No.  Your jury service -- I just want to make sure you were

 7       paying attention.  That's all.  Your jury service has

 8       concluded.

 9                It is after hours.  So what I would ask you to do is

10       please take your nametags off.  You can leave them in your

11       respective chairs and our courtroom deputy will pick them up.

12                I want to thank you all for being here today, even

13       those of you that I didn't get to know through the voir dire

14       process.  You served a very important and vital role in our

15       system, and we all appreciate it.  And particularly given the

16       late hour, just circumstances were such that we needed to take

17       the extra time and that's why we took some time to try to get

18       this resolved so that you can leave and not have to come back

19       tomorrow.  So I want to thank you all.

20                So for those of you that I did not call, you are

21       excused.  Best of luck to you.  See you next time in jury

22       selection.  All right?  So thank you.

23                They're closed.  So just leave your badges in the

24       chairs.  Leave the badges in the chair -- yeah, we'll take care

25       of that for tomorrow.  So just leave your badges downstairs --
```

| | |
|---|---|
| 1 | I mean, your badges in the pews. |
| 2 | (Pause in the proceedings.) |
| 3 | THE COURT:  Okay.  So we're going to do just a quick |
| 4 | game of musical chairs here just so you know where you'll be |
| 05:16PM 5 | seated tomorrow.  So just bear with me for a second. |
| 6 | Ms. Escobar, if you could move over to be next to |
| 7 | Mr. Reeves. |
| 8 | Ms. Tchekmedyian, you'll go up top next to |
| 9 | Ms. Escobar. |
| 05:16PM 10 | And, Ms. Sanchez, if you'll follow Ms. Tchekmedyian. |
| 11 | Mr. Conrad, if you wouldn't mind, you'll be seated |
| 12 | at the first seat there. |
| 13 | And then, Ms. Gritman, if you could follow the next |
| 14 | chair. |
| 05:17PM 15 | Mr. Alvarado, if you could come on down and join us, |
| 16 | followed by Ms. Palencia and Ms. Romero and Ms. Ramirez. |
| 17 | Perfect.  Yep. |
| 18 | Okay.  We've got -- Mr. Scott, if you wouldn't mind |
| 19 | sitting up next to Ms. Sanchez. |
| 05:17PM 20 | Ms. Vasquez, you'll sit next to Mr. Scott up top. |
| 21 | Mr. Cerda is in his chair. |
| 22 | And, Mr. Ornelas, you'll be seated next to Mr. Cerda |
| 23 | down below. |
| 24 | Ma'am -- |
| 05:17PM 25 | UNIDENTIFIED PROSPECTIVE JUROR:  I'm sorry, |

**UNITED STATES DISTRICT COURT**

1    Your Honor.

2          THE COURT:  It's hard for me to hear.

3          UNIDENTIFIED PROSPECTIVE JUROR:  Since no one is

4    downstairs, should I have, like -- I needed to get

05:18PM    5    certification for today to get to another court to say that I

6    was here.  I'm not sure if they're closed downstairs.

7          THE COURTROOM DEPUTY:  Today we'll take attendance.

8    By tonight after 7:00 PM, the attendance sheet should update on

9    your jury portal.  And you can print that out and show that to

05:18PM    10    whoever you need to.

11          UNIDENTIFIED PROSPECTIVE JUROR:  Okay.  Thank you so

12    much.

13          THE COURT:  All right.  Thank you.  Good luck.

14          Have a seat, folks.  So this is where you'll be

05:18PM    15    seated for the remainder of the trial.  I'm sorry to keep you

16    here late.  But I wanted to just keep you here so that our

17    courtroom deputy can instruct you in the mornings where to

18    report to begin the trial.  He'll show you the entryway.

19    You'll be coming in through the back hallway to the jury room.

05:18PM    20    So when we're done for today, he'll show you where the jury

21    room is, how to get in and get out in the morning.

22          We're going to start tomorrow morning at 9:30.  It's

23    a little later than normal because I've got to talk with the

24    lawyers about some matters.  And what we anticipate the run of

05:18PM    25    the show will be, I'll give you some opening jury instructions,

UNITED STATES DISTRICT COURT

1    then you'll hear opening statements, and then we'll begin the

2    testimony.

3              I'll ask you to be here at 9:30 in the morning.  We

4    can't start unless you're all here.  So do your best to be here

05:19PM  5    on time, please.

6              You're going to hear me say this repeatedly during

7    the trial:  Please do not form or express any opinion about the

8    case until the matter is finally submitted to you.  Don't talk

9    with anyone about the case.  Don't allow anyone to talk to you

05:19PM 10    about the case.  And do not conduct any research of any kind on

11    any subject matter connected with the case.

12              We'll see you all tomorrow morning at 9:30.  Again,

13    I appreciate your patience dealing with us today.

14              THE COURTROOM DEPUTY:  All rise for the jury.

05:19PM 15              (Out of the presence of the jury:)

16              THE COURT:  Okay.  Why don't you have a seat.

17              So I'm going to ask if you could all be here

18    tomorrow at 8:45 in the morning just because I'm going to

19    hopefully have my opening jury instructions, want to give you a

05:20PM 20    chance to review them.  I don't think any of them are

21    necessarily controversial.  And then we'll print them out, get

22    them ready for all our jurors.  And then I'll give the opening

23    instructions and then opening statements by one or both sides,

24    and then we'll start with the testimony.

05:20PM 25              I'm assuming the Government knows, have your

1  witnesses ready and let's keep them going as -- as fluidly as

2  possible.

3          Any issues that we need to discuss before we break

4  for this evening, from the Government's perspective?

05:21PM  5          MR. PANG:  Not from the Government, Your Honor.

6          THE COURT:  Mr. Brown, anything that we need to

7  discuss?

8          MR. BROWN:  Your Honor, just to -- just one quick

9  issue with respect to showing an exhibit during opening, if the

05:21PM  10  Court has any standing objections to that.

11          THE COURT:  Well, I mean -- well, if you've shown it

12  to Government counsel and there's no objection from the

13  Government, then -- you know, if you want to show an exhibit in

14  opening, that's fine.

05:21PM  15          MR. BROWN:  Thank you, Your Honor.  I'll discuss it

16  with Government counsel.

17          THE COURT:  Anything further?

18          MR. BROWN:  No, Your Honor.

19          THE COURT:  All right.  So we'll see you all

05:21PM  20  tomorrow at 8:45.  Thanks.  Have a good night.

21          MR. BROWN:  Thank you, Your Honor.

22              (Proceedings adjourned at 5:21 PM.)

23

24

25

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5

6              I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17              DATED THIS 17TH DAY OF APRIL, 2025.

18

19

20              /S/ MYRA L. PONCE
     _____
21      MYRA L. PONCE, CSR NO. 11544, CRR, RDR
             FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

**UNITED STATES DISTRICT COURT**